ORIGINAL



NAME KEVIN GUNN
*Pro-Persona*
PRISON NUMBER P-78894


CURRENT ADDRESS OR PLACE OF CONFINEMENT
*Chuckawalla Valley State Prison*
P.O. Box 2349
CITY, STATE, ZIP CODE
*Blythe, Ca 92226*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

KEVIN ORLANDO GUNN
*Pro-Persona*                    ,
(FULL NAME OF PETITIONER)
                              **PETITIONER**

        v.

                              ,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

                        **RESPONDENT**
        and
JERRY BROWN
                              ,
The Attorney General of the State of
California, Additional Respondent.

'08 CV 0972 LAB WMc

Civil No _____
        (TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**EVIDENTIARY HEARING REQUESTED**

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ___ No
COPIES SENT TO
Court ___ Pros. ___

FILED
MAY 2 7 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1. Name and location of the court that entered the judgment of conviction under attack:
   SUPERIOR COURT OF SAN DIEGO COUNTY

2. Date of judgment of conviction: MAY 26, 2000

3. Trial court case number of the judgment of conviction being challenged:
   SCD144476

4. Length of sentence: 17 YEARS

CIV 68 (Rev. Jan. 2006)

cv

**5.** Sentence start date and projected release date:
MAY 26, 2000, Oct 08 2015

**6.** Offense(s) for which you were convicted or pleaded guilty (all counts):
Penal Code 211 2 Counts

**7.** What was your plea? (CHECK ONE)

    (a) Not guilty     ☒

    (b) Guilty        ☐

    (c) Nolo contendere ☐

**8.** If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)

    (a) Jury         ☒

    (b) Judge only    ☐

**9.** Did you testify at the trial?

    ☐ Yes  ☒ No

## DIRECT APPEAL

**10.** Did you appeal from the judgment of conviction in the **California Court of Appeal**?

    ☒ Yes ☐ No

**11.** If you appealed in the **California Court of Appeal**, answer the following:

    (a) Result: D035782-Rev. In Part, Remanded W/Directions
            D041821-Affd.

    (b) Date of result (if known): D035782-01-08-02, D041821-05-20-04

    (c) Case number and citation (if known): See (b) above

    (d) Names of Judges participating in case (if known): D035782, McDONALD, j.,
BENKE, Acting P.J., and HUFFMAN,J. D041821, McDONALD, J., BENKE, Acting P.J.,
AARON (e) Grounds raised on direct appeal: INSUFFICIENT EVIDENCE TO SUPPORT THE
JUDGMENT, THE TRIAL COURT ERRED BY (a)EXCLUDING EVIDENCE OF THIRD PARTY CULPA-
BILITY, (b) DENYING MOTION FOR DISCLOSURE OF JUROR IDENTIFYING INFORMATION,
and (c) DENYING MOTION FOR NEW TRIAL, TRIAL COURT ON REMAND ABUSED HIS DISCR-
ECTION BY AMENDING THE ORDER OF THE FOURTH DCOA, JURY INSTRUCTION ERROR,IAC,
SENTENCING ERROR.

**12.** If you sought further direct review of the decision on appeal by the **California Supreme**

    **Court** (e.g., a Petition for Review), please answer the following:

    (a) Result: DENIED

    (b) Date of result (if known): S104425/03/27/02, S125763/08/11/04, S142309/11/-
29/06, S148849/09/25/07

    (c) Case number and citation (if known):
        See 12 (b) above

    (d) Grounds raised:

    (See 11 (c) above)

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a) Result:    N/A

    (b) Date of result (if known):

    (c) Case number and citation (if known):

    (d) Grounds raised:

    N/A

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
    ☒ Yes ☐ No

15. If your answer to #14 was "Yes," give the following information:

    (a) **California Superior Court** Case Number (if known):

    (b) Nature of proceeding: Writ of Habeas Corpus Petition

    (c) Grounds raised: Ineffective assistance of Counsel, newly discovered evidence, improper imposition of upper-term Sentence and failure of Counsel to object to the amount of restitution ordered.

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes ☒ No

    (e) Result:    N/A

    (f) Date of result (if known):

    N/A

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
    ☒ Yes ☐ No

**17.** If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number (if known):

    (b) Nature of proceeding: Writ of Habeas Corpus Petition

    (c) Names of Judges participating in case (if known) Presiding Justice McConnell and Associate Justices Aaron and Irion.

    (d) Grounds raised: See 15 (c)

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
        ☐ Yes ☒ No

    (f) Result: N/A

    (g) Date of result (if known):
        N/A

**18.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☒ Yes ☐ No

**19.** If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number (if known):

    (b) Nature of proceeding: Writ of Habeas Corpus Petition

    (c) Grounds raised: See 15 (c)

    (d) Did you receive an evidentiary hearing on your petition, application or motion?

        ☐ Yes ☒ No

    (e) Result: N/A

    (f) Date of result (if known):
        N/A

**20.** If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the <u>**California Supreme Court**</u>, containing the grounds raised in this federal Petition, explain briefly why you did not:

N/A

## COLLATERAL REVIEW IN FEDERAL COURT

**21.** Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
☒ Yes ☐ No          (IF "YES" SKIP TO #22)
   (a)  If no, in what federal court was the prior action filed?
     (i)  What was the prior case number?
     (ii)  Was the prior action (CHECK ONE):
          Denied on the merits?          ☐
          Dismissed for procedural reasons?  ☐
     (iii)  Date of decision:
   (b)  Were any of the issues in this current petition also raised in the prior federal petition?
     ☐ Yes ☐ No
   (c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
     ☐ Yes ☐ No

---

<u>**CAUTION:**</u>
- **Exhaustion of State Court Remedies:**  In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.
- **Single Petition:**  If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.
- **Factual Specificity:**  You must state facts, not conclusions, in support of your grounds.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do.  A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

1 <u>Ground Five</u>  Was raised  in the California Supreme
2 Court.
3 Petition for Writ of habeas Corpus denied.
4 Case number S142309
5 Courts denial is attached  SEE Exhibit "AA."

7 <u>Ground Six</u>  Was not raised  in  the California Supreme
8 Court.
9 Petition for Writ of habeas Corpus denied in Superior
10 Court. Citing  In re Huffman (1986) 42 Cal. 3d 552,
11 554-55;  In re Clark (1993) 5 Cal. 4th 750, 765.
12 Courts denial is  attached  SEE  Exhibit "AA."

14 <u>Ground Seven</u>  Was raised  in  the California Supreme
15 Court.
16 Petition for Writ of habeas  Corpus denied.
17 Case Number S142309
18 Courts denial is attached  SEE Exhibit "AA."

20 <u>Ground Eight</u> Was raised in the California Supreme
21 Court.
22 Petition for Writ of habeas Corpus denied.
23 Case number S142309
24 Courts denial is attached  SEE Exhibit "AA."

25

26

27



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

Topical Index

1

2  Ground One                                                                6

3  Ground Two                                                               10

4  Ground Three                                                             15

5  Ground Four                                                              23

6  Ground Five                                                              26

7  Ground Six                                                               33

8  Ground Seven                                                             36

9  Ground Eight                                                             39

10 Court denials - Exhibit AA                                           47 - 67

11 Exhibit "A"- Composite drawing of suspect and description    69

12 Exhibit "B"- Opening brief statement of facts                   71 - 74

13 Exhibit "C"- Newspaper Articles "Picture of Petitioner"        76 - 81

14 Exhibit "D"- Prelim Opening statements Re: ID of Petitioner    83

15 Exhibit "E"- Police reports, Copy of dispatch Tape, Kamien robbery  85 - 92

16 Exhibit "F"- Police reports, copy of dispatch Tape, Pomplin robbery  94 - 106

17 Exhibit "G"- Police reports copy of dispatch Tape, Fortunato robbery  108 - 116

18 Exhibit "H"- Newspaper Articles of Similiar robbery          118 - 119

19 Exhibit "I"- A possible suspect of Similiar robberies         121 - 122

20 Exhibit "J"- Letter From Jury Foreman                          124 - 125

21 Exhibit "K"- Newspaper Article "Possible Juror misconduct"    127 - 128

22 Exhibit "L"- Motion For a new trial                            130 - 138

23 Exhibit "M"- Slip op. Do35782  Pg #21                          140

24 Exhibit "N"- CAJIC 2.92 Factors not specified during trial   142 - 143

25 Exhibit "O"- Sentencing Minutes                                145

26 Exhibit "P"- Declaration of Attorney Nancy J. King            147

27 Exhibit "Q"- Prelim transcripts: Doepker receiving money      149 - 153

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

## GROUNDS FOR RELIEF

22. **State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground.** (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

**(a) GROUND ONE:** PETITIONER IS IN CUSTODY IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION, BECAUSE THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT PETITIONER'S CONVICTION.

**Supporting FACTS:** Although almost a dozen eyewitnesses testified to having seen the perpetrator of the robberies, not a single individual made a positive identification of petitioner when looking at the photographic lineup. Not one person gave an acurate physical descr- iption, although many of the descriptions were very similar to the other eyewitnesses. Not one single witness described a person who even remotely looked liked petitioner. More importantly, not a single witness was able to positively identify petitioner. Moreover, someone other than petitioner was selected seven times in the photographic lineup, and three witnesses did not identify anyone. Only 3 of the 11 witnesses tentatively identified petitioner. The identification of petitioner by these witnesses do not constitute substantial evidence indicating any level of certainty, and combined with the witnesses who actually excluded petitioner as the suspect, the probability increases that petitioner was not the person who committed the robberies. The identification evidence presented against petitioner was virtually worthless; on its own tending to prove petitioner's innocence beyond a reasonable doubt. The only significant circumstantial evidence was presented in Count Three that petitioner hired a cab for a short ride may be enough to raise a question about petitioner's conduct on that da. However, it does not demonstrate his involvement in the robbery, particularly when combined with the identification problems that point to his innocence. Carole Pomplin identified petitioner only in-court during trial. She could not identify the robber in a photo lineup and she could not identify the robber at the preliminary hearing. Her description of the suspect was dramatically different tha the actual appearance of petitioner. Rosetta Fortunato identified
CONTINUED ON NEXT SHEET

**Did you raise GROUND ONE in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition For review

(2) Case number or citation: S104925

(3) Result (attach a copy of the court's opinion or order if available): Denied

GROUND ONE CONTINUED

1  petitioner in court at the preliminary hearing and at trial. This despite

2  having been unable to pick him out of a photo lineup. She selected the

3  other person first and told Detective Griffin that the other person looked

4  more like the one who robbed her. (6 R.T. pp. 936-937; 7 R.T. p. 1160.)

5  She thought the other person looked more like the robber because she remem-

6  ered the suspect having more hair than petitioner. (6 R.T. p. 937; 7 R.T.-

7  p. 1165.)

8      With respect to both of these witnesses degree of attention, the trial

9  court did not mention the degree of stress that they both were under and

10  how it affected their degree of attention. They both were struck from behind

11  and (POMPLIN) was knocked to the ground and (FORTUNATO) was knocked into

12  her vehicle. This important fact was not delivered to the jury and therefore,

13  the jury was never made aware of the important fact that these two witnesses'

14  degree of attention was diminished dramatically. Thus, the record reveals

15  that the identification testimony upon which the prosecution based its case

16  was very inconsistent and unreliable. Furthermore, petitioner's appearance

17  in court suggest to these witnesses that he is in police custody for some

18  reason. This suspicion was significantly reinforced by seeing petitioner

19  at the prior court proceedings. It is very unlikely, that in such a stress-

20  ful and brief situation that they had any degree of attention as to the

21  description of their attacker or the identity.

22      These two witnesses were no doubt confident that the police had their

23  man and only identified petitioner out of that belief as opposed to recall-

24  ing him from memory. Simply put they did not have the opportunity to view

25  the robber sufficient to make a credible identification. Pomplin described

26  her attacker to police as tall and thin with hair "like Bozo the Clown."

27  (5 R.T. pp. 743, 758; 7 R.T. 1162-1163.)

(7)

1    Fortunato was very hysterical after she was robbed and knocked into

2    her vehicle. This witness was under a very high degree of stress which

3    affected her degree of attention, and the jury was not made aware of this

4    very important fact. Pomplin and Fortunato's in-court identification of

5    petitioner was not reliable using the five-factors enumerated in "Biggers,"

6    as a test for reliability of their identification testimony. Ironically,

7    the out-of-court identifications and descriptions by witnesses in the

8    instant case are also reliable, and virtually exonerate petitioner. The

9    factors listed by the Court in Cuevas demonstrate the eyewitness evidence

10    strongly shows the wrong person was convicted in this case.

11    Witnesses had good opportunities to view the culprit. They stared at

12    him, followed him, gave consistent descriptions, and told officers they

13    would be able to identify him if they saw him again. It is significant that

14    the only witnesses to even tentatively select petitioner out of the photo-

15    graphic lineup are the same ones who lived, shopped, and did business in

16    the very neighborhood where petitioner lived, shopped, and spent his days.

17    It is likely each of those witnesses had seen petitioner in the neighbor-

18    hood and recognized his photograph as being familar. However, other than

19    Steve Doepker, who did not see the crime but recognized petitioner as he

20    went into the Quick Mart, none of the witnesses told police the perpetrator

21    was someone who they had seen before.

22    An essential component of the due process guarantee by the Fourteenth

23    Amendment that no person shall be made to suffer the onus of a criminal

24    conviction except sufficient proof-defined as evidence necessary to convince

25    a trief of fact beyond a reasonable doubt of the existence of every element

26    of the offense.

27    Based on the totality of the circumstances; the tenative identifications

(8)

of petitioner by these witnesses do not constitute substantial evidence and when combined with the witnesses who actually excluded petitioner as a suspect, the probility increases that petitioner was not the perpetrator who committed the robberies. The evidence here does not support petitioner's conviction for the charges discussed above, and to sustain those convictions violates petitioner's State and Federal Constitutional right to due process under the law. His conviction must be reversed.

// See Exhibits A, B, C,
// D, E, F, G
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

(9)

**(b) GROUND TWO**: PETITIONER IS IN CUSTODY IN VIOLATION OF THE 5TH, 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION, BECAUSE THE TRIAL COURT DEPRIVED PETITIONER OF DUE PROCESS, A FAIR TRIAL, AND THE RIGHT TO PRESENT A DEFENSE WHEN IT EXCLUDED TESTIMONY ABOUT THIRD-PARTY CULPABILITY WHICH RAISED A REASONABLE DOUBT AS TO PETITIONER'S GUILT.

**Supporting FACTS**:

A man by the name of Michael Burgess was arrested in February, 1999 for the series of robberies on elderly people that petitioner was later accused of. (See Police arrest man in Robberies, Beatings, S.D. Union (Feb. 22, 1999) P. B-3) He was later released when the robberies petitioner was charged with occurred while Burgess was in custody. (1 R.T. p. 23) Defense counsel expressed that he did not intend to accuse Burgess of committing the crimes, since he could not have committed these particular robberies. Counsel did want to compare the investigative measures that were taken by law enforcement in connection with the arrest of Burgess with the relatively lackadaiscal investigation of petitioner. (1 R.T. pp. 23-24.) The prosecution objected to any mention by the defense of the existence of additional suspects. (1 R.T. p. 24) Counsel argued the investigative reports produced regarding Burgess were extensive, including detailed surveillance reports describing Burgess's every move. In contrast, there were no reports provided to the defense regarding the week petitioner was under surveillance. (1 R.T. pp. 25-26, 27-29, 31-32.) Counsel primarily wanted to argue to the jury there were other individuals investigated, and that law enforcement appeared to be far more careful in the records kept of those investigations than in the investigation of the person who was ultimately put on trial for the robberies. (Ibid.) Counsel pointed out that the onle reason he was even aware of the surveillance of petitioner was because of a "two-line blurb" in Griffin's arrest report. (1 R.T. p. 30) The prosecution agreed that in addition to Burgess, a third person was arrested in relation to this case, and that 80 to 100 other's were investigated. (1 R.T. p. 33) Counsel was never provided with the information concerning a third person being arrested. This information was only mentioned during trial. (1 R.T. p.33) The court ruled petitioner would be limited to asking whether surveillance efforts are "generally" documented with detailed reports, but said he would not be allowed to pursue any questioning about people who were investigated related to these particular crimes. (1 R.T. p. 34-36) The court, while stating that it would accept briefing on this issue, made it very clear petitioner would be precluded from any inference that there were other people, indeed many other people, they had

CONTINUED ON NEXT SHEET

**Did you raise GROUND TWO in the California Supreme Court?**

☒Yes ☐No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): *Petition For review*

(2) Case number or citation: *S104425*

(3) Result (attach a copy of the court's opinion or order if available): *Denied*

**GROUND TWO CONTINUED**

1  suspected of committing these crimes. To the extent the jury was prevented

2  from hearing about the existence of these people, and in particular from

3  hearing about the haphazard investigation of petitioner in relation to the

4  investigation of others, petitioner was denied the right to defind by the

5  court's restrictions on the presentation of evidence that a third person

6  had committed the charged crime, the trial court erred.

7      Under the Fifth, Sixth and Fourteenth Amendment of the U.S. Constitution

8  a criminal defendant has an unquestionable right to present relevant

9  exculpatory evidence to the jury. This necessarily includes evidence that

10 calls into doubt the reliability of the evidence on which the state is

11 relying.

12     Where the state has interfered with the defendant's right to do this

13 a subsequent conviction cannot stand. A criminal defendant also has the

14 riht to introduce relevant evidence under Article I, Section 28(d) of the

15 California Constitution. The California Supreme Court has expressely held

16 a criminal defendant has the right to present relevant evidence that a

17 third party committed the crime of which defendant is accused.

18     The United States Supreme Court has also held that if third person

19 evidence is excluded then petitioner was denied the right to defend by the

20 court's restrictions on the presentation of evidence that a third person

21 had committed the charged crime.

22     Such evidence may not be excluded under Evid. Code §352 if it is

23 capable of raising even a reasonable doubt of the defendant's guilt, (Ibid)

24 Furthermore, even hearsay of this type is nonetheless admissible because

25 a state may not mechanistically apply its rules of evidence to defeat a

26 defendant's constitutional right to a fair trial which, happened in the

27 instant case.

(11)

1    Here, law enforcement was conviced of petitioner's guilt based on the

2    taxi driver's statement, and despite mounds of exculpatory evidence, the

3    investigation of petitioner was cursory compared to that of other individuals.

4    The jury should have been allowed to hear what law enforcement did in other

5    innvestigations, and compare it to the perfunctory methods used  regarding

6    petitioner. The failure of law enforcement to investigate petitioner with

7    the same vigor could be enough to raise a reasonable doubt in the minds

8    of the jury regarding petitioner's guilt.

9    Nor could this evidence be excluded under Evidence Code  352 on grounds

10   that it was cumulative of other defense evidence. It would have taken no

11   more than one witness to describe how other investigations were conducted

12   in a more thorough fashion. Moreover, the evidence lost through the failure

13   to accurately record the time spent on surveillance was crucial to petitio⌐

14   ner's defense. It would have fully corroborated petitioner's witnesses,

15   and provided ample reasonable doubt as to whether petitioner was "the North

16   Park robber."

17   Evidence regarding third party culpability is not made inadmissible

18   merely because it is not sufficient to sustain a finding of guilt against

19   the third party:

20       The principles of law are clear. California courts rejected
         the rule that evidence of third party culpability could be
21       admitted only if there was a 'substantial proof of a
         probability' of guilt. Rather, the court held that the
22       standard for admitting evidence of third party culpability
         was the same as for other exculpatory evidence: the evidence
23       had to be relevant under Evidence Code section 350, and its
         probative value could not be 'substantially outweighed by
24       the risk of undue delay, prejudice, or confusion' under
         Evidence Code section 352.

25

26   Our Supreme Court held that in evaluating admissibility of third-

27   party culpability evidence, "[t]he court's proper inquiry was limited

(12)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1  to whether this evidence could raise a reasonable doubt as to defendant's

2  guilt and then applying section 352." The Court explained that this type

3  of evidence should be evaluated ""like any other evidence: if relevant

4  it is admissible (Evid. Code, §350) unless its probative value is

5  substantially outweighed by the risk of undue delay, prejudice or confusion

6  (Evid. Code, §352). The Court added:

7    We recognize that an inquiry into the admissibility of such
     evidence and the balancing required under section 352 will

8    always turn on the facts of the case. Yet courts must weigh
     those facts carefully....Furthermore, court must focus on the

9    actual degree of risk that the admission of relevent evidence
     may result in undue delay, prejudice and confusion. As Wigmore

10   observed, 'if the evidence is really of no appreciable value
     no harm is done in admitting it; but if the evidence is in

11   truth calculated to cause the jury to doubt, the court should
     not attempt to decide for the jury that this doubt is purely

12   speculative and fantastic but should afford the accused every
     opportunity to create that doubt.'(1A Wigmore, Evidence Tillers

13   (Tillers rev.ed. 1980) §139, p. 1724.

14  Courts have "warned trial courts to avoid hasty conclusions that third-

15  party culpability evidence is 'incredible'; this determination, we have

16  affirmed, 'is properly the province of the jury."'

17    The exclusion of this critical evidence requires that the judgments

18  of conviction be reversed. The members of the California Supreme Court

19  engaged in a vigorous debate concerning the appropriate standard for

20  asessing the prejudice resulting from this type of error. The court's

21  majority opinion concluded a misapplication of Evidence Code section 352

22  to exclude defense evidence, including third party culpability evidence,

23  was essentially state law error.

24    The exclusion of this critical evidence requires that the judgments

25  of conviction be reversed. Petitioner contends the prosecution's evidence

26  in this case was so weak as to be legally insufficient to support the

27  judgments of conviction. However, even assuming this court disagrees, it

(13)

must still conclude that the evidence of petitioner's guilt was not "overwhelming" and that serious problems exist with the identifications of petitioner as the perpetrator in all counts.

Furthermore, the length of the jury's deliberations and the request to hear critical testimony a second time show this case was a close case in the minds of the jury. Also, the fact the jury did not convict on all counts  indicates a close case overall.

"Apparently it was important for the police to have someone in jail for this crime for reasons related to a public outcry and pressure from police brass to make an arrest," which is apparent because petitioner was the second person arrested.

Under these circumstances, an error in excluding evidence that a third party was investigated and was believed to have committed the robberies of which petitioner was accused cannot conceivably be deemed harmless under any standard and there can be no alternative to a finding that the trial judge erred and that reversal is required.

//    See    Exhibits  H, I, J, K
//
//
//
//
//
//
//
//
//
//

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

(c) **GROUND THREE**: PETITIONER'S MOTION FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED BASED ON A LACK OF EVIDENCE, AS WELL AS MISCONDUCT BY LAW ENFORCEMENT, BRADY VIOLATION, PERJURY AND A BIASED JURY THAT RENDERED PETITIONER'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF THE 5TH, 8TH, & 14TH AMENDMENT OF THE U.S. CONSTITUTION.

**Supporting FACTS**: Officer Meaux testified he showed the photographic lineup to both John Burkholder and Dennis Loper on the same day. He placed both reports in a single envelope, and left the envelope on Detective Griffin's desk. (7 R.T. pp.1121-1122, 1127.) Loper was the prosecution witness who most closely observed the robbery suspect on February 24, and assisted the police in preparing a composite drawing of the suspect. He was also the only witness who positively identified petitioner in the courtroom as being the individual he observed on that day. However, when he looked at the photographic lineup, he positively excluded petitioner, and was 70 to 80 percent certain about his identification of another person. (7 R.T. p.1123.) The report regarding Loper's viewing of the photographic lineup was never produced or provided to the defense, but was only discovered during Loper's testimony and confirmed by the testimony of Detective Meaux. Griffin deliberately told the prosecutor that Loper never looked at a lineup, but he did provide the report from the same envelope regarding John Burkholder, whose testimony at trial was consistent with his viewing of the curbside lineup and the photographic display. (7 R.T. p.1157.) This evidence would have been favorable to my case because it showed that this witness picked someone else in the lineup. If the jury knew this then they might not believe his testimony. This would have cast serious doubt on the credibility of this key witness and continued to make the state's case against me weaker. This would also mean that no reliable witness could testify he or she saw me near the scene of the crime. If the detective had disclosed this evidence, the outcome of my trial would have been different because I would not have been convicted. The state could not have proven my guilt beyond a reasonable doubt if the jury did not believe this key witness. In summary, this evidence was material to my case, the detective did not disclose it, and it affected the outcome of my trial.

In addition to the Brady violation in failing to produce the exculpatory report of Loper's identification of a different person, Officer James Troussel testified untruthfully concerning how he and his partner stopped petitioner on February 24 shortly after the Kamien robbery. Troussel described spotting petitioner driving and testified they followed petitoner through numerous turns while petitioner was speeding and appearing to be trying to evade the officers. (4A R.T. p.607; 5 R.T. p.663, 683.)          CONTINUED ON NEXT SHEET

**Did you raise GROUND THREE in the California Supreme Court?**

☒ Yes ☐ No.

    If yes, answer the following:

    (1)   Nature of proceeding (i.e., petition for review, habeas petition): Petition for review

    (2)   Case number or citation: S 104425

    (3)   Result (attach a copy of the court's opinion or order if available): Denied

## GROUND THREE CONTINUED

1    The report of the traffic stop did not say petitioner engaged in any

2    kind of evasive maneuvers, or speeding describing only that the car was

3    seen as it traveled east on Madison, and was stopped after turning on

4    Wilson street. (5 R.T. p.665.) Nor was petitioner given a ticket for speeding

5    if in fact he was. The tape recording of the communications with dispatch

6    conclusively demonstrated the stop was entirely routine, with no actions

7    taken by petitioner to raise any suspicions. (See Court Exhibit B-1 C.T. -

8    pp. 91-92.) The tape also contradicted Troussel's testimony that the

9    description of the suspect as he heard on the radio was of a light-skinned

10   Black Male. (4A R.T. p. 602; 5 R.T. pp. 668; C.T. pp. 81-93.)

11   A letter from the jury foreman admitted the jury did not

12   think the prosecution met its burden of proof. The day after

13   returning guilty verdicts against petitioner, the jury foreman

14   sent a letter to District Attorney Paul Pfingst, criticizing

15   the "sloppy prosecution" of petitioner's case. (C.T. pp. 104-

16   105.) The letter described gaps in the evidence that raised

17   "issues" that had to be resolved by the jury without the

18   benefit of actual evidence. The letter concluded by stating

19   "had the jury been less proactive or less intelligent there

20   would not have been a conviction and a dangerous criminal

21   would be back on the streets." (C.T. p. 105.)

22   It cannot be disputed that a defendant has a constitutional

23   right to a trial by impartial jurors, as guaranteed by the Sixth

24   and Fourteenth Amendments to the United States Constitution and

25   Article I, Section 16 of the California Constitution. A single

26   juror who is partial or motivated by prejudice deprives a

27   defendant of his Sixth Amendment right to trial by an impartial

(16)

1  jury.

2      It is not even necessary for the juror to disclose his/her bias to other

3  jurors for the misconduct to be prejudicial. One biased juror deprives a

4  defendant of his right to a fair trial. Due process requires "a jury capable

5  and willing to decide the case solely on the evidence before it, and a trial

6  judge ever watchful to prevent prejudicial occurrences and to determine the

7  effect of such occurrences when they happen.

8      The existence of a biased juror so infects the entire trial process and

9  requires reversal even without a demonstration of prejudice. Although it is

10  possible for a defendant to receive a fair trial if the jurror sets aside his

11  or her biases and decides the case fairly, based on the evidence presented,

12  the foreman's letter showed the opposite occurred in petitioner's case. A

13  simple reading of the letter demonstrates the jury did not believe the

14  prosecution presented substantial evidence against petitioner. That in itself

15  is troubling, but further comments in the letter that the jury took a

16  "proactive" role in deciding upon petitioner's guilt implies exactly the

17  type of misconduct by the juror that requires reversal.

18      Once misconduct has been established, prejudice is presumed; reversal

19  is rquired unless the reviewing court finds, upon examination of the entire

20  record, there is no substantial likelihood that any juror was improperly

21  influenced to the defendant's detriment. This determination is a mixed quest-

22  ion of law and fact subject to an appellate court's independent determination.

23      The misconduct clearly requires reversal. The jury has a responsibility

24  to decide a case on the basis of the facts presented at trial alone. They

25  must find that the State presented evidence proving the guilt of the defendant

26  "beyond a reasonable doubt." Evidence gained outside of the courtroom, or the

27  opinions of the people in the media, cannot contribute to this finding.

(17)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

The evidence against petitioner was weak and the exculpatory evidence was very strong. Petitioner filed a motion for a new trial on the ground that the verdict was contrary to the law and evidence, the jury was not impartial and relied on evidence not presented at trial, and that law enforcement misconduct and perjury rendered the trial fundamentally unfair. (C.T. pp. 135-143.)

The very nature of the misconduct itself is centered around the failure of the prosecution to adequately prove its case. There is substantial likelihood a less "proactive" jury would not have convicted petitioner of these crimes. The trial court erred in failing to grant petitioner's motion based on clear evidence of misconduct by the jury, and his conviction must now be reversed.

A defendant is entitled to a decision by the judge as to the sufficiency of the evidence, giving due weight to conflicts and inconsistencies in the evidence and the credibility of the testimony of witnesses. In doing so, the court must use its own determinative discretion as distinguised from the conclusions reached by the jury. In passing on a motion for new trial it is not only the power but also duty of trial court to consider the weight of the evidence.

During the preliminary hearing, the prosecution presented defense counsel with information that Detective Griffin gave a prosecution witness, a local transient, Steven Doepker $300.00 dollars and put him up in a hotel for almost two weeks before the hearing. A subsequent investigation revealed that this witness did receive this and other monies from a District Attorney Investigator and Detective Griffin the day of the trial and appeared in court intoxicated, but was allowed to testify.

THis important fact was acknowledged by Doepker during the preliminary

(18)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1  hearing on cross-examination and not contested or rebuted by the prosecution.

2  (R.T. p. 136, 139.) And on recross (R.T. p. 140.) The prosecution informed

3  defense counsel that Griffin gave Doepker money. (6 R.T. p. 989-990.) This

4  same witness testified that he gave the police a description of petitioner.

5  (6 R.T. p. 998.) This information was not in any of the police reports

6  generated concerning the robbery of Mrs. Fortunato. This was an obvious fals-

7  ehood that the prosecutor knew or should have known was false when compared

8  to Doepker's actual statement to the police on the day of the robbery.

9      The duty of law enforcement officer's is to use every legitimate means

10 to bring about a just conviction is no greater than their duty to refrain from

11 improper methods calculated to produce a wrongful conviction. The California

12 Supreme Court has observed that "sufficiently gross police conduct could lead

13 to a finding that conviction of the accused would violate his constitutional

14 right to Due Process of Law." The United States Supreme Court has recognized

15 that situations may arise where the "conduct of law enforcement agents is so

16 outrageous that Due Process principles would absolutely bar the government

17 from invoking judicial process to obtain a conviction."

18     Examples of such outrageous conduct that resulted in a "Miscarriage of

19 Justice" that occured during petitioner's trial are as follows;

20     (1) Detective Griffin willfully, wantonly and deliberately

21 withheld exculpatory evidence from the prosecution and the defense.

22     (2) Detective Griffin willfully and purposely gave a

23 prosecution witness money in order to testify favorably for the

24 prosecution.

25     (3) A district Attorney investigator also gave this same witness

26 money on several occassions.

27     (4) Officer Troussel willfully, wantonely and blatantly committed perjury

(19)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1   during trial.

2      (5) The prosecutor used deceptive and reprensible

3   methods to persuade the court and the jury.

4      (6) The prosecutor knowingly presented false and

5   perjured testimony during trial.

6      (7) The jury was bias against petitioner.

7

8      The actions by Officer Troussel, Detective Griffin and the Prosecutor

9   was so outrageous that it was a shock to the conscience that violated the

10   fundamental fairness of petitioner's trial, resulting in a "Miscarriage of

11   Justice" all required by the Due Process Caluse of the Fourteenth Amendment

12   to the U.S. Constitution. By giving Doepker the money, Detective Griffin

13   along with the District Attorney Investigator induced false testimony,

14   but they bribed him as defined in P.C. §137(a)(c).

15      Furthermore, Doepker was not placed in the Witness Protection Program as

16   outlined in P.C. §14020 nor was this witness deemed a victim as defined in

17   P.C. §14026.5 and in subdivision (a) of section 14021 selected by local or

18   state prosecutors to receive services under the program established pursuant

19   to this title because he has been or may be victimized due to the testimony

20   he gave during petitioner's trial.

21      Moreover, there was no court order to direct the county auditor to draw

22   his warrant upon the county treasurer in favor of such witness fees pursuant

23   to P.C. §1329(a). The district attorney investigator also induced false

24   testimony and bribed this witness as described in P.C. §137(a)(c).

25      As the representative of the people, a prosecutor is not only obligated

26   to fight earnestly and vigorously to convict the guilty, but also uphold the

27   orderly administration of justice as a servent and representative of the law.

(20)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1  Hence, a prosecutor's duty is more comprehensive than a single obligation to

2  press for conviction.

3    The basic principle is clear enough: The government is obliged to

4  disclose pertinent material evidence favorable to the defense, and this

5  applies not only to matters of substance, but to matters relating to the

6  credibility, of government witnesses. The prosecution's failure to disclose

7  benefits to a witness violates due process in circumstantial evidence cases.

8    In the instant case, not only did Detective Griffin casually withhold

9  extremely exculpatory information and give money to a witness to testify

10  along with the district attorney's investigator, the prosecutor herself

11  showed no compunction about leading Officer Troussell and Steven Doepker

12  through testimony that she knew was blatantly false.

13    The prosecutor's knowing use of perjured testimony is a constitutional

14  error which carries an unusually high risk of affecting the judgement, and

15  requires reversal. Whether the prosecutor's error results from affirmative

16  misconduct or omission the error may deprive a criminal defendant of the

17  guarantee of fundamental fairness and thereby violates the due process

18  clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

19    Misconduct by a prosecutor may also violate a defendant's right to a

20  reliable determination of penalty under the Eighth Amendment to the U.S.

21  Constitution. In addition, under California Law a prosecutor who uses

22  deceptive or rephrensible methods to persuade either the court or jury

23  has committed misconduct even if such action does not render the trial

24  fundamentally unfair.

25    The misconduct stated above and the miscarriage of justice in conjunction

26  with the constitutional violations requires reversal. The trial court erred

27  in failing to grant petitioner's motion based on clear evidence of misconduct

(21)

1 | by the jury, and his conviction must now be reversed. On their own, the above

2 | described instances of misconduct by the government and the jury deprived

3 | petitioner of his right to due process of law, his Sixth Amendment right to

4 | an impartial jury, and his Eighth Amendment right to a reliable determination

5 | of guilt and penalty creating a miscarriage of justice.

6 | When combined with the scarcity of evidence against petitioner, as well

7 | as the solid proof of his evidence, there can be no alternative to a finding

8 | that the trial judge erred in refusing petitioner's request for a new trial,

9 | and reversal is required.

10 | // SEE Exhibit L

11 | //

12 | //

13 | //

14 | //

15 | //

16 | //

17 | //

18 | //

19 | //

20 | //

21 | //

22 | //

23 | //

24 | //

25 | //

26 | //

27 | //

(22)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

**(d)** **GROUND FOUR**: PETITIONER IS IN CUSTODY IN VIOLATION OF THE 6TH & 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION, BECAUSE THE TRIAL COURT ERRED IN REFUSING DEFENSE COUNSEL'S REQUEST FOR JURROR INFORMATION BECAUSE A BIASED JURY CONVICTED PETITIONER DESPITE IT'S AWARENESS THAT THE PROSECUTION DID NOT SATISFY ITS BURDEN OF PROOF.

**Supporting FACTS:** The jury foreman wrote the San Diego District Attorney an extremely provocative letter complaining about the substandard performance by the prosecution in this case, and concluded with a comment that "had the jury been less proactive or intelligent, there would not have been a conviction...."(C.T. p. 105.) Defense counsel filed a request for a hearing and the disclosure of jurror information for investigating whether the jury's "proactive" deliberations included misconduct that required reversal. (C.T. pp. 98-105.) The trial court disagreed with counsel's assessment of the letter. (12 R.T. pp. 1607-1608.) The court denied petitioner's request for disclosure of juror information. (12 R.T. p. 1610.) The trial court erred in not conducting a hearing to determine whether any jurors objected to being contacted by the defense, or even to determine whether there was, in fact, misconduct by the jury that required a new trial. Here of course, the trial court denied the defense the opportunity to discuss the problems with the members of the jury. The failure of the court to grant petitioner's request deprived petitioner of his Sixth Amendment right to have competent counsel for the preparation of a motion for a new trial, created a miscarriage of justice, and prevented any means of determining the extent of the damage done by the jurrors attitudes toward the defendant, his attorney, and the failure of the prosecution to present substantial evidence. Petitioner showed good cause and established prima facie that he was entitled to the information and the court's error in refusing to grant access to jurror information requires reversal. There is, however, information in the form of the foreman's letter to the district attorney, which give rise to a strong inference of misconduct. Because the court denied the defense the opportunity to investigate the issues raised by the letter, petitioner was deprived of his constitutional right to a fair, open hearing and a meaningful record on appeal, which in turn has created a systematic, reversable error. Where procedural due process is denied, reversal is required and no prejudice need to be shown. Structural defects include the denial of the right to fully present a defense, which in this case was the right to fully develop and present the Motion for a New Trial— and, by extension, to create as strong an appellate record as possible. Petitioner was denied the structural order expected of a criminal trial in compliance with the fundamental notions of fairness and due process of law, and as such defies "analysis by CONTINUED ON NEXT SHEET

**Did you raise GROUND FOUR in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): *Petition For review*

(2) Case number or citation: *S164425*

(3) Result (attach a copy of the court's opinion or order if available): *Denied*

GROUND FOUR CONTINUED

1  harmless-error standards." As a result of the court's failure to provide

2  petitioner reasonable means to investigate probable jury misconduct,

3  petitioner's conviction must be reversed per se.

4        However, even under the Chapman harmless error analysis petitioner

5  should prevail. On its face, the letter from the foreman describes a jury

6  that had questions about the evidence, and proceeded to speculate in a

7  "proactive" manner on the answers to those questions. The jury was not

8  impartial and relied on evidence that was not presented at the trial. The

9  jury chose to convict an innocent man as a favor to Paul Pfingst who

10  should be grateful for their "proactive (pro-prosecution/law enforcement?)"

11  stance. They chose to ignore that not one witness described the robber as

12  being taller than 6 feet 4 inches tall and that the majority of the witnesses

13  described the robber as dark skinned with a thin to medium build.

14        A defendant in a criminal case has a constitutional right to have the

15  charges against him or her determined by a fair and impartial juror. This

16  reality is why every juror must take an oath to "render true verdict

17  according only to evidence presented to you and the instructions of the

18  court." CCP Section 232(b).

19        An important corollary to this rule is that a juror cannot "inject

20  his or her own expertise into the jury deliberations." Jury misconduct

21  under §1181 (3) has long been considered grounds for a new trial.

22        It is not at all clear that had the defense been allowed to conduct

23  a competent investigation, the results would still point to petitioner's

24  ultimate conviction beyond a reasonable doubt. The court erred in thwar-

25  ting any investigation into the possibility these jurors were influenced

26  by extrinsic evidence or undue bias. The court must determine whether the

27  jury in this case did act "intelligently and justly" and be satisfied

(24)

1   that the probative force of the evidence viewed as a whole was suffi-

2   cient to sustain the verdivt rendered. Petitioner showed good cause and

3   this mistake by the court implicates the Sixth and Fourteenth Amendment

4   rights of petitioner were violated and requires reversal.

5   //    See Exhibit J

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

(25)

**GROUND FIVE**

THE FOURTH DISTRICT COURT OF APPEAL AFFIRMED IN PART AND REVERSED IN PART AND REMANDED WITH DIRECTIONS. JUDGE DOMNITZ AMENDED THE ORDER OF THE FOURTH DISTRICT COURT OF APPEAL. HE WILLFULLY ABUSED HIS DISCRETION AND WONTONLY VIOLATED THE INTEGRITY OF THE APPEAL COURT. THIS IS IN DIRECT VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

### SUPPORTING FACTS

On January 8, 2002 the Fourth District Court of Appeal (Fourth DCA) affirmed in part and remanded with directions. (See Slip Op. D035782 (Jan. 8, 2002).) The court concluded petitioner had made a prima facie showing of good cause for the disclosure of juror information, and remanded with an order to release personal juror identifying information to defense counsel, for the purpose of investigating a motion for a new trial. (Slip Op. D035782, pp. 20-22.) On June 3, 2002, Judge Peter Deddah ordered the release of confidential jury records to defense counsel, as ordered by the Fourth DCA, and ordered the Jury Services Department to release the jurror's addresses to counsel. C.T. p. 10.)

On July 12, 2002, the case was assigned to Judge H. Ronald Domnitz. He adamantly refused to act upon the substantive nature of the Court of Appeal's order by amending the June 3rd, 2002 order. (C.T. pp. 14.) On September 13, 2002 Judge Domnitz sustained the objections of five jurors, and their identifying information was not released to defense counsel. (C.T. p. 19.) On December 23, 2002, defense counsel stated he would not file a motion for a new trial and that the investigation is still ongoing, and petitioner was remanded to the DOC. (C.T. p. 24.)

Petitioner constructively filed a notice of appeal on January 6, 2003. (C.T. p. 8.)

Judge Domnit'z refusal to conduct the proceeding in the manner required by the court of appeal was unreasonable because it violated petitioner's

(26)

1  State and Federal due process rights guaranteed by the Sixth and Fourteenth

2  Amendments of the U.S. Constitution. Thus, Judge Domnitz willfully abused

3  discretion and violated the integrity of the higher court in a manner that

4  was constitutionally inept, since he does not have the authority to ignore

5  the remand orders.

6       Defense counsel objected to the court's limited order and the following

7  discussion ensued:

8       MR. WADLER: Yes, your Honor. Actually for the record, I've
        read the appellate court decision a number of times on this
9       issue. And it appears to me that whether it be an oversight
        on their part or something they intended. I don't know, but
10      the appellate court decision at page 21 clearly states that
        on remand, the trial court shall 'issue a new order granting
11      Gunn's request and shall release to Gunn's counsel personal
        juror identifying information regarding the jurors in this
12      case.'

13      THE COURT: Doesn't say anything in here that we're to ignore
        the code section.
14
        MR. WADLER: I understand that. That's why I'm raising the
15      issue, in order to preserve it.

16      ...

17      I fully recognize the tension between the language in that
        appellate court decision and the statute itself.
18
        THE COURT: I appreciate that you're doing that and that's
19      what a good lawyer should do, and I appreciate that.
        Although I will tell you that I'm sure that the Court of
20      Appeals had in mind the procedures set forth in the statute.

21      ...

22      MR. WADLER: For the record, it would be the defense's
        position that the appellate court can order the release
23      of all of it. I understand what the court is saying. I
        don't think we need to belabor that.
24
        The other issue that I have is obviously the court has
25      received correspondence from what I believe the indicated
        five jurors that had indicated that - well, I guess I'm
26      asking the court specifically what those five jurors
        indicated factually to fall within the provisions of 239,
27      subdivision dv.

THE COURT: Well, one. I think the code says if they don't
want to be contacted, they are not contacted, period. But
just to make it - I'm not going to give up anything. One
juror says one word, 'privacy.' Another said nothing.
Another one said nothing, other than 'I don't want to.'

MR WADLER: I guess all I'm getting at, did they specifically
say, did they write and respond?

THE COURT: You've never seen the form letter?

MR. WADLER: I've never seen anything.

THE COURT: You've never seen the form letter that went
out in this case? You're certainly entitled to see the
form letter.

...

Here's what the form letter says. If I had a blank one,
which I don't have. I'd show it to you. It says from me-
what it is, it says from Joe Schmoe, one of the jurors,
'I Joe Schmoe, do or do not object to allowing the
court to disclose my name, address, and telephone
number,' bla, bla, bla. Okay. 'Although not required,
below you may state your reasons for why you either
do or do not object. 'Okay. And then it says, 'I
either intend to appear or I don't intend to appear.'
Okay.

Those who object, three said nothing - two said nothing,
one said 'privacy,' one said the person's afraid
of the people who participate in this case,' and the
other one thought we already gave out the addresses
and was upset.

That's all there is. I've given you as much as I can.
(Aug. 2 R.T. pp. 18-20.)

The trial court's denial of petitioner's request, based solely on the

juror's objections to disclosure, violated petitioner's fundamental

constitutional rights to due process and jury trial. For this reason,

this provision of Code of Civil Procedure Section 237, subdivision (d),

is unconstitutional as applied in this case. Even if the statute itself is

constitutional, however, the procedure followed in this case violated the

plain language of the statute, and jurors' objectons were sustained with

(28)

1   no showing that they were unwilling to be contacted. Furthermore, defense

2   counsel was never showed a copy of the letter that was sent out to the jurors.

3         During the course of the proceedings, Domnitz offered no reasonable

4   explanation for assuming a novel authority to modify the Fourth DCA's

5   remand order, changing the date for compliance and limiting the parties

6   to written materials that lacked the results of investigative measures, such

7   as defense counsel or a defense investigator having the ability tosolicit

8   information on juror's bias or misconduct by conducting interviews with

9   the juror themselves.

10        Without this recourse, the defense would be severly damaged because,

11   as the Court of Appeal noted, "[I]t could be reasonable inferred from the

12   jury foreperson's letter that thejury may have engaged in improper actions

13   in proactively deciding GUNN's guilt or innocence." (Slip Op. at pp. 17–

14   22.)

15        If, as assumed by the trial court in this case, a mere objection must

16   be sustained with no further information, virtually all of subdivision (d)

17   is surplusage. This is certainly not the case. If the Legislature had

18   meant, "juror objections shall be sustained," period, it certainly would

19   have said so. Rather, the Legislature states the juror's protest shall be

20   sustained only if the defendant fails to show good cause (in this case

21   already established by the Fourth DCA's ruling), the record discloses a

22   compelling reason not to disclose, or the juror is unwilling to be

23   contacted. The language of the statute does not assume that a mere

24   objection is based upon a juror's unwillingness.

25        The trial court's letter to the jurors was not the equivalent of a

26   request from counsel to speak to the jurors. The letter does not ask the

27   jurors whether they are willing to speak with counsel about the case; nor

(29)

1   does it require the jurors to disclose the basis for the objection.

2   Rather, it merely asks the jurors to check a box stating they "do" or

3   "do not" object to the disclosure. It fails to mention that the Fourth

4   DCA ordered the release of their information. It invites the jurors to

5   come to the hearing, and also provides a place to write down their

6   reasons for objecting, but specifies neither is necessary. (See, Sealed

7   C.T.) The court's letter and the juror's responses were only the

8   beginning of the process described by section 237, subdivision (d).

9       Out of the five jurors who objected in writing to the release of

10  the information, only one juror's response reasonably infers an

11  unwillingness to discuss the case further. (Sealed C.T. p. 9 [juror had

12  already been contacted by someone and was "outraged" that the information

13  had been released].) An inquiry to the other jurors who objected very well

14  might have revealed they were perfectly willing to discuss the case, but

15  did not want their home addresses revealed. It is reasonable probable

16  jurors would have been willing to discuss the case on the phone, or at

17  a less intimate location than in their own homes. It is also possible the

18  jurors would not object to the release of their personal information if

19  they had been reassured the information would not be provided to the defen-

20  dant. The ascertainment of such information is appropriate as the Legislature

21  directs the trial court to "otherwise limit disclosures in any manner it

22  deems appropriate." (Code of Civ. Proc., §237, subd. (d).)

23      Unwillingness to have one's home address and telephone numbers

24  disclosed is not the same as unwillingness to talk to counsel about the

25  case. In addition, the letter does not inform the jurors that the Fourth

26  DCA had found good cause for the request, and it offers no explanation for

27  the request. Under these circumstances, it cannot be assumed the jurors

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1  would have refused to speak with counsel if they could do so without

2  disclosure of their home addresses and telephone numbers, of if the purpose

3  of counsel's inquiries had been explained to them.

4      When a reviewing court modifies or reverses a judgement with directions

5  the lower court has no discretion but to follow the dictates of those

6  directions to the letter of the law. The role of the trial court, upon a

7  judgement of reversal by the Fourth DCA with directions to the court below

8  in accordance with the views therein expressed the court below, has been

9  well defined as 'but to follow the directions thus given'. The courts have

10  repeatedly adhered strictly to this rule. the trial court is bound by the

11  directions given and has no authority to retry any other issue or to make

12  any other findings.

13      Its authority is limited wholly and solely to following the directions

14  of the reviewing court. These directions must be followed 'explicitly'.

15  The directed judgement of the reviewing court is the law of the case and is

16  controlling on the jurisdiction of the trial court. In this case, the Fourth

17  DCA adopted a written opinion determining the issues on appeal. The court

18  reversed in part, aff'd in part, and remanded with directions, specifically

19  directing the lower court with respect to a particular issue involving

20  possible jury misconduct/bias. Therefore, the trial court has no discretion

21  to interpret the opinion of the Appellate Court, but on the contrary, it

22  is bound to specifically carry out the instructions of the reviewing court,

23  which Judge Domnitz failed to do.

24      Any proceeding had or the judgement rendered contrary to such specific

25  directions would be void. There is no latitude for interpretation of the

26  judgement of the Fourth DCA. Neither is there any necessity for broading

27  the issues to be acted upon. The judgement of the Fourth DCA was a proper

(31)

1  and complete disposition of the issues that were presented by the record,

2  it is clear and positive, and there is no reason to doubt that the court

3  intended to confine further proceedings in the trial court to a determina-

4  tion of those issues.

5      This limitation measures the authority of the Superior Court upon

6  controlling on the jurisdiction of the trial court. Judge Domnitz's

7  failure to act in accordance with the directions of the Fourth DCA violated

8  petitioner's due process rights guaranteed by the Fourteenth Amendment to

9  the United States Constitution. Furthermore, this unlawful act created a

10  miscarriage of justice and requires reversal. If this Court finds that

11  jurors can, indeed, veto a defense request for information, after a

12  reviewing court has found good cause for the disclosure, then remand is

13  still necessary so a proper hearing can be held to determine whether

14  juror objections should be sustained governed by Code of Civil Procedure

15  Section 237 to determine whether the jurors "objection" to the release of

16  juror information is due to an unwillingness to be contacted, or for some

17  other reason that does not override the showing of good cause that the

18  Fourth DCA has already determined exists.

19  //        SEE Exhibit M

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

(32)

**GROUND SIX**
PETITIONER IS IN CUSTODY IN VIOLATION OF THE 6TH AND 14TH AMENDMENT OF THE
UNITED STATES CONSTITUTION, BECAUSE THE TRIAL COURT ERRED BY GIVING THE JURY
A LIMITED JURY INSTRUCTION DIRECTING THE JURY'S ATTENTION TO EVIDENCE FROM
WHICH IT MIGHT PROPERLY FIND A REASONABLE DOUBT OF PETITIONER'S GUILT.

## SUPPORTING FACTS

Petitioner has expressed concern with the jury instruction CALJIC NO.-
2.92 that was given in this case, that the jury should consider "the extent
to which the witness is either certain or uncertain of the identification."
There were factors not specified in CALJIC 2.92 based on the Johnson
instruction that focused the jury's attention on facts relevant to its
determination of the existence of reasonable doubt regarding identification.

Improper or inadequate instruction upon witness credibility implicates
the defendant's State and Federal Constitutional rights to trial by jury
ad due process. Failing to adequately instruct the jury upon matters relati-
ng to proof of any element of the charge and/or the prosecution's burden
of proof therein violates the defendant's State and Federal Constitutional
rights to trial by jury and due process.

These missing factors are aimed at identification factors uniquely
relevant to the reliability of any eyewitness identification. Jurors in
the instant case are not likely to recognize the unreliable nature of
identifications made by strangers to the defendant in the absence of Court
instructions identifying those factors which can affect the reliability
of eyewitness identifications.

In the instant case, the trial court erred by not giving the appro-
priate instructions involving eyewitness identifications. The failure of
the trial court to give the correct eyewitness instruction is reversable
error.

The only identifications made of petitioner were in court. When a

(33)

suspect/accused is presented to a witness singly, "It is hard to imagine

a situation more clearly conveying the suggestion to the witness that the

one presented is believed guilty by police."

The suggestion is conveyed to the witness more clearly when that

person presented is a suspect, has been formally arrested, accused and

brought to court in an even more suggestive atmosphere, where, under the

critical eye of the trier of fact and prosecutor, he or she may well feel

compelled to identify the defendant at trial.

The identification evidence presented against petitioner was virtually

worthless; on its own tending to prove petitioner's innocence beyond a

reasonable doubt.

Both Pomplin and Fortunato were under a very high degree of stress

which affected their degree of attention, and the jury was not made aware

of this important fact. If the jury knew the extent of the degree of stress

that both of these witnesses went through, they may have had doubts about

their identification of petitioner as the suspect. Based on the totality

of the circumstances, petitioner's physical appearance is unusually

distinctive. He is an extremely light-skinned African American, he is a

giant at 6 feet 9 inches tall and weighs well over 300 lbs.

The fact that not even one witness described the robber as a huge

person with light skin, and not one witness could identify petitioner

as the perpetrator with any degree of confidence is so significant on it's

own that no reasonable juror could find this man guilty beyond a reaso-

nable doubt. Given the notoriously unreliable nature of even positive

identifications, the trial court should have made sure to give an

instruction on mistaken identity.

It is highly probable that petitioner was wrongly identified as the

(34)



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

perpetrator. No other evidence was presented that could outweigh the

direct evidence of petitioner's innocence. The failure of the trial court

to give an instruction on mistaken identity had a substantial influence

on the jury. The factors not specified in CALJIC 2.92 had a very "sub-

**stantial an injurious effect and influence in determining the jury's**

verdict."

It is petitioner's position in this appeal, therefore that based on

the circumstances of the present case, an instruction focusing the attention

of **the jury on the defense** of misidentification was appropriate and

should have been given by the trial court. However, since the instruction

was not given this was a violation of petitioner's Sixth and Fourteenth

Amendments of the United States Constitution.

CALJIC 2.92 was inadequate in that it failed as to at least two of

the enumerated factors to explain the effect of those factors on the

accuracy of the identification:

(1) The instruction informs the jurors to consider the
witness' certainty of identification, thereby leading
the jurors to believe that more certain the witness is
the more likely the identification is correct.

(2) The instruction tells the jury to consider the stress
to which the witness was subjected at the time of the
observation, but there is no consensus on whether stress
improves or worsens eyewitness accuracy.

Yet, the California Supreme Court noted that studies have shown a

lack of correlation between the degree of confidence an eyewitness expr-

esses in her identification and the accuracy of that identification.

Based on the constitutional violations that occurred in this case,

petitioner urges this court to reverse his conviction.

// SEE Exhibit N

//

(35)

**GROUND SEVEN**

PETITIONER IS IN CUSTODY IN VIOLATION OF THE 6TH AMENDMENT OF THE UNITED STATES CONSTITUTION, BECAUSE THERE WAS A SENTENCE ERROR BECAUSE OF THE JUDGE'S IMPOSITION OF THE UPPER TERM ON COUNT TWO IN EXCESS OF THE MAXIMUM ALLOWED ON THE BASIS OF FINDINGS MADE BY THE JUDGE RATHER THAN BY THE JURY.

<div align="center">

**SUPPORTING FACTS**

</div>

Petitioner was sentenced to the upper term of five years for the principal count, doubled to 10 years pursuant to Penal Code Section 667, subdivisions (b) through (i). One-third the midterm of 1 year, doubled to two years, was imposed for the second count. Finally, a five year enhancement was imposed pursuant to Penal Code Section 667, subdivision (a). Petitioner's aggregate term of imprisonment is 17 years. (D035782 C.T. pp. 152, 200.)

The Sixth and Fourteenth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." Where proof of a particular fact exposes the defendant to greater punishment than that available in the absence of such proof, that fact is an element of the crime which the Sixth Amendment requires to be proven to a jury beyond a reasonable doubt.

Petitioner contends on appeal that he was deprived of his Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process because the trial court imposed the upper term in count two by relying on aggravating factors found true neither by a jury nor beyond a reasonable doubt.

As the United States Supreme Court has repeatedly made clear, any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt.

<div align="center">

(36)

</div>

When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority. The Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury duty. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Because the facts supporting petitioner's exceptional sentence were neither admitted by petitioner nor found by a jury, the sentence violated his Sixth Amendment right to trial by jury.

Petitioner's imprisonment is illegal and in contravention of rights guaranteed by the Sixth Amendment to the United States Constitution and by Article 15 of the California Constitution.

Petitioner's sentence was enhanced by five years because of the first alleged prior conviction for Unlawful driving or taking of vehicle without the owner's consent for which petitioner served a prior prison term. Petitioner admitted the prior on counsel's advice (R.T. p. 1505).

Penal Code Section 667.5 provides in pertinent part;

> [enhancement of prison terms for prior prison terms
> shall not be imposed where there has been a period
> of five years in which the defendant has remained
> free of felony convictions]

A cursory review of petitioner's record reveals that the prior felony conviction and prison term were over five years prior to his instant offense and thus cannot be used to enhance under Penal Code Section 667.5.

The trial court should have been alert to the inapplicability of the alleged prior under Penal Code Section 667.5, when reading the information in the instant case which states May 8, 1990 as the date of the prior conviction. The nine-year span between the alleged prior and the new offense is an obvious indicator which should have motivated the trial court

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1  or even the prosecution to engage in a rudimentary search to check into

2  the applicable five year "wash-out" clause of Penal Code Section 667.5.

3       Petitioner was released from prison in May 1991, and he suffered no

4  subbsequent felony convictions from that date until his conviction for

5  the instant case.

6       The sentence of one-third the midterm of 1 year, doubled to two

7  years is double jeopardy in violation of Penal Code Section 654, and the

8  Fifth Amendment of the United States Constitution.

9       Penal Code Section 654(a) states...An act or omission that
    is punishable in different ways by different provisions of
10   law shall be punished under the provision that provides
    for the longest potential term of imprisonment, but in no
11   case shall the act or omission be punished under more than
    one provision. An acquittal or conviction and sentence
12   under any one bars a prosecution for the same act or
    omission under any other.

13      By permitting sentencing judges to impose sentences based on their

14  determination of facts not found by the jury or admitted by the defendant,

15  or subjecting the defendant to double jeopardy has violated petitioner's

16  Fifth, Sixth and Fourteenth Amendment rights of the United States

17  Constitution. Under these circumstances this sentencing error cannot

18  conceivably be deemed harmless under any standard.

19  //     SEE Exhibit O

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

**GROUND EIGHT**
PETITIONER IS IN CUSTODY IN VIOLATION OF THE 6TH, AND THE 14TH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 15 OF THE
CALIFORNIA CONSTITUTION, BECAUSE DEFENSE COUNSEL'S REPRESENTATION AT TRIAL,
SENTENCING AND ON REMAND FELL BELOW AN OBJECTIVE LEVEL OR REASONABLENESS,
PREJUDICING PETITIONER AND CREATING A REASONABLE PROBABILITY THE RESULT
OF THE TRIAL WOULD HAVE BEEN DIFFERENT HAD COUNSEL ACTED REASONABLY.

### SUPPORTING FACTS

Counsel's performance was deficient, falling below an objective standard

of reasonableness because defense counsel failed to meaningfully challenge

the State's case at trial. Counsel did not even bother to object to the

procedure whereby witnesses Loper, Pomplin, and Anderson were allowed to

identify a photo of one single vehicle as opposed to having six different

vehicles (six pack) to choose from. Counsel should have pointed this out

for the jury to hear. By not objecting to the prosecution allowing these

witnesses to view a single vehicle and make an identification of that

single vehicle in such a suggestive manner "fell below an objective

standard of reasonableness."

Counsel has a responsibility to meaningfully challenge the State's case.

The identification of this single vehicle by these witnesses was central

to the States case in Counts #1 and #2.  The jury utilized this identification

evidence to make a crucial determination in finding petitioner guilty in

Count #2. This failure by petitioner's counsel remains simply unreasonable,

as there was no contemporary evidentiary hearing on the facts surrounding the

identification of the vehicle.

The identification of the vehicle in court by these witnesses was

unduly suggestive, when equating certainty with reliability "determinations

of the reliability suggested by these witnesse's certainty after the use

of suggestive procedures are complicated by the possibility that the

certainty may reflect the corrupting effect of the suggestive procedures

(39)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

1    [themselves]."

2         If counsel would have objected to this suggestive procedure then the

3    jury would not have been allowed to hear this crucial identification

4    testimony or the jury would have been told to disregard this identification

5    or the jury could have found this identification evidence not substantiated

6    and decide to find petitioner not guilty in Count #2.

7         Furthermore, counsel failed to put an identification expert on the

8    stand after explaining to the jury during opening arguments that they would

9    hear testimony from one. Based on the problems with identification in this

10   case there is no tactical, or logical explanation for counsel's lack of

11   "Diligence." The jury foreperson mentioned in his letter to the District

12   Attorney that "It was suggested that an expert would testify-that never

13   happened." It is apparent that even the jury was anxiously waiting for

14   counsel to present an expert witness on the stand to help them in their

15   decision making. This was objectively unreasonable and resulted in prejudice

16   to petitioner, since the jury didn't get the opportunity to hear from

17   this very crucial and important witness. In addition, the standard of

18   reasonably competent representation affords a measurable guide for

19   evaluating the quality of trial counsel's decision making.

20        During the sentencing hearing counsel failed in his duties to object

21   to the amount of money petitioner was ordered to pay for restitution.

22       THE COURT: All right. With regard to the restitution,
         any additional information as to either victims?
23       MS. KATE BUSH: No, your Honor.
         PROBATION: No, your Honor.
24       THE COURT: Okay. And Mr. Wadler, anything else?
         Mr. Steven Wadler: No, Sir.
25       THE COURT: Any comment on the restitution being
         requested by the two victims?
26       Mr. Steven Wadler: I am sorry your Honor?
         THE COURT: On the issue of restitution, any comment there?
27       Mr. Steven Wadler: No. Submit it.

(40)

1    Counsel failed in his duties to mention that petitioner was "indigent"

2   and could not even afford to pay for counsel to represent him during trial.

3   Counsel failed in his duties as an advocate for petitioner to request a

4   hearing regarding petitioner's ability to pay when it imposes a restitution

5   fine.

6       The statute requiring restitution fine of not less than $200.00 dollars

7   is subject to the defendant's ability to pay. West Ann. Cal. Penal Code

8   Section 1202.4, 1202.4(A), West Ann. Govt. Code §13967(A), Crim. Law

9   §1208.4(2).

10      Under Government Code §27755(B)(2) ability to pay means the overall

11  capability of the person to reimburse the costs or a portion of the costs

12  involved. This section allows the following factors to be used to determine

13  one's ability to pay the person's financial position, the person's future

14  financial position predicted for up to six months in the future the

15  likelihood that the person will be able to obtain employment within the next

16  Six months and any other factor bearing upon the person's ability to pay

17  for the costs involved, Government Code §27755(B)(2)(A)(D).

18      Under Government Code §27755(B)(1)(B), unless there are unusual cir-

19  cumstances a person sentenced to state prison does not have the future

20  financial position which allow an ability to pay within Six months

21  time frame.

22      With the current restitution payment recovery procedure taking a

23  total of 55% of all money deposited into an Inmate's trust account 45%

24  going towards the actual restitution fine and 10% going towards a

25  processing cost at the institution petitioner is housed.

26      The fact that petitioner is indigent he has no likelihood of making

27  payment in accordance with Government Code §27755(B)(2)(A)(d), to the

(41)

1  maximum fine which was imposed upon him at the time of sentencing and his

2  counsel failed in his duties to object to the amount of restitution imposed.

3  Had counsel objected to the amount of restitution that was imposed upon

4  petitioner there was a probability that he would have suceeded in requesting

5  a hearing to determine petitioner's ability to pay.

6      While out to court on remand petitioner ran into a prosecution witness

7  by the name of Steven Doepker in the local county jail. Mr. Doepker

8  didn't recognize petitioner at first, but after speaking with petitioner

9  he remembered testifying against him. Doepker apologized for sending him to

10  prison, but he mentioned that he was paid money by Detective Griffin during

11  the whole trial process and even before trial started. This money was for

12  favorable testimony to help the detective get a conviction against

13  petitioner so that he could close the case.

14      Petitioner relayed this shocking and relevant information to his

15  counsel as soon as he was able to get to a phone. If counsel had actually

16  investigated this important information, there is a posibility it would

17  have been enough to undermine the testimony of Mr. Doepker in relation to

18  Count #3.  Counsel's performance was deficient, falling below an objective

19  level of reasonableness, prejudicing petitioner and creating a reasonable

20  probability that the result's on remand would have been different since

21  this witness felt bad by perjuring himself on the witness stand to receive

22  the money promised to him by Detective Griffin. This failure to investigate

23  by petitioner's counsel deprived petitioner of his Sixth Amendment right

24  to have counsel make a reasonable investigation into his claims. Counsel's

25  errors prejudiced petitioner, because counsel's errors led to a reasonable

26  probability that the results of the proceedings would have been different had

27  the errors not occurred. Due to these errors reversal is required.

See Exhibit P

(42)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 05 90192

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes    ☒ No

24. If your answer to #23 is "Yes," give the following information:
    (a)  Name of Court:
    (b)  Case Number:
    (c)  Date action filed:
    (d)  Nature of proceeding:

    (e)  Name(s) of judges (if known):
    (f)  Grounds raised:

    (g)  Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes    ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a)  At preliminary hearing . . . . . . . .  Steven Wadler
           110 W. A St. #100
           San Diego, Ca. 92101-3907

    (b)  At arraignment and plea . . . . . . .  Steven Wadler
           see (A)

    (c)  At trial . . . . . . . . . . . . . . . . . . . .  Steven Wadler
           see (A)

    (d)  At sentencing . . . . . . . . . . . . . .  see (c) above

    (e)  On appeal . . . . . . . . . . . . . . . . .  Nancy J. King # 210.0
           1406 6th Ave # 210.0
           San Diego Ca 92101

    (f)  In any post-conviction proceeding .  N/A

    (g)  On appeal from any adverse ruling in a post-conviction proceeding:
           N/A

CIV 68 (Rev. Jan. 2006)

cv

(43)

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒Yes  ☐No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐Yes  ☒No

  (a) If so, give name and location of court that imposed sentence to be served in the future:

  (b) Give date and length of the future sentence:

  (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
  ☐Yes  ☐No

28. Consent to Magistrate Judge Jurisdiction

    In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

    The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

    You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☒ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☐ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

29. Date you are mailing (or handing to a correctional officer) this Petition to this court:
5/22/08

CIV 68 (Rev. Jan. 2006)

cv

(44)

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

5/22/08
_____
(DATE)

_____
SIGNATURE OF PETITIONER

CIV 68 (Rev. Jan. 2006)

cv

(45)

# EXHIBIT
## A A

**Description:** _Court Denials_

**Page:** _42 Pages_

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

Division One

San Diego County Superior Court
P.O. Box 2724
San Diego, CA  92112

RE:  THE PEOPLE,
            Plaintiff-Respondent,

     v.

     KEVIN GUNN,
            Defendant-Appellant.
     D035782
     **San Diego County No. SCD144476**

## * * * REMITTITUR * * *

I, Stephen M. Kelly, Clerk of the Court of Appeal of the State of California, for the Fourth Appellate District, certify the attached is a true and correct copy of the original opinion or decision entered in the above-entitled case on January 8, 2002, and that this opinion or decision has now become final.

_____ Appellant  _____ Respondent to recover costs.
_____ Each party to bear own costs.
__X__ Costs are not awarded in this proceeding.

4-3-02

Witness my hand and the seal of the Court affixed this March 11, 2002.

STEPHEN M. KELLY, Clerk

By: _____
    Deputy Clerk

cc:  All Parties (Copy of remittitur only, Cal. Rules of Court, rule 26(c))

(47)

Court of Appeal, Fourth Appellate District, Division One - No. D035782
**S104425**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

KEVIN GUNN, Defendant and Appellant.

SUPREME COURT
**FILED**

MAR 2 7 2002

Frederick K. Ohlrich Clerk

_____
DEPUTY

Petition for review DENIED.

Chin J., was absent and did not participate.

GEORGE
_____
Chief Justice

(48)

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

Division One

San Diego County Superior Court
P.O. Box 120128
San Diego, CA 92112-0128

RE:  THE PEOPLE,
      Plaintiff and Respondent,
  v.
  KEVIN GUNN,
      Defendant and Appellant.
D041821
**San Diego County No. SCD144476**

# * * * REMITTITUR * * *

    I, Stephen M. Kelly, Clerk of the Court of Appeal of the State of California, for the Fourth Appellate District, certify the attached is a true and correct copy of the original opinion or decision entered in the above-entitled case on May 20, 2004, and that this opinion or decision has now become final.

    _____ Appellant _____ Respondent to recover costs.
    _____ Each party to bear own costs.
    __✗__ Costs are not awarded in this proceeding.

    Witness my hand and the seal of the Court affixed this   **AUG 1 7 2004**

                     STEPHEN M. KELLY, Clerk

                By: _____
                     Deputy Clerk

cc:  All Parties (Copy of remittitur only, Cal. Rules of Court, rule 26(d))

(49)

Court of Appeal, Fourth Appellate District, Division One - No. D041821
**S125763**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

KEVIN GUNN, Defendant and Appellant.

SUPREME COURT
**FILED**

AUG 1 1 2004

Frederick K. Ohlrich Clerk

DEPUTY

Petition for review DENIED.

GEORGE,

Chief Justice

(50)

1

2

3       F I L E D
        Clerk of the Superior Court

4       OCT 25 2005

5       By: DSR  Deputy

6

7

8

9       **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10      **COUNTY OF SAN DIEGO**

11

12      IN RE THE PETITION OF:        )   SCD 144476
                                      )
13      KEVIN GUNN,                   )
                                      )   ORDER DENYING MOTION
14              Petitioner.           )   TO REDUCE RESTITUTION
                                      )
15                                    )
                                      )
16                                    )

17      _____

18          THIS COURT, HAVING READ AND CONSIDERED THE FORM MOTION TO

19      REDUCE RESTITUTION, AND THE FILE IN THE ABOVE CAPTIONED MATTER,

20      FINDS:

21          On May 26, 2000 the Court sentenced Petitioner to the total term of 17 years for two

22      counts of robbery (Penal Code § 211) and pursuant to Penal Code § 667(b)-(i). The Court also

23      ordered Petitioner to pay a restitution fine of $5,000 (Penal Code § 1202.4(b)), payable forthwith

24      (Penal Code § 2085.5), with an additional restitution fine of $5,000, suspended unless parole is

25      revoked (Penal Code § 1202.45), plus restitution to the victim in the total amount of $2,328.00.

26      Petitioner timely appealed, but on January 8, 2002, the Fourth District Court of Appeal affirmed

27      in part and reversed in a part that has nothing to do with restitution. In fact, Petitioner never

28      mentions restitution in that appeal.

29          Now, five years later, Petitioner brings for the first time the present form motion that

30      contains nothing factually specific to his case, but asks for a waiver/reduction of the above-

(51)

ORDER - 1

1   referenced restitution order because he claims that he is indigent without the ability to pay.

2       There are several reasons why this request is denied:

3       1. Pursuant to Penal Code § 1202.4(b), the imposition of the restitution fine was

4   mandatory when Petitioner was sentenced and there is no law that allows for it to be waived.

5       2. Because this is a motion to modify the sentence, the Superior Court has no jurisdiction

6   to modify sentence after 120 days have passed from the date of that judgment.

7       3. Petitioner has failed to meet the burden of proving he was unaware of his obligation to

8   pay these amounts at the time of sentencing in this case.

9       First, at the time Petitioner was sentenced and the restitution fine was imposed, Penal

10  Code § 1202.4(c) provided in pertinent part as follows: "The court shall impose the restitution

11  fine unless it finds compelling and extraordinary reasons for not doing so, and states those

12  reasons on the record. A defendant's inability to pay shall not be considered a compelling and

13  extraordinary reason not to impose a restitution fine. . . ." Subsection (d) adds that when the

14  courts sets the fine in excess of the $200 minimum, it shall consider the inability to pay, but also

15  "the seriousness and gravity of the offense and the circumstances of its commission, any

16  economic gain derived by the defendant as a result of the crime, the extent to which any other

17  person suffered any losses as a result of the crime, and the number of victims . . . ."

18      In the present case, Petitioner was convicted of two serious/violent felonies, so it can be

19  assumed the sentencing Court took these facts into consideration when the order was made.

20      Second, Pursuant to Penal Code § 1170(d) the court lacks jurisdiction to rule on

21  Petitioner's motion because more than 120 days have passed between the date sentence was

22  imposed in 2000, and the date of filing the present request.

23      Third, the California Supreme Court stated in People v. Scott (1994) 9 Cal.4[th] 331, 350-

24  351, "The parties have ample opportunity to influence the court's sentencing choices under the

25  determinate scheme. As a practical matter, both sides often know before the hearing what

26  sentence is likely to be imposed and the reasons therefor. Such information is contained in the

27  probation report, which is required in every felony case and generally provided to the court and

28  parties before sentencing. (§ 1191, 1203, subds. (b) & (g), 1203c, 1203d, 1203.10; rules 411,

29  411.5(a)(8), (9); People v. Edwards (1976) 18 Cal.3d 796, 801 & fn. 8.) In anticipation of the

30  hearing, the defense may file, among other things, a statement in mitigation urging specific

sentencing choices and challenging the information and recommendations contained in the

(52)

1 probation report. (§ 1170, subd. (b); rule 437.) Relevant argument and evidence also may be

2 presented at sentencing. (§ 1204; rule 433.)."

3     On page 10 of the Probation Report prepared for use at the initial sentencing hearing, it

4 clearly states that the Probation Officer recommended that Petitioner pay the exact amount

5 ordered: $5,000 for the restitution fine and a total of $2,328 in restitution to the victim. It can be

6 assumed that Petitioner saw this recommendation and was aware of it prior to the actual

7 imposition. Petitioner has been present at all hearings, but no claim of this alleged inability to

8 pay has even been mentioned in the past.  Since Petitioner chose not to contest the matter at

9 sentencing or on appeal, he has waived any right to challenge the order for lack of specificity.

10 People v. Blankenship (1989) 213 Cal.App.3d 992, 998. The Petitioner was represented by

11 counsel at the time of sentencing and failed to show that he was not aware of the restitution fine

12 and restitution to the victim amounts, so the issue has been waived because it was not raised at

13 the sentencing.

14     Therefore, for the reasons stated, Petitioner's motion to modify the sentence is DENIED.

15 It is further ordered that a copy of this order be served upon Petitioner.

16     IT IS SO ORDERED.

17 DATED: ___10/25/05___

18

19                     JOHN L. DAVIDSON

                  JUDGE OF THE SUPERIOR COURT

20 I hereby certify that the foregoing instrument is a
full, true & correct copy of the original on file in

21 this office, that said document has not been revoked,
annulled or set aside, and it is in full force and effect.

22 OCT 2 5 2005  2 4Pm
Attest: _____

23     Clerk of the Superior Court of the State
of California, in and for the County of San Diego

24     By_____ Deputy

25

26

27

28

29

30

(53)

ORDER - 3

F I L E D

Clerk of the Superior Court

NOV 2 3 2005

By: DSR Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| In the Matter of the Application of | ) HC 144476 |
| | ) SCD 18350 |
| | ) |
| | ) |
| KEVIN ORLANDO GUNN, | ) ORDER DENYING PETITION FOR WRIT |
| | ) OF HABEAS CORPUS |
| Petitioner. | ) |
| | ) |
| | ) |
| | ) |

AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE

COURT FILE IN THE ABOVE REFERENCED MATTER, THE COURT FINDS AS

FOLLOWS:

On May 26, 2000, the Court sentenced Petitioner to a total term of 17 years for two

counts of robbery (Penal Code section 211) and pursuant to Penal Code section 667(b)-(i).  The

Court also ordered Petitioner to pay a restitution fine of $5,000 (Penal Code section 1202.4(b).),

payable forthwith (Penal Code section 1202.45), plus restitution to the victim in the total amount

of $2,328.00.  Petitioner timely appealed on the grounds that (1) there was insufficient evidence

(54)

-1-

1   to support the judgment and (2) the trial court erred by (a) excluding evidence of third party

2   culpability, (b) denying his motion for disclosure of juror identifying information, and (c)

3   denying his motion for new trial. On January 8, 2002, the Fourth District Court of Appeal

4   affirmed in part and reversed in part. (Case No. D035782) The court reversed the trial court's

5   denial of Petitioner's motion for disclosure of juror identifying information and motion for new

6   trial and affirmed the judgment in all other respects. (*Ibid.*)

7        After remand, Petitioner appealed again on the grounds that (1) the trial court erred by

8   sustaining five jurors' objections to his petition without a showing they were unwilling to be

9   contacted; and (2) section 237(d) is unconstitutional as applied by the trial court. On August 17,

10  2004, the Fourth District Court of Appeal affirmed the trial court in all respects. (Case No.

11  D041821)

12       On October 11, 2005, Petitioner filed a Motion for Reduction of Restitution/Fines for

13  Lack of Ability to Pay. In an Order filed October 25, 2005, the Court denied Petitioner's motion

14  in its entirety.

15       Petitioner filed the instant Petition For Writ Of Habeas Corpus on November 4, 2005.

16  Petitioner seeks to set aside his conviction on the following grounds: (1) ineffective assistance of

17  counsel, (2) newly discovered evidence, (3) imposition of an upper-term sentence was improper,

18  and (4) Petitioner's counsel failed to object to the amount of restitution.

19       Every petitioner, even one filing in pro per, must set forth a prima facie statement of facts

20  which would entitle him to habeas corpus relief under existing law. (*In re Bower* (1985) 38

21  Cal.3d 865, 872; *In re Hochberg* (1970) 2 Cal.3d 870, 875 fn 4.)  Vague or conclusory

22  allegations do not warrant habeas relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)  The

23  petitioner then bears the burden of proving the facts upon which he bases his claim for relief. (*In*

24  *re Riddle* (1962) 57 Cal.2d 848, 852.)  The petition should include copies of "reasonably

25  available documentary evidence in support of claims, including pertinent portions of trial

(55)

-2-

1 | transcripts and affidavits or declarations." (*People v. Duvall, supra* 9 Cal.4th 474)  As set forth

2 | below, Petitioner has failed to meet this burden.

3 | <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>.

4 | Petitioner contends his court appointed counsel, Steven Wadler, failed to provide

5 | Petitioner with effective assistance of counsel under the law. Petitioner states Mr. Wadler failed

6 | to (1) object to the photo line-up identification of certain witnesses, (2) file a motion to suppress

7 | certain evidence, (3) have an identification expert testify, (4) obtain an affidavit from a

8 | prosecution witness who was allegedly paid by the People to testify against Petitioner, and (5)

9 | investigate and research the facts of the case. Petitioner contends Mr. Wadler's conduct violated

10 | his rights to due process. Petitioner claims that if Mr. Wadler had performed effectively the jury

11 | would not have heard the unduly prejudicial identification information and his defense would not

12 | have otherwise been undermined to Petitioner's detriment.

13 | Denial of the right to effective assistance of counsel, is one error which is cognizable on

14 | collateral review whether or not it was raised on appeal. (*People v. Jackson* (1973) 10 Cal.3d

15 | 265, 268, *citing In re Hochberg* (1970) 2 Cal.3d 870, 875.)

16 | In order for a convicted defendant to establish that counsel's assistance was so defective

17 | as to require reversal of a conviction, the defendant must show: (1) that counsel committed error

18 | so serious that his attorney was not functioning as the "counsel" guaranteed by the Sixth

19 | Amendment, and (2) that the deficient performance prejudiced the defense. (*Strickland v.*

20 | *Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)

21 | A reviewing court must apply the first of these prongs "deferentially" since there is a

22 | strong presumption that counsel's conduct falls within the "wide range of reasonable professional

23 | assistance." (*Strickland, supra*, 466 U.S. at p. 689; *Ledesma, supra*, 43 Cal.3d at p. 216).  The

24 | second prong of prejudice must be "affirmatively proved." (*Ledesma, supra*, 43 Cal.3d at p. 217.)

25 | To prove prejudice, defendants must establish the "reasonable probability that but for counsel's

1    unprofessional errors, the result of the proceeding would be different. A reasonable probability

2    is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S.

3    at p. 694.)

4         Other than Petitioner's conclusory statements and allegations he has submitted no

5    admissible evidence to support his claim that Mr. Wadler committed error so serious that he

6    failed to function as the "counsel" guaranteed by the Sixth Amendment. (*Strickland, supra,*

7    *Ledesma, supra*) In addition, Petitioner failed to submit any affirmative admissible evidence that

8    Mr. Wadler's alleged deficient performance prejudiced Petitioner's defense. (*Ibid.*) Thus, there

9    is no evidence before the Court that would establish a reasonable probability that but for Mr.

10    Wadler's conduct the result of Petitioner's trial would be different.

11        <u>NEWLY DISCOVERED EVIDENCE.</u>

12         Petitioner asserts while his case was on remand, he met prosecution witness, "Doepker,"

13    who allegedly told Petitioner that Detective Griffin paid Doepker to testify against Petitioner.

14    Petitioner seems to argue prosecutorial misconduct in this regard, but also blames his attorney

15    for not discovering this information and/or failing to move to suppress Doepker's testimony. Yet,

16    the Petition admits that during Petitioner's preliminary hearing Doepker "willingly admitted to

17    receiving [money] from the same detective and a D.A. Investigator." (Petitioner p. 7 of 13)

18    Further, the Petition admits that "during trial, [his] counsel failed to bring this important fact to

19    the attention of the jury." (*Ibid.*)

20         The evidence described by Petitioner does not constitute newly discovered evidence and

21    the Court elects not to address the issue. (See: *In re Miller* (1941) 17 Cal.2d 734) Further, the

22    general rule is that habeas corpus cannot serve as a substitute for an appeal, and that matters that

23    "could have been, but were not, raised on a timely appeal from a judgment of conviction" are not

24    cognizable on habeas corpus in the absence of special circumstances warranting departure from

25    that rule. (*In re Clark* (1993) 5 Cal.4th 750, 765 [*quoting In re Dixon* (1953) 41 Cal.2d 756, 759;

1   *In re Walker* (1974) 10 Cal.3d 764, 773.) Petitioner has failed to set forth any argument or

2   evidence of special circumstances that warrants this Court's review in this regard.

3   <u>IMPOSITION OF AN UPPER-TERM AND AMOUNT OF RESTITUTION.</u>

4   Finally, the Petitioner challenges the sentence he received more than five years ago on

5   May 26, 2000. He contends the judge improperly imposed the upper-term and required Petitioner

6   to pay restitution despite the fact that Petitioner is indigent.

7   On October 25, 2005, the Court issued an order denying Petitioner's motion to reduce the

8   restitution he was ordered to pay. That motion essentially challenged the sentenced imposed in

9   May, 2000. Since the amount of restitution and the imposition of the upper-term are sentencing

10  issues, the Court's reasoning in its October 25, 2005, order applies to Petitioner's instant request.

11  As such, the Court deems Petitioner's request here as a motion for reconsideration. New

12  applications based on the same grounds will be denied unless there has been a change in the

13  existing facts or the law. (*In re Lynch* (1972) 8 Cal.3d 410, 439 fn. 26; *In re Miller* (1941) 17

14  Cal.2d 734.) Petitioner has stated neither new facts nor new law justifying reconsideration of the

15  sentencing issues raised here. As Petitioner was informed previously, the Court has no

16  jurisdiction to modify a sentence after 120 days have passed from the date of that Judgment.

17  (Penal Code section 1170(d); See *People v. Scott* (1994) 9 Cal.4th 331, 350-351).) Since

18  Petitioner elected not to contest the matter at sentencing or an appeal, he has waived any right to

19  challenge his sentence at this time. (*People v. Blankenship* (1989) 213 Cal.App.3d 992, 998)

20  The petition is denied. A copy of this Order shall be served upon Petitioner and the

21  Office of the San Diego County District Attorney, Appellate Division.

22  IT IS SO ORDERED:

23  Dated: NOV 2 3 2005

        DAVID M. GILL
24      JUDGE OF THE SUPERIOR COURT

25

(58)

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| ☒ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814<br>☐ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827<br>☐ FAMILY COURT, 1501 6TH AVE., SAN DIEGO, CA 92101-3296<br>☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105<br>☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649<br>☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792<br>☐ JUVENILE COURT, 1701 MISSION AVE., OCEANSIDE, CA 92054-7102 | F I L E D<br>Clerk of the Superior Court<br>NOV 2 3 2005<br>By: ⟨signature⟩ Deputy |

| PLAINTIFF(S)/PETITIONER(S)<br><br>The People of The State of California | |
|---|---|
| DEFENDANT(S)/RESPONDENT(S)<br><br>KEVIN ORLANDO GUNN | JUDGE: ____<br><br>DEPT: ____ |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL**<br>(CCP 1013a(4)) | CASE NUMBER<br><br>HC144476<br>SCD18350 |

I, **STEPHEN LOVE**, certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS


on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:     ☒ San Diego     ☐ Vista     ☐ El Cajon     ☐ Chula Vista     ☐ Oceanside     ☐ Ramona, California.

| <u>NAME</u> | <u>ADDRESS</u> |
|---|---|
| KEVIN ORLANDO GUNN<br>P-78894          D2 - 220 LOW | IRONWOOD STATE PRISON<br>P.O. BOX 2199<br>BLYTHE, CA 92226-2199 |
| SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE<br>APPELLATE DIVISION | P.O. BOX 121011<br>SAN DIEGO, CA 92112-1011 |

STEPHEN LOVE
CLERK OF THE SUPERIOR COURT

Date: 11/23/05 _____          By ⟨signature⟩ _____, Deputy

(59)

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

# Court of Appeal
State of California
FOURTH APPELLATE DISTRICT
Division One
750 B Street, Suite 300
San Diego, CA 92101-8196
www.courtinfo.ca.gov/courts/courtsofappeal
(619) 645-2760

December 30, 2005

RE:   In re KEVIN GUNN on Habeas Corpus
**D047765**
**San Diego County No. SCD144476**

Dear Petitioner:

Your petition for writ of habeas corpus has been received and filed on December 30, 2005, and assigned case number D047765. It is currently pending before the court. You will be notified of the court's decision once it has been rendered.

Please notify the court should you have a change of address.

STEPHEN M. KELLY, CLERK

BY: _____
Deputy Clerk

(60)

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re KEVIN GUNN | D047765 |
| on | (San Diego County Super. Ct. No. SCD 144476) |
| Habeas Corpus. | |

THE COURT:

The petition for writ of habeas corpus has been read and considered by Presiding Justice McConnell and Associate Justices Aaron and Irion.

A jury convicted petitioner of two counts of robbery. The court found he had a prior strike, sentenced him to a 17-year term and ordered him to pay a $5,000.00 restitution fine and $2,328.00 in restitution. He appealed, contending there was insufficient evidence to support the conviction, and the court erred in excluding evidence of third party culpability, in denying a motion to disclose juror identifying information, and in denying a motion for new trial. This court reversed the order denying disclosure of juror information and affirmed the judgment in all other respects. After remand petitioner again appealed, claiming the court erred in sustaining five jurors' objections to disclosing information and that Penal Code section 237, subdivision (d) was unconstitutional as applied. This court affirmed the order. Subsequently, the superior court denied petitioner's motion to reduce the restitution fine.

Petitioner contends he received ineffective assistance of counsel because his counsel did not object to suggestive vehicle identification; did not move to suppress the vehicle identification or present expert identification testimony; did not investigate petitioner's claim that a prosecution witness offered perjured testimony; did not adequately investigate his case; and did not object to the amount of the restitution fine.

For a petitioner to prevail on a claim of ineffective assistance of counsel he or she must establish that counsel "failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People v. Pope* (1979) 23 Cal.3d 412,

(61)

S142309

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

_____

In re KEVIN GUNN on Habeas Corpus

_____

Petition for writ of habeas corpus is DENIED.  (See *In re Robbins* (1998) 18 Cal.4th 770, 780.)

SUPREME COURT
FILED

NOV 2 9 2006

Frederick K. Ohlrich Clerk
_____
DEPUTY

GEORGE
_____
Chief Justice

(62)

S148849

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re KEVIN GUNN on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

SEP 2 5 2007

Frederick K. Ohlrich Clerk

——————————————
Deputy

GEORGE
——————————————
Chief Justice

(63)

F I L E D

Clerk of the Superior Court

DEC 18 2007

By: _____ , Deputy

1

2

3

4

5

6

7

8   **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9   **IN AND FOR THE COUNTY OF SAN DIEGO**

10  IN THE MATTER OF THE APPLICATION OF:  )
                                          )
11  KEVIN GUNN,                           )   HC 18350
                                          )   SCD 144476
12                  Petitioner.           )
                                          )   ORDER DENYING PETITION FOR WRIT
13                                        )   OF HABEAS CORPUS
                                          )
14  _____)
                                          )

15

16      AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE

17  COURT FILE IN THE ABOVE REFERENCED MATTER, THE COURT FINDS AS

18  FOLLOWS:

19      On September 17, 1999, a jury convicted petitioner of two counts of Robbery (Pen. Code

20  § 211). One of the counts carried an enhancement pursuant to Penal Code section 667. The

21  court sentenced petitioner to 17 years. Defendant filed a timely notice of appeal. In the appeal,

22  petitioner raised issues of (1) insufficient evidence to support the judgment, (2) trial court error

23  by (a) excluding evidence of third party culpability, (b) denying a motion for disclosure of juror

24  identifying information, and (c) denying his motion for a new trial. The court of appeal affirmed

25  the judgment, but then remanded reversing the orders denying the motion for disclosure of juror

26  information and new trial.

27      On September 13, 2002, the court granted the motion to release juror information as to

28  seven of the twelve jurors. The remaining jurors objected to the release of their information, and

(64)

ORDER - 1

1    the court acceded to those objections.  Petitioner then appealed the court's decision denying the

2    motion to release juror information as to the five jurors who objected to that release.  On August

3    17, 2004, the court issued its remittitur.  The court affirmed the trial court's order.

4      Petitioner filed his first petition for writ of habeas corpus with this court on November 4,

5    2005.  There he alleged ineffective assistance of counsel, newly discovered evidence, paying a

6    witness to testify, sentencing error, and amount of restitution.  That petition was denied November

7    23, 2005.

8      Petitioner now claims there was insufficient evidence because there was no credible

9    evidence to prove he committed the crimes he was convicted of.  Petitioner contends the trial

10    court error in excluding testimony regarding potential third party culpability.  Petitioner contends

11    there was law enforcement misconduct, perjury, and police bias.  Also the trial court erred in

12    refusing the request for juror information.  Petitioner contends the trial court abused its discretion

13    by disregarding the 4th District Court of Appeal.  Petitioner contends the trial court erred by

14    improperly instructing the jury.

15      In general, habeas corpus cannot serve as a second appeal, and matters that were raised

16    and rejected on appeal are not cognizable on state habeas corpus in the absence of special

17    circumstances.  (*In re Huffman* (1986) 42 Cal.3d 552, 554-55; *In re Terry* (1971) 4 Cal.3d 911,

18    927.) The same rule applies to petitioners filing writs of habeas corpus in federal court pursuant

19    to 28 U.S.C. §§ 2254 and 2255. (See *United States v. Frady* (1982) 456 U.S. 152, 164-65 [71

20    L.Ed.2d 816, 828] ("[W]e have long and consistently held that a collateral challenge may not do

21    service for an appeal." [citations omitted]).)

22      Additionally, The general rule is that habeas corpus cannot serve as a substitute for an

23    appeal, and that matters that "could have been, but were not, raised on a timely appeal from a

24    judgment of conviction" are not cognizable on habeas corpus in the absence of special

25    circumstances warranting departure from that rule. (*In re Clark* (1993) 5 Cal.4th 750, 765

26    [quoting *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Walker* (1974) 10 Cal.3d 764, 773.)

27      Here, petitioner has two appeals, a previous habeas petition in this court, and a previous

28    habeas petition in the court of appeal.  Petitioner has had opportunities to raise these issues.

1    There are no unusual circumstances to justify this court reviewing these issues.

2         The petition is therefore denied.

3         A copy of this Order shall be served upon Petitioner and the San Diego Office of the

4    District Attorney.

5         IT IS SO ORDERED.

6

7    DATED: 12/18/07

8                                        RANDA TRAPP

9                                        JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(66)

ORDER - 3

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☒ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814
☐ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ FAMILY COURT, 1501 6TH AVE., SAN DIEGO, CA 92101-3296
☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105
☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649
☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792
☐ JUVENILE COURT, 1701 MISSION AVE., OCEANSIDE, CA 92054-7102

**F I L E D**
Clerk of the Superior Court

DEC 1 8 2007

By: _____, Deputy

PLAINTIFF(S)/PETITIONER(S)

The People of The State of California

DEFENDANT(S)/RESPONDENT(S)

KEVIN GUNN

JUDGE: _____

DEPT: _____

| **CLERK'S CERTIFICATE OF SERVICE BY MAIL**<br>**(CCP 1013a(4))** | CASE NUMBER<br><br>HC 18350 |
|---|---|

I certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:   ☒ San Diego   ☐ Vista   ☐ El Cajon
☐ Chula Vista   ☐ Oceanside   ☐ Ramona, California.

| NAME | ADDRESS |
|---|---|
| KEVIN GUNN | CDC # P-78894<br>P.O. BOX 608<br>TEHACHAPI, CA  93581 |
| SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE<br>APPELLATE DIVISION | P.O. BOX 121011<br>SAN DIEGO, CA 92112-1011 |

**CLERK OF THE SUPERIOR COURT**

Date:12/18/07___          By L. SANDOVAL_____, Deputy

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

SDSC CIV-286(Rev 11-99)

# EXHIBIT
## A

**Description:** Composite Drawing
Of Suspect

**Page:** 1



# SAN DIEGO
# Police Bulletin
## Western Division
## March 4, 1999

( For the exclusive use of Law Enforcement Officers only )

# Information Wanted

### 211 PC - Robbery

**SUSPECT**
B/M/A
6'-00 to 6'-03"  220 Lbs
"Heavy Set with Big Bones"
Very Dark Shiny Skin

**VEHICLE**
Older Model Toyota or Similar
Dull Black paint
Chrome Missing from Right Wheel Well



Computerized Composite

Western Division is investigating two cases where the listed suspect beat and robbed elderly victims. In each case, the suspect approached the victims and without any warning, punched them in the face numerous times. While the victims were on the ground, the suspect went through their pockets, removing wallets. Prior to leaving, the suspect kicks the victims numerous times then calmly walks away. The suspect walks to a vehicle parked one or two blocks away. The vehicle is described as an older model dull black Toyota or similar. The right wheel well may be missing a chrome strip leaving white paint showing. Please forward any possible suspect information to Detective Eastus, Western Investigations  692-4833.

## Official Publication of the San Diego Police Department
### Jerry Sanders, Chief of Police

99-913117 PMS  OOP #2317

(69)

# EXHIBIT

## β

**Description:** Opening Brief statement of Facts and Argument

**Page:** 4 Pages

ordered to be served consecutively for Count Three. Finally, a five-year

enhancement was imposed pursuant to Penal Code section 667, subdivision

(a). Appellant's aggregate term of imprisonment is 17 years. (C.T. pp.

152, 200.)

Appellant timely filed a notice of appeal on June 7, 2000. (C.T. p.

154.)

## STATEMENT OF FACTS

A.    Introduction

Appellant was arrested for a series of street robberies that had been

committed over several months in 1998 and 1999 in the Normal Heights,

North Park, University Heights, and Kensington areas of San Diego. The

robberies were committed primarily against elderly people, and generated

attention from local politicians and law enforcement, who made solving the

crimes a priority. (4A R.T. pp. 580-582; see also, *Officials Target Crimes*

*Against Elderly*, S.D. Union (Feb. 28, 1999) p. B-2.)

Based on statements by eyewitnesses, police were looking for an

African-American male, 6 feet to 6 feet, 3 inches tall, heavy set, with "very

dark shiny skin."[1] The crimes were unusual for the callous and bold way in

---

[1] Defense Exhibit A, along with any other appropriate exhibits, will be
transmitted to the Court pursuant to Rule 10 (d).

which they were committed, where the attacker would strike an individual from behind in broad daylight and in front of numerous witnesses, then casually walk away from the scene. At least two additional suspects were arrested for the crimes, but then released when the same type of robberies continued. (1 R.T. pp. 23, 33.) Many other suspects were investigated. (1 R.T. p. 33.)

The evidence at trial established Mr. Gunn stands unusually tall at 6 feet, 9 inches, and that he is an African-American with very light-colored skin. Most of the witnesses who testified were shown People's Exhibit 10, a photographic lineup of six individuals, in which it was stipulated that appellant occupied the number three spot. (4 R.T. p. 394.) A review of the exhibits in this case will reveal that Mr. Gunn is an extremely distinctive-looking individual, yet, as will be seen below, very few witnesses selected his photograph out of the lineup, and nobody positively identified him in the lineup. Not a single eyewitness offered police a physical description that accurately reflected Mr. Gunn's appearance and stature.

Appellant's primary contention in this case is that the circumstantial evidence presented is not sufficient to sustain his conviction given the extensive eyewitness evidence that a different individual committed the crimes. Because the evidence presented is crucial to a resolution of this issue, the facts are described here in detail.

(72)

## ARGUMENT

### I

## THE EVIDENCE IS NOT SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION

### A.    Introduction

Although almost a dozen eyewitnesses testified to having seen the perpetrator of the robberies, not a single individual made a positive identification of appellant when looking at the photographic lineup. Not one person gave an accurate physical description, although many of the descriptions were very similar to the other eyewitnesses. As seen below, none of the descriptions offered by witnesses are consistent with Mr. Gunn's physical appearance. Moreover, someone other than appellant was selected seven times in the photographic lineup, and three witnesses did not identify anyone. Only three of the 11 witnesses tentatively identified appellant.

The following chart breaks down the description offered to police by eyewitnesses, and the results of those witnesses looking at Exhibit 10, the photographic lineup[3]:

---

[3] Steve Doepker, who testified regarding Count Three, is not included in the chart. He is the only person who positively identified appellant from the photographic lineup, but he also testified he knew appellant through living in the same neighborhood. Also, he did not witness the robbery, and only testified to seeing appellant in the area of the Quick Mart, where the evidence showed appellant was during the time of the robbery.

| Witness | Height | Build | Complexion | Hair | Photo ID |
|---|---|---|---|---|---|
| Kamien V1 | N/a | N/a | N/a | N/a | N/a |
| Brennan | 6'1" | medium | | | Wrong (2x) |
| Schroeder | 5'10" to 6' | | | "Bad haircut; "Kinky hair" | Wrong (2x) |
| Burkholder | 6' or slightly taller | | | Short | Nobody & excluded D |
| Loper | 6' to 6'3" | | Very dark, shiny skin | | Excluded D & picked wrong guy |
| Pomplin V2 | Tall | Thin | Dark skin | "like Bozo" | Wrong guy |
| Andaya | 6' or taller | 250+ | Dark skin | Clean cut | Nobody |
| Anderson | 6'1" | 200+ | | | Nobody |
| Fortunato V3 | 6' + | | | | Picked D & 1 other; other more likely |
| Stowell | 6'4" | Thin | | | Tentative ID |
| Halloran | 6'3" | Thin | | | Tentative ID |

As discussed below, the identifications of appellant by these witnesses do not constitute substantial evidence, and when combined with the witnesses who actually excluded appellant as a suspect, the probability increases that Mr. Gunn was not the person who committed the robberies.

**B.    Standard Of Review**

The appellate court reviews the record in the light most favorable to the judgment, drawing all inferences and presuming every fact in support of the judgment that a trier of fact could reasonably deduce or draw from the evidence. (*People v. Miranda* (1987) 44 Cal.3d 57, 87.) "The court does not, however, limit its review to the evidence favorable to the respondent." (*People v. Johnson* (1980) 26 Cal.3d 557, 577.)

(74)

# EXHIBIT
C

**Description:** Newspaper Article of
Petitioner's trial, showing his size + complexion

**Page:** 6 Pages

# Gunn, convicted of a series of robberies may get new trial

**JOHN E. WARREN**
*Publisher*

Kevin Gunn, 38, convicted of beating and robbing four people early last year in the mid-city area, was scheduled to be sentenced last week, but his lawyer petitioned the court for a new trial.

The reason sited could be as serious as the Rampart's investigations into the conduct of certain Los Angeles police officers, a number of whom have now been arrested.

The motion for a new trial for Gunn was made on the grounds that the verdict was contrary to law and evidence. 1) The jury was not impartial and relied upon evidence not presented at the trial; and 2) numerous incidents of law enforcement misconduct and perjury, rendering the trial fundamentally unfair, in violation of Gunn's constitutional rights to a fair trial.

In the documents presented to the court, Gunn says "that such procedures amounts to a denial of due process of law."

Support for Gunn's motion



Kevin Gunn, 36, with his attorney Steve Wadler.

for a new trial is found in part in a September 19, 1999 letter from Robert I. Morse, the jury foreman in this case, to District Attorney Paul Pfeinst. In the letter Morse stated, "I am writing this letter to raise some issues in regard to the District Attorney's Office during the trial of People vs Gunn." Morse went on to make the following observations:

- Lack of time or overwork can not be allowed as an excuse for sloppy prosecution.

- There was no framework on which to bring the scattered bits of evidence;

- Much of the identification depended on perceptions of height. It was suggested )by the D.A.) that an expert would testify. It never happened;

Turn to page A12

*San Diego Voice and Viewpoint*
*may 25, 2000*

(76)

This statement by the jury foreman appears to fly in the face of California Civil Procedure Code, Sec 232 (b), which requires every juror in California to take an oath to "render true verdict according only to evidence presented and the instructions of the court."

Evidence in this case showed Gunn in a store at the time of the robbery and not at the scene of the robbery.

The descriptions of the witnesses could possibly describe a half dozen Black men, since Black people tend to be identified as all looking alike.

The witness describe the robber as an African-American man between 5'10 and 6'3 in height and that he weighed between 170 and 200 lbs.

Some say the robber has a thin build. Another says he had a very dark complexion with dark shiny skin. Gunn is 6'9, weighs 320 lbs. plus, and has a very light complexion.

All of the wanted posters and Crime Stoppers video showed the robber to be 6'0 to 6'3, 220 lbs, heavy set and with very dark shiny skin.

Between February 24, 1999 to April 6, 1999, three more robberies occurred. In each of the descriptions given, the robber was described as a Black male, 40 to 45 years-old, about 6'3 with a thin build, and a very dark complexion.

Gunn had been stopped as he was returning from paying a utility bill a few blocks away. He was released, but was arrested a couple of weeks later.

City Councilwoman Christine Kehoe held a news conference in which she awarded the police commendations for the arrest of Kevin O. Gunn. The citizens in attendance questioned the arrest, because Gunn did not fit the composite drawing the police issued to the public and the broadcast on television.

One witness chose a dark skin Black man in a police lineup.

Local transient and known alcoholic Steve Doepker testified on April 6, 1999, that he did not see anyone fleeing the robbery scene, nor did he notice anyone running or was out of breath, or in physical distress as if anyone had robbed a store or assaulted someone. But he later testified that he saw Gunn leave the scene.

The defense later learned that the transient had been paid $300 for his testimony. He (Steve Doepker) admitted that he drinks liquor regularly, and that he was intoxicated the day of the robbery. He even showed up in court drunk. The day he testified while so intoxicated, he was given $20 to clean himself up.

The *San Diego Voice & Viewpoint* looked at the wanted poster and it describes the suspect as a B/M/A (Black Male Adult), 6'0 to 6'3 and 220 lbs, heavy set with big bones, and underlined is Very dark shiny skin.

## Gunn

Continued from A1

- The witnesses were never asked if their description could extend to someone the size of the defendant;

- The street map, the people's exhibit, left out many of the alley's that were referred to by witnesses;

- A witness identifying a tear in a shirt must have caught the prosecutor by surprise, as there was no testimony as to when or if he had seen the shirt up close before that time.

But the most telling reason for a new trial could be found in the last two sentences of Morse's letter – "Based on the prosecutor's performance, had the jury been less proactive or less intelligent, there would not have been a conviction."

"Neither overwork nor public service is an excuse for substandard performance."

A4 • Voice & Viewpoint • Thursday, May 25, 2000

# Editorial & Commentary

## EDITORIAL

# Mr. Gunn should have a new trial

The case of Kevin O. Gunn raises enough questions for both the courts and the public to have concern over how the entire matter has been handled. While Mr. Gunn is large in stature and might be intimidating to some, it does not follow that he has to be the large Black man who robbed the senior citizens who have been victimized by these crimes, time after time witnesses described the person who committed these crimes as a "large, dark skin man." Mr. Gunn is not able to change his skin complexion at will.

In addition to this fact, additional robberies occurred after Mr. Gunn's arrest. There were down played by police and prosecutors. The additional issues raised in our story on this case certainly make the case for a new trial.

The San Diego Voice and Viewpoint has an excellent opportunity to serve justice by calling for a new trial rather than continue with the sentencing of a man whose only real crime at this point is being Black in a case involving little old White senior citizens.

The public should be just as concerned because to sentence the wrong man in a case where evidence has either been "worked" or omitted to get a conviction, does a disservice to all of us and leaves a dangerous person on our streets.



Suspect described as a black male dark complexion, and he has very dark shiny skin, 6'0-6'3 200 lbs

CUFF 'IM? WE GOT NO HARD EVIDENCE ON THIS GUY!

Kevin Gunn 6'4 300+ lbs he has a very light skinned complexion.

NOT A PROBLEM. WE MAKE IT UP AS WE GO ALONG.

PG 40F17 (78)

San Diego Weekly Reader 5/11/2001

# Justice for the Giant

*By Ernie Grimm*

In early 1999, over a dozen similar assault-and-robbery crimes took place against elderly pedestrians in the Mid-City area. In all of them, the victims were knocked over from behind, held face down, and robbed. Many of the assaults were in broad daylight in front of bystanders. All of the witnesses' accounts said the perpetrator was a black man, but more specific descriptions of his appearance varied. He was described as anywhere from 5'10" to 6'4", 200 to 230 pounds, thin to large. Some witnesses said he was medium-complexioned, others said very dark.

San Diego Police arrested a man in February of 1999 in connection with the crimes, but prosecutors released him when the crimes continued, and they realized they had the wrong man. In April of that year, police arrested Kevin Orlando Gunn, a then-37-year-old ex-convict and Mid-City resident, and charged him with committing three of the robberies. Gunn, a light-complexioned African-American who stands 6'9" and weighs over 300 pounds, had a criminal history of assault and robbery, most notably a 1985 attempted robbery near an automatic teller machine. The victim turned out to be an off-duty Carlsbad police officer, Jimmy Byler. In response, Byler shot Gunn in the calf and back. Gunn pleaded guilty to that crime, which was similar in method to the Mid-City robberies of 1999 he was charged with.

Gunn pleaded not guilty to those charges. In trial, his attorney, Steven Wadler, stressed the 5-inch to 11-inch gap between Gunn and the tallest height given by witnesses, the 70-pound weight difference, and the shade in skin complexion. He also pointed out that no witnesses had picked Gunn out of photo lineups and that one man had excluded Gunn at the scene of one crime. Prosecutor Kate Bush countered that all of the witnesses had described Gunn as tall and that people don't think in terms of 6'9". She put witnesses on the stand who made courtroom identifications of Gunn as the perpetrator.

*Justin Brooks*

Dear Judge Enright,

This letter is in regards to my trial. There were two factors in ... the suspects height and the other was the complexion of the suspe... witnesses described the suspect as a dark complected black male. 5 ... picked a dark complected black male in the police photo line-up. I... Kamion case, Mr Loper (witness) gave the police a description of t... order for the police to make a composite drawing. When shown a photo... Detective Means Mr Loper picked a dark complected black male and ... of 1 - 10 he is a 8, according to Detective Means's testimony he c... one else as being the suspect. But, Mr Loper has the audacity to c... and say under oath, that I was the suspect but, I must have gotten ... was also admitted under oath, that the vehicle used in the people'... have the damage on it, as did the car, that he saw that day! He al... oath that he recognizes my pendelton jacket, because of the tear/ho... the preliminary hearing when asked did the pendelton jacket have a ... in it he replied "no it did not"!

IF YOUR HONOR, WOULD BE SO KIND TO REVIEW THE VIDEO TAPE FROM THE ... WILL SEE THAT THERE IS NO TEAR OR HOLE WHATSOEVER IN THE PENDELTON ...

*Letter to Judge Enright*

Despite the discrepancy between eye-witness descriptions and Gunn's size and skin color, he was found guilty on two of three counts by a jury September 17, 1999. When the verdict was read, Wadler told Judge Kevin Enright that the jury erred when it found his client guilty. "The jury ignored the presumption of innocence," he said. "The jury did not act intelligently or justly."

Support for Wadler's claim came the very next day in the form of a letter jury foreman Robert Morse sent to District Attorney Paul Pfingst. "To begin with," Morse wrote, "after the prosecutions [*sic*] opening statement, I barely had an idea of what she intended to prove. There was no framework on which to hang the scattered bits of evidence. I was not alone in this perception."

Morse went on to characterize the prosecution as "sloppy," to criticize prosecutor Kate Bush's use of a self-professed clairvoyant as a witness, and to criticize her for not using an expert to support her claim about the way people perceive height. He concluded the letter by stating, "Based on the pros-

*continued on page ...*

...g facility," Berkman said.
He said the board's real estate ...

...proved without discussion the historic designation of the 50-year-old, ...

4720 Fourth Ave., occupied in last 45 years by Elks Lodge 168 ...

...vin Gunn (left) sat with his attorney, Steven Wadler, during his sentencing yesterday to 17 years in priso... ...ocking down and robbing two women in North Park. *Don Kohlbauer / Union-Tribune*

...und his client guilty.

"The jury ignored the presumption of innocence," he said. "The ...

the trial in September, Wadler said Gunn was "freaky big" and that anyone who had seen him would have ...

...said. "Justice was done — fina...

Enright described Gunn ... predator who sought out the v...

*Kevin Gunn (left) and Steven Wadler*

19 of 17 (79)

**CITY LIGHTS · CITY LIGHTS · CITY LIGHTS · CITY LIGHTS**

## Justice

*continued from page 4*

ccutor's performance had the jury been less proactive or less intelligent, there would not have been a conviction, and a dangerous criminal would be back on the streets."

Justin Brooks directs the Innocence Project, a student-staffed workshop at California Western School of Law that reviews criminal convictions and works

on behalf of inmates convicted unjustly or under questionable circumstances. He says a letter such as Morse's is not that unusual.

"I've seen quite a few jurors come forward," Brooks says, "and say the proceedings

were inappropriate. But you can't get a case reversed due to the fact that a juror had buyer's remorse. A juror coming forward and saying 'I shouldn't have gone along with everybody else,' that's not really grounds for a reversal. For a lot of them, it's hard to live with the fact that they put someone in prison possibly for the rest of their life."

Yet Brooks says Morse's letter has a twist to it that

continued on page 8

## Justice

continued from page 6

may point to jury miscon- duct. "The word 'proactive' is very dangerous," he ex- plains. "Being proactive ex- plains the role of the juror. The not the role of the juror. The role of the juror is to be re- active to the evidence. They're supposed to con- sider what is put in front of them and nothing else and make their decision based on that. What [Morse] is saying is the prosecutor, didn't prove the case, but we went ahead and convicted anyway."

The district attorney's of- fice turned the letter over to Judge Kevin Enright and to Wadler who on May 17, 2000, filed a motion for a new trial with the judge. In his motion, he summarized the evidence that had been offered at trial. Wadler pointed out that one pivotal witness, Duane Loper, iden- tified Gunn "in court at the preliminary hearing and at the trial" after having "ex- cluded him in a photo lineup." And Loper's identi- fication of Gunn in the courtroom was, Wadler said, "despite providing descrip- tive information dramati- cally different than the ac- tual appearance of Mr. Gunn."

Wadler pointed out that one police officer, Detective Pete Griffin, denied know- ing that Loper had been shown a photo lineup; then another officer stated that he had shown Loper the lineup and reported the results to Griffin.

The jury hung, 10-2 for guilt, on that count. Regard- ing the other two counts, Wadler, in the motion for a new trial, noted that one vic- tim/witness — the clairvoy- ant — who identified Gunn during the trial, had ex- cluded him in a photo lineup and at the prelimi- nary hearing. He also indi- cated that another vic- tim/witness had identified Gunn at the preliminary hearing and trial after hav- ing been unable to identify him in a photo lineup. He mentioned two other wit- nesses who could not iden- tify Gunn in photo lineups, the preliminary hearing or the trial. And Wadler cited the convenience-store surveil- lance-camera footage, which put Gunn in the store at the time of one of the crimes.

Wadler closed his written motion with a reference to Morse's letter. "The jury chose to ignore these reali- ties and convict an innocent man as a favor to Paul Pfin- gst, who should be grateful for their 'proactive (pro- secution/law enforce- ment)' stance."

On May 26, 2000, Judge Enright denied Gunn's mo- tion for a new trial and sen- tenced him to 17 years in prison. A brief was filed by Gunn's appellate attorney, Nancy King, in late April of this year. "The main issue," King says, "is that we just don't think the evidence was sufficient."

Arguing insufficient ev- idence is a tack usually not taken by appellate attorneys because in appeals, King ex- plains, "The presumption switches. In a trial, the pre- sumption is that he's inno- cent and the prosecution has to prove him guilty. In ap- peals court, there's a very strong presumption of guilt because a jury found him guilty."

For that reason, appeals briefs usually try to point out some error in process during the trial that may have affected the outcome. "A common example," King says, "is judge's instructions: instructions that weren't instructions properly given, instructions that should have been given but weren't, or instructions that should not have been given and were."

But in this case, King believes a strong insuffi- ciency argument can be made. "First," she explains, "there is some circumstan- tial evidence which really influenced the jury. But I think it's pretty easily ex- plained by the fact that he lives in the area where the last robbery occurred. The fact that he was in the area when it happened is not all that meaningful. And it's really striking how huge this man is. I mean, he is just a giant. And nobody, not a single witness de- scribed him that way. I don't think anybody who looked at Kevin Gunn would say, 'He was tall.' But that's what witnesses de- scribed, a tall African-Amer- ican. Several people de- scribed him as 'over six feet.' Mr. 6'4" was the highest. Mr. Gunn is 6'9". For an African- American, he's way on the light side of the complexion scale. Yet the suspect was de- scribed from very dark- skinned to medium com- plexion. Nobody described him as very light-skinned. And he's very distinctive looking; he's heavyset and has a distinctive face. Yet not a single person posi- tively identified him from photographs."

The letter from Morse to Pfingst is being addressed in King's appeal as well: "It influenced the jury. But I think it sounds to me," King says of the letter, "like the jury fore- man was saying, 'Gee, the evidence in this case just stunk, and it's a good thing we were here to cover for you.'"

The three-judge panel at the Fourth District Court of Appeals could take one of three courses of action re- garding the Gunn case: up- hold the original verdict, grant a new trial because of errors or questions about evidence, or decide that ev- idence was not sufficient to convict. The final option, King explains, "acts like an acquittal, and there would be no retrial."

Though she says she's as optimistic about the Gunn case as she ever is about an appeal, King points out that the rate for cases being re- turned is, by her own esti- mate, only 3 to 5 percent. And even if the case were overturned, it wouldn't be soon. "Once I've filed my brief, the attorney general's office — they take over for the district attorney on this level — will take two or three months to file a response. Then I get the last word. I get to file a reply brief within 2 days after they file. So we'll be talking about four months from now, realistically, be- fore all the briefing is done. Then it's just in the hands of the Court of Appeals. That usually takes a few months. So it will be a year, maybe a little less, from today before Kevin knows."

# EXHIBIT
# D

**Description:** Opening statements during Preliminary hearing Re: Identification of Petitioner as suspect

**Page:** 1

(82)

*Preliminary Transcript*

1    MEDIA BE EXCLUDED FROM RECORDING EITHER STILL OR LIVE FILM

2    FOR PURPOSES OF TELEVISION OR ANY OTHER PURPOSE THE

3    PROCEEDINGS HERE TODAY.

4         ALTERNATIVELY, IF THE COURT FEELS THAT THE PUBLIC

5    RIGHT TO -- WELL, TO KNOW WHAT'S TRANSPIRING HERE OUTWEIGHS

6    MR. GUNN'S RIGHT TO A FAIR TRIAL ULTIMATELY, I'D ASK THE

7    COURT TO ASK THE MEDIA OR ORDER THE MEDIA TO TILE OUT

8    MR. GUNN IF FILM IS RECORDED AND SHOWN, BOTH HIS FACE AS

9    WELL AS HIS BODY.

10        THIS CASE IS AN I.D. CASE.  THAT'S WHAT

11   ULTIMATELY THE JURY IS GOING TO HAVE TO DETERMINE, WHETHER

12   OR NOT THE PROSECUTOR PROVED IDENTITY BEYOND A REASONABLE

13   DOUBT.  THERE ARE FOUR COUNTS IN THIS CASE.  IN EFFECT,

14   THERE ARE FOUR SEPARATE AND DISTINCT INCIDENTS FILED IN THE

15   SAME COMPLAINT.

16        MY CONCERN IS ALSO THAT -- WELL, AS TO -- IN

17   TERMS OF THE FOUR COUNTS MR. GUNN IS FACING HERE AT THIS

18   PRELIMINARY HEARING, AS AN OFFER OF PROOF, IT IS MY BELIEF

19   BASED ON THE DISCOVERY THAT NONE OF THE ALLEGED VICTIMS

20   WILL BE ABLE TO MAKE AN IDENTIFICATION.

21        IF THEY AT SOME POINT SEE MR. GUNN IN THE MEDIA,

22   THEY MAY USE THAT TYPE OF VISUALIZATION, TRANSFER, HAVING

23   SEEN HIM EITHER IN THE MEDIA OR IN COURT TODAY, AND IN

24   THEIR VIEW THEY MAY ARRIVE AT AN OPINION THAT IN FACT

25   MR. GUNN WAS THE INDIVIDUAL INVOLVED.

26        MORE IMPORTANTLY, AS I INDICATED TO THE COURT IN

27   CHAMBERS, IN FACT, THE SAN DIEGO POLICE DEPARTMENT ROBBERY

28   DIVISION ASKED THE DISTRICT ATTORNEY'S OFFICE TO FILE A

# EXHIBIT
# E

**Description:** Police reports of witnesses statement from Kamien robbery and police dispatch of suspect discription.

**Page:** 8 pages

### SAN DIEGO REGIONAL
### OFFICER'S REPORT
### NARRATIVE

| | | INCIDENT NUMBER |
| --- | --- | --- |
| | | 00020052004 |
| | PAGE | CASE NUMBER |
| | 1 OF 4 | 00013117 |

| | DATE | DAY OF WEEK | TIME |
| --- | --- | --- | --- |
| CTION AND DESCRIPTION (ONE INCIDENT ONLY) | 02/24/1999 | WED | |
| | CITY | DISTRICT | BEAT |
| LOCATION OF INCIDENT (OR ADDRESS) | SAN DIEGO | | 631 |

| PERSON(S) INVOLVED, VICTIM |
| --- |
| SUSPECT (IF NAMED) |
| PROPERTY TAG NO (S) |

## OFFICER STATEMENT:

I responded to ▓▓▓▓▓▓▓ on a call of a pedestrian robbery. A witness (Loper) flagged me down as I was enroute there, at Florida and Madison, showing me a brown wallet in the street and saying "He just drove south on Florida St. and east on Meade Ave., about 3 minutes ago. He dropped the wallet here." I was also approached by another witness (Schroeder) who said he had followed the suspect after the crime. I took their statements and gave the wallet to Officer Kimber Hammond #4931 to return to the victim. I conducted a witness check and searched the area for evidence. I showed Agent Mark Annis #2981 the path that the suspect had taken so he could complete his evidence collection

## WITNESS STATEMENT:

David Menno Schroeder (witness) told me: I was with my boss, John Burkholder, on Adams Avenue, when I saw the elderly white man on the ground and a large black male over him. The victim (white male) was face down on the grass. The suspect (black male) hit him in the head with his fist. Then he was frisking him all over, as if looking for a wallet or other property on him. I saw him take a wallet from the victim. I thought the victim was dead. The suspect slowly walked away and watched me watching him. John called 911 and I followed the suspect. He was on foot and I was in my car. I saw him go behind ▓▓▓▓▓▓▓▓▓▓ then I lost him. I told the other guy (Schroeder) to watch him as he walked through the property at ▓▓▓▓▓▓▓▓▓ was driving around in my truck, looking for him in the alleys. But I never saw him again.

He was a black male, 35-45, 220 pounds, 5'10 to 6'0. He was wearing a black and white checkered flannel shirt, and a grayish or light blue baseball cap. I don't know if he had any facial hair or not. He had a medium black complexion and kinky hair. It was a bad haircut. He had a very large build. John can tell you more about him.

I am moving to Las Vegas next week. I'm not sure exactly when, but John (Burkholder) can get in touch with me.

Dennis Wayne Loper (witness) told me: I had just pulled my car into the yard in the alley at my apartment a ▓▓▓▓▓▓▓▓▓▓ I saw a large black male walking ahead of me through my yard toward v building. He was walking very slowly and calmly. I was watching him when this guy in a truck

| G OFFICER | I.D. # | DIVISION | | DATE OF REPORT | TIME |
| --- | --- | --- | --- | --- | --- |
| RYG  Hays | 3184 | W1 | | 02/24/1999 | 16:49 |

CONTINUED  Y

# SAN DIEGO REGIONAL
## OFFICER'S REPORT
### NARRATIVE

| | |
|---|---|
| CONTINUE FROM<br>☐ OFFICER'S REPORT ONLY<br>☐ ADDITION. CONT.<br>☒ CRIME<br>☐ OTHER | INCIDENT NUMBER 00020052094 |

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | PAGE 2 OF 4 | CASE NUMBER 00013117 |
|---|---|---|

| LOCATION OF INCIDENT (OR ADDRESS) | DATE 02/24/1999 | DAY OF WEEK WED | TIME |
|---|---|---|---|

| | CITY SAN DIEGO | DISTRICT | BEAT 631 |
|---|---|---|---|

PERSON(S) INVOLVED: VICTIM

SUSPECT (IF NAMED)

PROPERTY TAG NO.(S)

(Schroeder) came up to me, screaming at me to watch him, that he had just robbed and beat up someone. So I followed him to the front of my building, then ducked into my apartment area for a couple of seconds. When I then walked to the front yard, I saw him driving south on Florida St., right in front of me. I saw him pull to the right curb about 3/4 of the way down the block ▓▓▓▓▓▓ I could see him with his head bent over, apparently looking through the wallet. Then he continued driving south and he threw the wallet out the driver window when he got to the stop sign at Madison Ave. He continued south and turned (left) east on the street before the red light. (Meade Ave.) He was in no hurry, I'll tell you that.

The suspect is a black male, 40-45, 200 pounds, 6'0 to 6'3, wearing a long-sleeved black and white checkered flannel shirt (the checks were about 1 1/2 inches square), dark jeans or pants. He had a very dark complexion, a short natural type haircut and I don't know if he had any facial hair or not. He had a wide face, big eyes and a wide forehead. He has a very large build. He was very calm and casual.

He was driving an older black "boxy" type compact car, similar to a Toyota Corolla, but I don't know what make it was for sure. It had faded black paint and was a 4 door. It had a white plate, California, I think, with a possible plate of something like ---C25-. I don't remember any stickers or anything unusual about the car. It didn't make any loud engine noises.

VITNESS CHECK:

went to the 4-plex apartment building a ▓▓▓▓▓ and looked for witnesses. I found no one ome at ▓▓▓▓▓▓ I contacted Jack Fresh ▓▓▓▓▓▓▓▓▓ t, who said he had not een nor heard anything.

| REPORTING OFFICER<br>Le Hays | I.D. #<br>J104 | DIVISION<br>W1 | | DATE OF REPORT<br>02/24/1999 | TIME<br>16:49 |
|---|---|---|---|---|---|

CONTINUED Y

CONTINUED FROM

☐ OFFICER'S REPORT ONLY

☒ ARR/JUV CON

☐ CRIME

☐ OTHER

# SAN DIEGO REGIONAL
## OFFICER'S REPORT
### NARRATIVE

INCIDENT NUMBER
88020052004

PAGE
3 OF 4

CASE NUMBER

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | DATE | DAY OF WEEK | TIME |
|---|---|---|---|
| 211 / PC / ROBBERY | 02/24/1000 | WED | 14:15 |

| LOCATION OF INCIDENT (OR ADDRESS) | CITY | DISTRICT | BEAT |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | SAN DIEGO | | 811 |

PERSON(S) INVOLVED: VICTIM

SUSPECT (IF NAMED)
Gunn, Kevin Orlando

PROPERTY TAG NO.(S)

## Origin/Probable Cause:

Officer J. Troussel #5293 and I responded to the area of ▓▓▓▓▓▓▓▓▓ o look for a robbery suspect who had just beaten and robbed an elderly gentleman.  While searching the area we saw a black 4 door compact car driving E/B on Madison Ave. just west of I-805.  We followed the car and saw that the driver was a tall black male with a plaid shirt and baseball cap on and had a fair complexion.  This matched the description of the suspect.  We initiated a traffic stop ▓▓▓▓▓▓ ▓▓▓▓ We told the driver to step out and I conducted a pat-down search as he was wearing a flannel shirt  and I was unable to see if he was armed or not.  I obtained "FI" information and Officer Cooley #4870 brought a witness by to view the driver.  According to the witness, the driver was not the suspect.  The driver was then released.

Reviewed By:  Sgt. J. Ramos #4417

*THEY NEVER ASKED ME ABOUT MY ADDRESS*

| REPORTING OFFICER | I.D. # | DIVISION | | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| Charles Dunnigan | 4969 | W1 | | 02/24/1999 | 16:00 |

CONTINUED  Y

# ARREST / JUVENILE CONTACT REPORT

| | | | AGENCY/ACTIVITY NUMBER 09020052094 |
|---|---|---|---|
| WARRANT None | AGENCY SDPD | ARJIS ASSISTED? N | AGE 1 OF 4 | 8030 BOOKING M |

| ARREST DATE 02/24/1999 | TIME 14:15 | BEAT/DISTRICT 811 | RELATED REPORTS (TYPE, NUMBER) A2 CRIME/INCIDENT | | CITATION NUMBER |
|---|---|---|---|---|---|

**CHARGE(S)**
211 / PC / ROBBERY

ADDNL. CHGS. N   ADULT RELEASES

**PERSON ARRESTED (L, F, M)**
Gunn, Kevin Orlando

**NICKNAME**    P.O.B Unknown

| RACE B | SEX M | AGE 38 | HEIGHT 6'08" | WEIGHT 280 | BUILD NORM | HAIR BRO | EYES HZL |
|---|---|---|---|---|---|---|---|

**ALIAS/MAIDEN NAME (L, F, M)**

**ARRESTEE'S ADDRESS**
2217 BETA ST

CITY SAN DIEGO    STATE CA   ZIP 91950

| EMPLOYER/SCHOOL Unk | MILITARY N | OCCUPATION/RANK Unk | | HOME PHONE (619)283-4512 | BUSINESS PHONE |
|---|---|---|---|---|---|

**BUSINESS OR MILITARY ADDRESS**

CITY    STATE   ZIP

**EMERGENCY CONTACT/NEXT OF KIN (L, F, M)**
None Given.

**EMERGENCY ADDRESS**

CITY    STATE   ZIP

| HOME PHONE | IS SUBJECT A SUSPECTED USER OF NARCOTICS/DRUG? N | INTERPRETER REQUIRED? N | LANGUAGE | SUSPECT'S RELATION TO VICTIM(S) |
|---|---|---|---|---|

**LOCATION OF ARREST**
4400 WILSON AV

CITY SAN DIEGO

**LOCATION OF OFFENSE**
1800 ADAMS AV

CITY SAN DIEGO

| OFFENSE DATE 02/24/1999 | OFFENSE TIME | CITIZEN ARREST? N | ARRESTING OFFICER Charles Dunnigan | I.D. 4969 | ADMONISHED BY Not Admonished | I.D. |
|---|---|---|---|---|---|---|

**DO YOU UNDERSTAND EACH OF THESE RIGHTS THAT I HAVE EXPLAINED TO YOU?**
Na

**HAVING IN MIND AND UNDERSTANDING YOUR RIGHTS AS I HAVE TOLD YOU, ARE YOU WILLING TO TALK WITH US?**
Na

STATEMENT

| HAIR LENGTH/TYPE 6. Short 4. Thinning | HAIR STYLE 1. Afro/Natural | FACIAL HAIR 8. Mustache I had a Goatee | COMPLEXION Light No mention or Or white paint passenger side | SPEECH 9. Talkative | VOICE 8. Medium chrome missing showing on of vehicle |
|---|---|---|---|---|---|

**IDENTIFICATION NUMBERS**

| DRIVER'S LICENSE NO. C0398832 | STATE CA |
|---|---|

SOCIAL SECURITY NO. 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

FBI NO.

CII NO.

OTHER I.D.    TYPE

**FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, MANNERISMS, ETC.)**
Tt Of "skyline"-On Left Arm

**CLOTHING DESCRIPTION**
Black/Whit Plaid L/S Shirt, Black T- Shirt, Green Jeans, Black B.B. Cap

| SUSPECT VEHICLE | YEAR 1990 | MAKE DAIHATSU | MODEL CHARADE | COLOR/COLOR BLACK / BLACK | BODY TYPE 4 DOOR | LICENSE NO. 2WCR174 | STATE CA |
|---|---|---|---|---|---|---|---|

| ADDITIONAL VEHICLE IDENTIFIERS (CHROME, DAMAGE, ETC.) Bad Oxidized Paint | VIN NUMBER | DISPOSITION OF VEHICLE |
|---|---|---|

**REGISTERED OWNER (L, F, M)**
Dearing, Cheryl D

**REGISTERED OWNER'S ADDRESS**
5263 CAMINITO CACHORRO

CITY SAN DIEGO    STATE CA   ZIP 92105

**PROPERTY TAG NOS**    DISPOSITION OF EVIDENCE

| REPORTING OFFICER Charles Dunnigan | I.D. 4969 | DIVISION W1 | REPORT DATE 02/24/1999 | TIME 16:00 |
|---|---|---|---|---|

ARJIS-8 (REV 7-95 Electronic)    COPY    2/25    EASTUS

PAGE 2 OF 10.

CASE NUMBER 99020052094

| ITEM NO. | ARTICLE NAME | STOLEN | RECVD | IDENTIFICATION NUMBERS | BRAND, MAKE OR MANUFACTURER | MODEL NAME AND MODEL NUMBER | MISCELLANEOUS DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|---|---|
| 1. | CASH | 1 | 0 | | U.S. MINT | | CASH, UNK DENOMINATIONS, APPROXIMAT | 60.00 |
| 2. | WALLET | 1 | 1 | | | | MEN'S BROWN WALLET WITH I.D. | 32.00 |
| 3 | | | | | | | | |
| 4 | | | | | | | | |

**ARRESTED SUSPECT #1 (LAST, FIRST, MIDDLE):** Suspect, One

NICKNAME/AKA

SUSPECT'S ADDRESS     ID TYPE   ID NUMBER

PHONE   CITY   STATE  ZIP

| | RACE B | SEX M | AGE 40 | DOB | HT. 6'03" | WT. | BUILD MUSC | HAIR COLOR BLK | EYE COLOR |
|---|---|---|---|---|---|---|---|---|---|

ADDITIONAL INFORMATION / FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, ETC.)

SUSPECT'S CLOTHING
SEE WITNESS STATEMENTS

| HAIR LGTH/TYPE | HAIR STYLE | FACIAL HAIR | COMPLEXION | GENERAL APPEARANCE | DEMEANOR | SPEECH | VOICE |
|---|---|---|---|---|---|---|---|
| 6. SHORT | 6. MILITARY | CLEAN SHAVEN | 2. DARK | 1. CASUAL | 10. VIOLENT | 0. UNKNOWN | 0. UNKNOWN |
| 6. OTHER | | | | | | | |
| SHAVED | | | | | | | |

*(handwritten note):* Mention of chrome missing or white Paint showing on passenger side of vehicle

| SUSPECT VEHICLE | YEAR | MAKE UNKNOWN | MODEL | COLOR / COLOR BLACK / BLACK | TYPE 4 DOOR | LICENSE NO. | LIC STATE |
|---|---|---|---|---|---|---|---|

ADDITIONAL VEHICLE IDENTIFIERS (DAMAGE, CHROME WHEELS, ETC.)
"BOXIE COMPACT", FADED PAINT

VIN   VEHICLE IMPOUND N   TOWING COMPANY

EVIDENCE OBTAINED   8. PHOTOS   9. OTHER   SEE INV. ADDENDUM.

SEE INVESTIGATION ADDENDUM FOR DETAILS

TAG NOS.
98074 & 98075, -777430

ADDITIONAL OFFENSES:   ADDN'L PERSONS LISTED N   WITNESS CHECK N

HEADINGS: CRIME DESCRIPTION; VICTIM(S) STATEMENT; OFFICER'S STATEMENT / INVESTIGATION; EVIDENCE/DISPOSITION; WITNESS STATEMENT/ WITNESS CHECKS:

| officer assault: | DAK ZZ | Number Officers | 0 | Activity when assault occured: |
|---|---|---|---|---|
| | | Number Officers without personal injury | 0 | |

ON TYPE

SCRIPTION

| | | CONTENT LOSS $ .00 | STRUCT LOSS $ .00 | ABANDON N | CONTINUED Y |
|---|---|---|---|---|---|

COPY (89)

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

CONTINUED FROM

- [ ] OFFICER'S REPORT ONLY
- [ ] ADJUSN. CON.
- [x] CRIME
- [ ] OTHER

| | | INCIDENT NUMBER 99020062004 |
|---|---|---|
| | PAGE 9 OF 10 | CASE NUMBER 99013117 |

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) PC / 211 / ROBBERY/PEDESTRIAN | DATE 02/24/1999 | DAY OF WEEK Wed | TIME 13:55 |
|---|---|---|---|
| LOCATION OF INCIDENT (OR ADDRESS) | CITY SAN DIEGO | DISTRICT | BEAT 632 |

PERSON(S) INVOLVED: VICTIM
KAMIEN, LEONARD LAWRENCE

SUSPECT (IF NAMED)
Suspect, One

PROPERTY TAG NO.(S)
98074 & 98075, , 777430

## STATEMENT OF VERA BRENNAN:

Vera Brennan told me she was riding her bicycle and saw Kamien laying on the ground in front of ▓▓▓▓▓▓ He was bleeding, and she saw the suspect leaning over him going through his pockets. She said the suspect "ran" eastbound Adams. She tried to follow him on her bike but lost sight of him near Florida and Adams. She described the suspect as a tall black male, wearing white pants and a dark colored shirt.

## STATEMENT OF JOHN BURKHOLDER:

Burkholder told me he was driving on Adams Ave. in his vehicle when he looked over and saw the suspect violently kicking Kamien as he (Kamien) lay on the lawn in front of the apartment building at ▓▓▓▓▓▓ Burkholder stopped his car as the man bent over and began going through Kamien's pants pockets. The suspect removed Kamien's wallet and then fled eastbound on Adams Ave.

Burkholder ran to "Cheers Bar" across the street and told them to call the police. He then returned to Kamien until paramedics arrived. Burkholder described the suspect's clothing as "dark clothing, possibly a blue sweatshirt and brown pants" or something similar.

## STATEMENT OF WILLIAM MARNHOUT:

Marnhout told me he is the bartender at "Cheers". He was unaware of the incident until Burkholder came into the bar and told someone to call the police. Marnhout ran across the street to help the victim. He found the driver's licenses and the ATM card on the ground next to Kamien and held onto them until police arrived.

| REPORTING OFFICER Long | I.D. # 3922 | DIVISION W1 | | DATE OF REPORT 02/24/1999 | TIME 18:06 |
|---|---|---|---|---|---|

CONTINUED [Y]

/09/99  13:13:57 PRINT REQUESTED BY TERMINAL MIDL2
ncident History for: #P9 ( 0052094
ase Numbers. $PR990013117

eceived      02/24/99   13:54:23   BY CT15    8462
ntered       02/24/99   13:56:45   BY CT15    8462
ispatched    02/24/99   13:57:44   BY RC06    8576
.route       02/24/99   13:58:41
nscene       02/24/99   14:02:24
losed        02/24/99   19:23:56


nitial Type: 211
inal    Type: 211      (ROBBERY) Pri: 1 Dispo: R
olice BLK:  0100000110500   FMap: 2124M8 TMap: 1269C3 Group: P6
eat: 632 Src: 9 Inc Cmdr: ·
oc: ▓▓▓▓▓▓▓▓▓ btwn PARK BL & GEORGIA ST

oc Info: CHEERS
ame: MARNHOUT, WILLIAM        Addr: ▓▓▓▓▓▓▓▓▓       Phone: ▓▓▓▓▓

356   (8462 )   NBRHD              University Heights
.356            ENTRY              ELDERLY MALE LYING ON GRASS ACRS ST FRM ABV/VIC I
                                   S CONSCIOUS BUT FACE IS BLEEDING/SOMEONE TOLD RP
                                   THAT VIC WAS 211'D/SUSP IS B/M/NFD/PM ENRT
.357  (8576 )   DISP     636J1     #3922  LONG, TIMOTHY M A
.358            ASST     627J1     #4870  COOLEY, PATRICK
758             MISC     Single mnn , 622S 10-4 ON THIS
                         Unit
.358 . (4870 ) *ENROUT   627J1     Asking for a sgt
.359  (8576.)   ASST     632J1     #3184  HAYS, SUSAN K
.359  (3922 )  *ENROUT   636J1
.01   (3184 )  *ENROUT   632J1
.401  (8576 )   ASST     624K1     #5293  TROUSSEL, JAMES J
                         2 mnn Unit #4969  DUNNIGAN, CHARLES
.01   (4969 )  *ENROUT   624K1     pc indicated suspect was light skined by dispatch
.402  (3922 )  *ONSCNE   636J1
.403  (8576 )   NEWLOC   632J1     [4600 FLORDIA]
                                   , SUP IN OLDER BLK 4DR COROLLA TYPE VEY , DROPPED
                                   WALLETT AT FL/MADISON, L/S SB ABOUT 3 AGO
.403            MISC     632J1     , SUSP TALL BM IN 40TH, WRG BLK AND WHT FLANNEL C
                                   HECKED JACKET
.403  (8185 )   SUPP               NAM: FIRE
                                   TXT: FIRE 97 ON MED AID OF ELDERLY MALE WHO'S BEE
                                   N 242'D, NFD
.404  (8576 )   MISC     632J1     , HAS 2 WITNESS
.404            MISC     624K1     , CKING AREA FOR POSS SUSP
.404  (4969 )  *ONSCNE   624K1
.405  (8576 )   ASSTER   ABLE1     [4600 FLORDIA]
                                   #3624  ROESINK, GARY A
                                   #4249  GASSMANN, ROBERT E
.405            MISC     636J1     , WITH THE VICT, WILL NOT BE GETTING ANY FURTHER
                         off lwing FRM VICT AT THIS TIME
.406  (8758 )   CALLBK             ,CT02/PLS NOTIFY CHP
.407  (8460 )   MISC     632J1     , * OLD BLK COMPACT 4 DR
.409            MISC               , * * 625Y W/RESPOND AS FET
.409            ONSCNE   ABLE1     Helicoter Assist   tall Birck male in his 40's
.409  (4870 )  *ONSCNE   627J1
.414  (8460 )   CALLBK   636J1     CT02 ** ID DROPPED MICHAEL PITT BLEVINS.. ▓▓▓▓▓
                                   ▓▓▓▓ RUN THIS PERSON
.14   (*****)   REMINQ   624K1     PLATE/2WCR174  Asked who susp wearing a cap
.15   (8335 )   CHANGE             ,CHP ADV/CT02
.15   (8460 )   NEWLOC   624K1     [SB 4500 WILSON ]

(91)

```
:15           NEWLOC   624K1   [4400 WILSON]
                               , > > MAKING STOP
:16           ASST     2950S1  [4400 WILSON]
                               #3638  SPETTER, HOWARD W
.16           MISC     624KJ   , > > POSS SUSP VEH REG VALID FROM: 01/08/99 TO 0
                               1/08/00LIC#:2WCR174 YRMD:90 MAKE:DAIH BTM :4D VIN
                               :JDIEG1126L4407793 R/O :DEARING CHERYL D,
                               ████████████████████ITY:SAN DIEGO C.C.:37 ZIP#
:17           MISC     632J1   , > > 5'10" -6', 35-45 KINKY BLACK HAIR, BAD HAIR
                               CUT  BLK/WHI PENDELTON
:18  (3638 )  *ONSCNE  2950S1
:18  (8460 )  MISC     624K1   , ** VERY TALL
:19           CLEAR    ABLE1
:21  (8335 )  CHANGE           ,DESC; 6'1, 200LBS,,BRN/BRN,CONTACT WAS FOR 22350
                               /CT02
:22           CHANGE           ,CONTACT FOR 273.6/CT02
.26  (4870 )  *CHGLOC  627J1   [4400 WILSON AVE]
:27  (8576 )  NEWLOC   632J1
:27           ASSTER   635Y2   [4600 FLORDIA]
                               #4931  HAMMOND, KIMBER LEA
:28           ASST     625Y2   [1839 ADAMS AV]
                               #3873  MORRISON, CYNTHIA M
.28           NEWLOC   636J1   [1842 ADAMS ]
.29           MISC     636J1   , VICT ENRT TO UCSD
.29           MISC     625Y2   , RESPONDING AS FET
.30  (3873 )  *ENROUT  625Y2
.31  (8576 )  MISC             , VICT WILL BE 75 YRS
.32  (4870 )  *ONSCNE  627J1
.35           *CHGLOC  627J1   [1800 ADAMS]
.37  (4931 )  *ONSCNE  635Y2
.38  (8576 )  CHGLOC   632J1   [4400 WILSON ]
.39           MISC     624K1   , PER 1 WITNESS CKED NEG WILL NOT BE RESPONDING F
                               OR CURBSTONE
.39  (4870 )  *MISC    627J1   , WITNESS #1 GAVE A CERTAIN NEGATIVE CURBSIDE.
.39  (8576 )  NEWLOC   632J1   [1839 ADAMS AV]
.40  (3638 )  *CLEAR   2950S1
.40  (3873 )  *ONSCNE  625Y2
.40  (4870 )  *ONSCNE  627J1
.44  (8195 )  MMISC            , AIRED ON MID CITY
.45  (8576 )  ASSTOS   633S2   [1842 ADAMS ]
                               #2961  ANNIS, MARK
.50  (4931 )  *CHGLOC  635Y2   [UCSD]
.01           *ONSCNE  635Y2
.07  (3922 )  *ASNCAS  636J1   $PR990013117
.08           *MISC    636J1   ,PLS REF SDPD CASE 99-013117
.10           *CLEAR   636J1
.11  (8108 )  ASST     636J1   #3922  LONG, TIMOTHY M A
.11  (3922 )  *ONSCNE  636J1
.15           *CHGLOC  636J1   [SUB]
.17  (4870 )  *CLEAR   627J1
.22  (3922 )  *ONSCNE  636J1
.24  (4969 )  *CLEAR   624K1
.36  (3184 )  *CHGLOC  632J1   [SUB]
.45           *ONSCNE  632J1
.48  (4931 )  *CHGLOC  635Y2   [WESTERN]
.05  (2961 )  *ONSCNE  633S2
.05           *CLEAR   633S2
.11  (3873 )  *CHGLOC  625Y2   [SUB/PPR]
.15           *ONSCNE  625Y2
```

# EXHIBIT
F

**Description:** Statement of Carole Pomplin
to Police day of robbery
and other witnesses and Police
dispatch of suspect description
**Page:** 12 Pages

(93)

# SAN DIEGO REGIONAL
## CRIME / INCIDENT REPORT

PAGE 1 of 14   CASE NUMBER 99-015014

TYPE OF INCIDENT (ONE INCIDENT ONLY): ROBBERY STRONG ARM

MONTH 03   DAY 04   YEAR 99   DAY OF WEEK THUR   TIME 1045

INCIDENT (OR ADDRESS): HIGH 33RD ST.   S.D.   BEAT 8 II   DISTRICT

VICTIM'S NAME (LAST, FIRST, MIDDLE / OR ORGANIZATION): COMPLIN, CAROLE E.

RACE W   SEX M   DATE OF BIRTH   ID TYPE CDL   ID NUMBER

STATUS U   EMPLOYER (RANK IF MILITARY): NONE   INTERPRETER REQUIRED Y

BUSINESS OR MILITARY ADDRESS: NONE

ADDITIONAL INFORMATION (VICTIM VEHICLE INFO IF APPLICABLE): NONE

VICTIM'S NAME (LAST, FIRST, MIDDLE / OR ORGANIZATION): QUESSADA KATRINA HALL

RACE B   SEX F   DATE OF BIRTH   ID TYPE CDL   ID NUMBER

STATUS E   EMPLOYER (RANK IF MILITARY): ARCO   INTERPRETER REQUIRED Y

BUSINESS OR MILITARY ADDRESS:

ADDITIONAL INFORMATION (VICTIM VEHICLE INFO IF APPLICABLE): NONE   DAYS OFF F/S   WORK HRS 9-5 M-F / 400

TOTAL # OF WITNESSES AT CRIME O2

WITNESS TYPE: 01 ARRESTING OFFICER   06 OTHER LAY WITNESS   07 NARC CHEMIST   12 OTHER EXPERT   13 INVESTIGATOR   16 OTHER POLICE

STATUS: E EMPLOYED   S STUDENT   U UNEMPLOYED   N NON-SALARIED WORKER

PLACE OF ATTACK: (1) Structure  (2) Vehicle  (3) Street/Alley  (4) Lot/Park/Yard

DESCRIPTION OF SURROUNDING AREA: (1) Residential  (2) Business  (3) Industrial/Mfg  (4) Recreational  (5) Institutional  (6) Open Space  (7) School  (8) Marina/Water  (9) Other

FORCE TOOL WEAPON: SPECIFY: HANDS

FORCE TOOL WEAPON: SPECIFY:   HOW USED: TO HIT AND PUSH VICTIM

TYPE OF STRUCTURE   POINT OF ENTRY   SECURITY USED   SUSPECT ACTIONS

TYPE LOCK ATTACKED

| ITEM NO. | ARTICLE NAME | STOLEN/RECOV'D | IDENTIFICATION NUMBERS | BRAND, MAKE OR MANUFACTURER | MODEL NAME AND MODEL NUMBER | MISCELLANEOUS DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|---|
| | PURSE | | NONE | UNK. | | BROWN / LEATHER | 1.00 |
| | MONEY | MISC | NONE | | | MISC. CHANGE | 2.00 |

# INJURED

EXTENT OF TREATMENT: (1) NONE  (2) TREATED  (3) HOSPITAL  (4) DEATH   SIC: YES  ADULT  JUVENILE   NO - PROBABLY IS

REPORTING OFFICER: E. ACOSTA   ID# 5528   DIVISION MC-1   APPROVED BY:   DETECTIVE(S) ASSIGNED   ID#   DIVISION

DATE AND TYPE OF REPORT: MO 03   DAY 04   YEAR 99   TIME 1514   CASE STATUS

(94)

AGENCY SDPD   CRIME TYPE 211 P.C.

2 of 14

| RACE CODE LEGEND | A- OTHER ASIAN B- BLACK C- CHINESE | D- CAMBODIAN E- FILIPINO G- GUAMANIAN | H- HISPANIC I- INDIAN J- JAPANESE | K- KOREAN L- LAOTIAN O- OTHER | P- PACIFIC ISLANDER S- SAMOAN | U- HAWAIIAN V- VIETNAMESE W- WHITE | | CASE # 99-015014 |

**ARRESTED/SUSPECT #1 (LAST, FIRST, MIDDLE)**

| | NICKNAME/AKA | RACE B | SEX M | AGE | DOB | HT. TALL | WT. | BUILD THIN | HAIR COLOR | EYE COLOR |

**SUSPECT'S ADDRESS** | CITY | STATE | ZIP | PHONE | ID TYPE | ID NUMBER

**ADDITIONAL INFORMATION / FURTHER SUSPECT DESCRIPTION (I.E. GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, ETC.)**

**SUSPECT'S CLOTHING**

BROWN JACKET, BLACK PANTS, BLACK BEANIE

**ARRESTED SUSPECT #2 (LAST, FIRST, MIDDLE)**

| | NICKNAME/AKA | RACE | SEX | AGE | DOB | HT. | WT. | BUILD | HAIR COLOR | EYE COLOR |

**SUSPECT'S ADDRESS** | CITY | STATE | ZIP | PHONE | ID TYPE | ID NUMBER

**ADDITIONAL INFORMATION / FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, ETC.)**

**SUSPECT'S CLOTHING**

| HAIR LGTH/TYPE | HAIR STYLE | FACIAL HAIR | COMPLEXION | GENERAL APPEARANCE | DEMEANOR | SPEECH | VOICE |
|---|---|---|---|---|---|---|---|

**SUSPECT VEHICLE**

| YEAR UNK. | MAKE UNK. | MODEL UNK. | COLOR / COLOR BLACK w/ A | TYPE | LICENSE NO. UNK. | LIC STATE UNK. |

**ADDITIONAL VEHICLE IDENTIFIERS (DAMAGE, CHROME WHEELS, ETC.)**

4 DR SMALL OLDER CAR, DRIVER'S SIDE INOPERATEABLE, HARD TO START

VEHICLE IMPOUND | TOWING COMPANY

| EVIDENCE OBTAINED | 0 NONE | 1 FINGERPRINTS | 2 OTHER PRINTS | 3 WEAPON/TOOLS | 4 VEHICLE | 5 PHOTOS | 6 HAIR | 7 STAINS | 8 BLOOD/SEMEN | 9 OTHER |

**DISPOSITION OF EVIDENCE**

WITH CASE

TAG NOS. | ADDN'L PERSONS LISTED | WITNESS CHECK

**ADDITIONAL OFFENSES:**

NONE

**HEADINGS: CRIME DESCRIPTION; VICTIM(S) STATEMENT; OFFICER'S STATEMENT / INVESTIGATION; EVIDENCE/DISPOSITION; WITNESS STATEMENT / WITNESS CHECKS; INJURIES / PROPERTY DAMAGE**

I H # 990300007306

(SEE ATTACHED)

**officer assault:**  OAK ZZ

- One-Officer Vehicle
- Two-Officer Vehicle
- Detective or Special Assignment
- Alone
- Assisted

Number Officers with personal injury ........
Number Officers without personal injury ........

**Activity when assault occured:**
- 415
- 459
- 211
- OTHER ARREST
- CIVIL DISORDER
- SUSP CIR / PERSON
- TRANSPORTING
- TRAFFIC STOP
- PURSUIT
- AMBUSH
- 5150
- ALL OTHER

**ARSON TYPE:** A SINGLE RESIDENTIAL | B OTHER RESIDENTIAL | C STORAGE | D INDUSTRIAL/MANUFACTURING | E OTHER COMMERCIAL | F COMMUNITY/PUBLIC | G ALL OTHER STRUCTURE | H MOTOR VEHICLES | I OTHER MOBILE PROPERTY | J CROPS, TIMBER, FENCES, SIGNS, ETC

**DESCRIPTION:**

| CONTENT LOSS $ | STRUCT LOSS $ | ABANDONED | CONTINUED |

(95)

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

☐ OFFICER'S ... ORT ONLY
☐ ARR/JUV.CON
☒ CRIME
☐ OTHER _____

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | | | PAGE 5 OF 14 | | CASE NUMBER 99-015-014 |
|---|---|---|---|---|---|

| | MONTH 03 | DAY 07 | YEAR 99 | DAY OF WEEK THUR | TIME 1045 |
|---|---|---|---|---|---|
| LOCATION OF INCIDENT (OR ADDRESS) | CITY | | | | |

| PERSON(S) INVOLVED: VICTIM | SUSPECT (IF NAMED) | BEAT 811 | DIST. |
|---|---|---|---|

| REPORTING OFFICER R. ACOSTA | I.D. # 5528 | DIVISION MC-1 | APPROVED BY | | | |
|---|---|---|---|---|---|---|
| | | | DATE OF REPORT | MONTH 05 | DAY 07 | YEAR 79 | TIME 1500 |

A854

**Synopsis:**
Carole Pomplin was attacked by an unknown suspect at 4300 33rd
Street. Pomplin suffered numerous injuries from the attack. The
suspect took Pomplin's purse and left the scene before officers
arrived.

**Origin:**
On 03-04-99, at 1056 hours, Officer Southerland #4679 and I
responded to a call of a robbery that occurred at 4300 33rd
Street.

**Officer's Investigation:**
On arrival I made contact with the victim who was identified as
Carole Pomplin. I saw Pomplin bleeding from the facial area and
she was holding a bloody rag to her nose. I called for an
ambulance to evaluate the extent of Pomplin's injuries. I got a
description of the suspect from Pomplin. Pomplin described the
suspect as a black male, tall, thin build, brown jacket, and
dark pants. I read the description to the dispatcher. Pomplin
said she was dizzy, so I had her sit in my patrol vehicle for her
safety. Pomplin told me essentially the following:

**Statement of Carole Pomplin:**
Pomplin was standing in front of ▓▓▓▓▓▓▓▓▓▓ Pomplin was
playing with the dogs in the gated yard of the residence. Pomplin
began walking southbound on 33rd Street when she noticed the dogs
started barking at something. Pomplin turned to see what the dogs
were barking at, and she was attacked by an unknown suspect. The
suspect hit Pomplin on the back side of her head and pushed her
down. Pomplin believes the push resulted in her striking her nose
on the cement, causing it to bleed. The suspect grabbed Pomplin's
purse and pulled it off her right shoulder/arm. Pomplin did not
recognize the suspect. Pomplin believes she could possibly
identify the suspect. The suspect did not say anything to Pomplin
during the attack.

**Investigation:**
After getting Pomplin's statement, Medic unit #18 arrived on
scene. Pomplin refused medical treatment. Officer Hays #3184 had
an individual detained at ▓▓▓▓▓▓▓▓ identified as Kenneth
Newton. I asked Pomplin if she could identify the suspect, she
said, "possibly." Pomplin consented to a Curbside Line-Up. I

PD-9A (Rev. 7-91)

(96)

CONTINUED



# SAN DIEGO POLICE DEPARTMENT
# CURBSIDE LINE-UP

(One Victim/Witness per Form / One Form per Location)

Page 13 of 14

On 03·04·99 _____ (date), at 1136 _____ (hours), at 3000 ADAMS AVE.T, _____

CASE # 99·015014

the Victim/Witness POMPLIN, CAROLE _____ (location)

_____ (name)

was read the following statement by officer(s) R. ACOSTA #5528

I want you to look at somebody we have detained. Do not conclude from the fact that we have detained someone that he/she is the guilty party. You are not obligated to identify anyone. It is just as important to free an innocent person as to identify the guilty person. Be aware that sometimes people who commit crimes will try to disguise their appearance by changing clothes and wearing hats, sunglasses, or wigs. Do not say anything or make any gestures (nod, point, etc.) until you have totally viewed this person.

The following person(s) were detained and presented at this line-up:

A: NEWTON, KENNETH

B: _____ by presenting officer HAYS #3184

B: _____ by presenting officer _____

_____ by presenting officer _____

_____ by presenting officer _____

detained person(s) were positioned approximately 50 FEET

m/Witness. The lighting conditions for the viewing were as follows: IT WAS AN OVERCAST DAY.

HTING WAS GOOD.

tim/Witness identified or could not identify the following:

Identified ☒ Could not identify

dentified ☐ Could not identify

dentified ☐ Could not identify

entified ☐ Could not identify

(97)

Page _14_ of _14_

Victim/Witness statement for person #1:

"_THAT IS NOT THE GUY! THAT GUY IS TOO BIG!_"

Victim/Witness statement for person #2:

Victim/Witness statement for person #3:

Victim/Witness statement for person #4:

Victim/Witness Signature _____ Date _____

continued ☐



Victim Pomplin stated her attacker had hair like "Bozo the Clown" Above

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

☐ OFFICER'S REPORT ONLY
TIN JEO: ☐ ADD./SUPP. CON.
☐ CRIME
☐ OTHER _____

| | PAGE | CASE NUMBER |
|---|---|---|
| | 7 OF 14 | 99-015014 |

SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | MONTH | DAY | YEAR | DAY OF WEEK | TIME

TION OF INCIDENT (OR ADDRESS) | CITY | | BEAT | DISTRICT

SON(S) INVOLVED: VICTIM | SUSPECT (IF NAMED) | PROPERTY TAG NO. (S)

_OFFICER STATEMENT_

I VOLUNTEERED TO ASSIST OFFICERS ON A ROBBERY CALL AT
▆▆▆▆▆ I ARRIVED AND CONDUCTED A WITNESS CHECK.
I TALKED WITH THE MANAGER OF THE AM/PM SERVICE STATION AT
▆▆▆▆▆ THE MANAGER, ROSE ANDAYA HAD RECENTLY
ARRIVED AT WORK. ANDAYA EVEN HEARD A WITNESS SAY
THE ROBBERY SUSPECT WAS PARKED AT THE WATER/AIR PUMP
OF THE SERVICE STATION. ANDAYA TOLD ME SHE HAD PARKED
HER VEHICLE NEXT TO THE SUSPECT'S VEHICLE WHEN SHE ARRIVED.
I TOOK HER STATEMENT.


_STATEMENT OF ROSE ANDAYA_

ANDAYA TOLD ME WHEN SHE PARKED HER VEHICLE AT
THE LOT. SHE NOTICED A BLACK OLDER VEHICLE NEXT TO
HER. SHE DESCRIBED THE DRIVER AS A BLACK MALE,
6-0 PLUS, 250-275, SHORT HAIR, CLEAN CUT,
WITH A DARK COMPLEXION. SHE NOTICED THE DRIVER
BECAUSE HE HAD TROUBLE CLOSING THE DOOR. SHE GLANCED
AT HIM THEN LOOKED AWAY. THEN SHE HEARD HIM
ATTEMPT TO START THE ENGINE. THE VEHICLE
SOUNDED AS IF IT WOULD NOT START SO SHE LOOKED

| TING OFFICER | I.D. # | DIVISION | APPROVED BY: | | MONTH | DAY | YEAR | TIME |
|---|---|---|---|---|---|---|---|---|
| E JONES | 4935 | MCI | SGT. R [signature] #4395 | DATE OF REPORT: | 03 | 04 | 99 | 1500 |

(REV. 9-84)

CONTINUED ☒

AT THE DRIVER AGAIN. THE VEHICLE FINALLY STARTED
AND DROVE AWAY. ANDAYA SAID SHE MAY BE ABLE
TO IDENTIFY THE SUSPECT IF SEEN AGAIN.

15-9 [REV. 9-84]

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

☐ OFFICER'S REPORT ONLY
NT NUED: ☐ ARR./JUV.CON.
OM ☐ CRIME
☐ OTHER _____

| | PAGE 9 of 14 | CASE NUMBER 99-015014 |
|---|---|---|

| ECTION AND DESCRIPTION (ONE INCIDENT ONLY) 11 P.C. ROBBERY (STRONG ARM) | MONTH 3 | DAY 4 | YEAR 99 | DAY OF WEEK THUR | TIME 1055 |
|---|---|---|---|---|---|

| CATION OF INCIDENT (OR ADDRESS) | CITY | BEAT 811 | DISTRICT |
|---|---|---|---|

| RSON(S) INVOLVED: VICTIM | SUSPECT (IF NAMED) | PROPERTY TAG NO. (S) |
|---|---|---|

ORIGIN

ON 3-4-99 AT ▮▮▮▮▮, I RECEIVED A RADIO CALL TO ASSIST UNIT 84261, OFFICER STEVE SOUTHERLAND #4679 AND OFFICER ROBERT ACOSTA #5528 ON A STRONGARM ROBBERY THAT OCCURRED AT 4300 33RD STREET. THE INCIDENT NUMBER WAS F99030007306.

UPON ARRIVAL, I CONDUCTED A WITNESS CHECK IN THE AREA. I LOCATED THE FOLLOWING WITNESSES THE CRIME

STATEMENTS

NOTE! His identification is different than the victims

STATEMENT OF TIMMY ANDERSON (WITNESS)

I WAS AT WORK AND STANDING IN THE ULTIMATE MOTORSCARS LTD WHEN I HEARD A DOG START BARKING ACROSS THE STREET NEAR THE ARCO STATION. I LOOKED UP AND SAW A B/M/A 6'1" 200+ LBS WEARING A BLACK BEANIE SKI CAP, BLACK JACKET, AND BLACK PANTS THE BLACK MALE PUNCHED A WHITE FEMALE IN THE FACE. HE GRABBED HER PURSE AND WALKED OVER TO A BLACK FOUR DOOR CAR THAT WAS PARKED IN THE EAST PART OF THE

| EPORTING OFFICER LEIBER | I.D. # 5206 | DIVISION MC-1ST | APPROVED BY: S Rapaly | DATE OF REPORT: | MONTH 3 | DAY 4 | YEAR 99 | TIME 13C |
|---|---|---|---|---|---|---|---|---|

RJ1S-9 (REV. 9-84)     (102)    4864     CONTINUED ⊙

STATEMENT OF ANDERSON (CONT.)

ARCO PARKING LOT. THE BLACK MALE KNEELED DOWN
BETWEEN HIS CAR AND ANOTHER ONE AS HE GOT
HIS KEYS OUT. HE LOOKED ACROSS THE STREET AND
SAW ME WATCHING HIM. HE THEN PUT ONE FINGER
UP TO HIS MOUTH MAKING A SYMBOL FOR ME
TO KEEP QUIET. THE BLACK MALE THEN GOT INTO HIS
CAR AND IT APPEARED HE WAS TRYING TO START
IT.

        I THEN SAW A POLICE CAR DRIVE UP AND
CONTACT THE WHITE FEMALE. THE BLACK MALE GOT
HIS CAR STARTED BACK OUT AND LEFT NORTHBOUND
ON 33RD STREET.

        I WAS UNABLE TO SEE THE LICENSE PLATE OF
THE VEHICLE. I DO KNOW IT WAS A WHITE PLATE
WITH BLUE LETTERS AND NUMBERS. I THINK I
COULD IDENTIFY THE BLACK MALE IF I SAW
HIM AGAIN.


STATEMENT OF KATRINA HALL (REPORTING PARTY)

        I WAS WORKING INSIDE THE ARCO STATION
WHEN I DECIDED TO GO GRAB MY JACKET OUT
OF MY CAR. MY CAR WAS PARKED ON THE EAST
SIDE OF THE ARCO BUILDING. I WALKED OUT TO
MY CAR AND GRABBED MY JACKET. I WAS RETURNING
TO THE STORE BECAUSE A CUSTOMER WAS WALKING
IN THE FRONT DOOR. BEFORE I GOT BACK INSIDE
I HEARD A FEMALE SCREAMING FOR HELP. I LOOKED
TOWARD 33RD STREET BUT COULD NOT SEE ANYTHING
DUE TO A LARGE WALL. I HAD TO GO INSIDE

RJIS-9 (REV. 9-84)

(103)

CONTINUED

☐ OFFICER'S REPORT ONLY

☐ ARR./JUV.CON.

☒ CRIME

☐ OTHER

| SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | | | PAGE 11 of 14 | | CASE NUMBER 99-015014 |
|---|---|---|---|---|---|
| 211 ROBBERY (STRONG ARM) | MONTH | DAY | YEAR | DAY OF WEEK | TIME |
| LOCATION OF INCIDENT (OR ADDRESS) | | CITY | | | |
| PERSON(S) INVOLVED: VICTIM | | | BEAT | | DISTRICT |
| | SUSPECT (IF NAMED) | | PROPERTY TAG NO. (S) | | |

STATEMENT OF KATRINA HALL (CONT.)

THE STORE AND HELP THE CUSTOMER. ONCE BACK INSIDE THE STORE, I SAW A WHITE FEMALE WALK INTO THE STORE. SHE WAS BLEEDING FROM THE FACE. SHE ASKED ME TO CALL THE POLICE. I ASKED HER, WHY, WHAT HAPPEN? THE WHITE FEMALE SAID SHE WAS ROBBED. I CALLED THE POLICE AND WAS TALKING TO THE DISPATCHER WHEN I SAW A POLICE CAR DRIVE UP. I THEN ADVISED THE DISPATCHER THE POLICE WERE HERE AND HUNG UP THE TELEPHONE.

AFTER TALKING WITH HALL, I CHECKED ARCO'S VCR TAPES BUT THEY DO NOT HAVE A CAMERA ON THE EAST SIDE OF THE BUILDING. HALL SAID HE DID NOT REMEMBER THE BLACK MALE, MATCHING THE SUSPECTS DESCRIPTION, COMING IN THE STORE. I VIEWED THE TAPE AND DID NOT SEE ANY PATRONS COME INTO THE STORE MATCHING THE SUSPECTS DESCRIPTION.

| REPORTING OFFICER | I.D. # | DIVISION | APPROVED BY: | | MONTH | DAY | YEAR | TIME |
|---|---|---|---|---|---|---|---|---|
| LEIBER | 5206 | MC-1ST | SK Dell | DATE OF REPORT: | 3 | 4 | 99 | 130 |

2 (REV. 9-84)

(104) 4884

CONTINUED



The Arco station where Rose Andava was Parked next to the suspect of the Carole Pomplin robbery



The location of Timmy Anderson during the Robbery of Carole Pumplin. Across the street.

# EXHIBIT
# G

**Description:** Statement of Rosetta Fortunato to Police day of robbery and other witnesses and Police dispatch of suspect description

**Page:** 9 Pages

CRIME INCIDENT REPORT

| | DATE | | | 1 OF 12 | 99022588 |
|---|---|---|---|---|---|

DATE 04/06/1999       Tue       12:30

#211 / Robbery Purse Snatch

LOCATION OF INCIDENT (IF ADDRESS)

EL CAJON BLVD (rear parking lot.)       CITY  SAN DIEGO

VICTIM'S NAME (LAST, FIRST, MIDDLE OR ORGANIZATION)

Fortunato, Rosetta

CITY  EL CAJON       STATE  CA

| HOME PHONE | RACE W/ | SEX F | DATE OF BIRTH | ID TYPE CI | ID NUMBER | INTERPRETER REQUIRED  Y | RELATION TO VICTIM/SUSPECT R S |
|---|---|---|---|---|---|---|---|

STATUS  U   EMPLOYER (RANK IF MILITARY)  Home Maker      BUSINESS PHONE      DAYS OFF      WORK HRS.      V.W. ASSIST  N

BUSINESS OR MILITARY ADDRESS       CITY       STATE  ZIP

ADDITIONAL INFORMATION (VICTIM VEHICLE INFO. IF APPLICABLE)

Language: Italian-

VICTIM'S NAME (LAST, FIRST, MIDDLE OR ORGANIZATION)

W   Abbey, Leroy

V/-TYPE/ RESIDENCE ADDRESS

06       CITY  SAN DIEGO       STATE  CA

| HOME PHONE | RACE W | SEX M | DATE OF BIRTH | ID TYPE SS | ID NUMBER | INTERPRETER REQUIRED  N | RELATION TO VICTIM/SUSPECT S S |
|---|---|---|---|---|---|---|---|

STATUS  U   EMPLOYER (RANK IF MILITARY)      BUSINESS PHONE      DAYS OFF      WORK HRS.      V.W. ASSIST  N

BUSINESS OR MILITARY ADDRESS

(Transient. Add and ph # are for contact purposes.)       CITY       STATE  ZIP

ADDITIONAL INFORMATION (VICTIM VEHICLE INFO. IF APPLICABLE)

TOTAL # OF WITNESSES AT CRIME:  5     PLACE OF ATTACK:     6. Other:  Parking Lot

DESCRIPTION OF SURROUNDING AREA:     1. Residential

| W | SPECIFY  FIST | | HOW USED:  PUNCH |
|---|---|---|---|
| | SPECIFY. | | HOW USED: |

| TYPE OF STRUCTURE | POINT OF ENTRY | SECURITY USED | SUSPECT ACTIONS |
|---|---|---|---|
| Non-Residential | 0. N/A | 0. N/A | 4. CASED AREA  22. INFLICTED INJUP  30. PURSE SNATCH |
| 1. BANK/S&L/CU | 0. N/A | | |
| | 0. N/A | | |
| TARGET(S)  8. PURSE | | | |
| | TYPE LOCK ATTACKED  0. N/A | | |

On This day, I had a baseball haT wiTh my Name (kevin) in big whiTe leTTers on The front. The video shows This. The Police TooK iT in The Search of my home.

| VICTIM INJURED:  Y | EXTENT OF TREATMENT: HOSPITAL | SIC: | NO, probably is:  ADULT |
|---|---|---|---|

REPORTING OFFICER  Danny Grubbs       I.D.#  4776       DIVISION  MC1       DETECTIVE(S) ASSIGNED       I.D.#       DIVISION

DATE AND TIME OF REPORT

DATE  04/06/1999     TIME.  17:27       CASE STATUS  131   AGENCY  SDPD   CRIME TYPE  PC / 211

PD15 3 (REV 7-91)       COPY

(108)

| ITEM NO. | ARTICLE NAME | STOLEN RECVD | IDENTIFICAL NUMBERS | BRAND MAKE OR MANUFACTURER | MODEL NAME AND MODEL NUMBER | MISCELLANEOUS DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|---|
| | Purse | 1 | | | | Black large leather purse | 25.00 |
| | Wallet | 1 | | | | Brown leather wallet | 10.00 |
| | Check book | 1 | | | | BROWN CHECK BOOK WITH CHECKS | 0.00 |
| | Bank Card | 1 | | | | | 10.00 |

**ARRESTED SUSPECT #1 LAST, FIRST, MIDDLE:**
Unknown,

NICKNAME/AKA

ID TYPE   ID NUMBER

SUSPECT'S ADDRESS

CITY

STATE   ZIP

| PHONE | RACE | SEX | AGE | DOB | HT | WT | BUILD | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|---|
| | B | M | 45 - 50 | | 6'03" - 6'04" | 170 - 190 | THIN - NORM | BRO | BRO |

ADDITIONAL INFORMATION / FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, ETC.)

SUSPECT'S CLOTHING
White And Black Checkered Flanel, Approximately 6" Square Pattern.  Dark Pants.

| HAIR LGTH/TYPE | HAIR STYLE | FACIAL HAIR | COMPLEXION | GENERAL APPEARANCE | DEMEANOR | SPEECH | VOICE |
|---|---|---|---|---|---|---|---|
| 5. SHORT | 1. AFRO-NATURAL | 7. NONE/FUZZ | 5. MEDIUM | 1. CASUAL | 10. VIOLENT | 0. UNKNOWN | 0. UNKNOWN |
| 1. COARSE | | | | | | | |

| SUSPECT VEHICLE | YEAR | MAKE | MODEL | COLOR / COLOR | TYPE | LICENSE NO. | LIC STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

ADDITIONAL VEHICLE IDENTIFIERS (DAMAGE, CHROME WHEELS, ETC.)   VIN   VEHICLE IMPOUND   TOWING COMPANY

EVIDENCE OBTAINED   9. OTHER   SEE INV. ADDENDUM.

SEE INVESTIGATION ADDENDUM FOR DETAILS

TAG NOS.
None,None.,Photograph

ADDNL PERSONS LISTED   Y   WITNESS CHECK   Y

ADDITIONAL OFFENSES:

HEADINGS: CRIME DESCRIPTION; VICTIM(S) STATEMENT; OFFICER'S STATEMENT / INVESTIGATION; EVIDENCE DISPOSITION; WITNESS STATEMENT/ WITNESS CHECKS; INJURIES / PROPERTY DAMAGE

| officer assault: | OAK ZZ | Number Officers | 0 | Activity when assault occured: |
|---|---|---|---|---|
| | | Number Officers without personal injury | 0 | |

ARSON TYPE:

DESCRIPTION

CONTENT LOSS $   .00   STRUCT LOSS $   .00   ABANDON   N   CONTINUED   Y

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

| CONTINUED FROM | | |
|---|---|---|
| | OFFICER'S REPORT ONLY | |
| | ARR/JUV. CON. | |
| X | CRIME | |
| | OTHER | |

INCIDENT NUMBER
99040011318

| | PAGE 9 OF 12 | CASE NUMBER 99022688 |
|---|---|---|

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) PC / 211 / Robbery [Purse Snatch] | DATE 04/06/1999 | DAY OF WEEK Tue | TIME 12:30 |
|---|---|---|---|

| LOCATION OF INCIDENT (OR ADDRESS) ████████████ | CITY SAN DIEGO | DISTRICT | BEAT 841 |
|---|---|---|---|

PERSON(S) INVOLVED: VICTIM
Fortunato, Rosetta

SUSPECT (IF NAMED)
Unknown,

PROPERTY TAG NO.(S)
None,None.,Photograph

## SYNOPSIS:

An unknown black male suspect punched Fortunato twice in the back of her head while she was loading groceries into her van.  He took her purse containing over $600.00 in cash. Inc#P99040011318.

## ORIGIN:

I responded to assist on a radio call of a car jacking.  The first unit to arrive at the scene advised the car jacking was actually a purse snatching.  Due to a language barrier the original information put out by dispatch was not completely accurate.

## INVESTIGATION:

When I arrived several units were checking the area for the suspect.  Motor Off B Hibsman, 3773, was with the victim, relaying suspect information over the air.  I went to the scene to assist Off Hibsman.

The robbery occurred in the parking lot behind ████████████

The Victim, later identified as Rosetta Fortunato, is an Italian speaker.  I noticed she was holding the back of her head.  There was a large lump forming on the left back side of her head.  I ordered an ambulance for her.

Off Hibsman took witness, John Haollaoran, in his patrol car and checked the area for the suspect.

Fortunato was hysterical, crying and yelling.  She appeared to be quite frightened.  I requested an Italian speaking Officer.  I obtained limited information from Fortunato.  Italian speaking Off L Zizzo, 5087, responded to the scene.

Paramedic unit # 31 [James Barnett and Rick Lewis] responded to our location, evaluated Fortunato's head injury, and transported her to Kaiser Permanente for treatment.  Off Zizzo accompanied Fortunato to Kaiser and took her statement. [See Off Zizzo's attached report.]

| REPORTING OFFICER nny Grubbs | I.D. # 4776 | DIVISION MC1 | DATE OF REPORT 04/06/1999 | TIME 17:27 |
|---|---|---|---|---|

COPY
(110)

CONTINUED  Y

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

| | PAGE 1 OF 2 | CASE NUMBER 99-022688 |
|---|---|---|

☐ OFFICER'S REPORT ONLY
☐ APPLICATION
☐ CRIME
☐ OTHER: _____

| TITLE AND DESCRIPTION (ONE INCIDENT ONLY) | | MONTH | DAY | YEAR | DAY OF WEEK | TIME |
|---|---|---|---|---|---|---|
| SITE OF INCIDENT (OR ADDRESS) | | CITY | | | BEAT | DISTRICT |
| WHO(S) INVOLVED: VICTIM | SUSPECT (IF NAMED) | | | PROPERTY TAG NO. (S) | | |

STATEMENT OF ROSETTA FORTUNATO (VICTIM): FORTUNATO TOLD ME SHE HAD JUST FINISHED SHOPPING AT THE NORTH PARK PRODUCE AND WAS WALKING OUT TO WHERE HER VEHICLE WAS PARKED, IN THE LOT BEHIND THE DENTAL OFFICE AT 3531 ECB. AS FORTUNATO APPROACHED HER VEHICLE SHE SAW THE SUSPECT WALKING TOWARDS HER FROM THE W/A OF 4200 WILSON AVE. FORTUNATO CONTINUED TO HER VEHICLE AND STARTED TO UNLOAD THE GROCERIES INTO THE VEHICLE. THE SUSPECT THEN APPROACHED FORTUNATO FROM BEHIND AND PUNCHED HER TWICE TO THE LEFT SIDE OF HER HEAD CAUSING FORTUNATO TO FALL FORWARD INTO HER VEHICLE. FORTUNATO SAID SHE WAS STUNNED BUT DID NOT LOSE CONCIOUSNESS. FORTUNATO FELT THE SUSPECT GRAB HER PURSE WHICH SHE HAD BEEN CARRYING AROUND HER LEFT SHOULDER. THE SUSPECT REMOVED THE PURSE AND FLED. FORTUNATO BEGAN YELLING FOR HELP.

I INTERVIEWED FORTUNATO IN THE AMBULANCE, AND THEN ONCE AGAIN AT KAISER HOSPITAL AFTER SHE HAD CALMED DOWN SOME. FORTUNATO VERIFIED THAT $800.00 IN ONE HUNDRED DOLLAR BILLS HAD BEEN TAKEN FROM HER WALLET. NO OTHER PROPERTY HAD BEEN TAKEN FROM FORTUNATO'S PURSE. FORTUNATO SAID THAT SHE WOULD BE ABLE TO IDENTIFY THE SUSPECT.

| REPORTING OFFICER L. ZITELLO | I.D. # 5057 | DIVISION MK-1 | APPROVED BY: | | | | |
|---|---|---|---|---|---|---|---|
| | | | | DATE OF REPORT: | MONTH 04 | DAY 06 | YEAR 99 | TIME 1515 |

R (REV. 9-84)

CONTINUED

SAN DIEGO REGIONAL
OFFICER'S REPORT
NARRATIVE

CONTINUED FROM:
- [ ] OFFICER'S REPORT ONLY
- [ ] ARR./JUV. CON.
- [x] CRIME
- [ ] OTHER

4/6

| INCIDENT NUMBER | | |
|---|---|---|
| 99040011318 | | |
| | PAGE | CASE NUMBER |
| | 10 OF 12 | 99022688 |

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | DATE | DAY OF WEEK | TIME |
|---|---|---|---|
| PC-212 / Robbery [Purse Snatch] | 04/06/1999 | Tue | 12:30 |

| LOCATION OF INCIDENT (OR ADDRESS) | CITY | DISTRICT | BEAT |
|---|---|---|---|
| 3551 EL CAJON BL (Rear parking lot.) | SAN DIEGO | | 841 |

| PERSON INVOLVED: VICTIM |
|---|
| Fortunato, Rosetta |

| SUSPECT (IF NAMED) |
|---|
| Unknown, |

| PROPERTY TAG NO.(S) |
|---|
| None,None.,Photograph |

Off Hibsman brought witness Haollaoran to me.  I took Haolloran's statement.

STATEMENTS:

Statement of John Haolloran [Witness]:

"I was walking out of the Pep Boys on the north side of 3600 El Cajon Blvd.  I heard a woman scream.  I saw a black guy about 6'3", thin build, 45-50 years old, wearing a black and white checkered flanel, walking quickly north across El Cajon Blvd.  He walked behind the Challenger Car Wash and turned left[West].  I followed him in my car.  I lost track of the guy in the north alley of 3500 El Cajon Blvd behind the Challenger Car Wash.  I never saw the guy make it to 35th St.  I'm sure he never crossed 35th. St."  Haolloran told me he can ID the suspect.

I spoke to another witness, Donald Stowell, in the parking lot and took his statement.

Statement of Donald Stowell [Witness]:

"I was showing my condo to a prospective tenant.[Stowell's condo is located directly south of the parking lot where Fortunato was attacked.  West side of Wilson.]  We were standing in the alley [West alley of 4200 Wilson].  I saw this tall thin black man.  He was about 6'4" with short black hair, loitering around at our dumpster.  The guy saw me and walked north towards where the woman was attacked.  About a minute later I heard a woman screaming.  I came over when I saw the police cars here."  Stowell told me he can ID the suspect.

I was advised Off Hibsman located Fortunato's purse behind 3504 El Cajon Blvd under a car parked in the alley there.  Next to the passenger side front tire.  Off Hibsman recovered the purse.  There was $163.00 in a side pocket of the purse.  I took custody of the purse.

A white male, later identified as Leroy Abbey, told Off's he found a bag with a wallet in it next to the power box, directly behind the Challenger Car Was 3540 El Cajon Blvd.

I photographed the wallet that contained identification, grocerey cards, and Fortunato's check book.

Statement of Leroy Abbey [Witness]:

| REPORTING OFFICER | I.D. # | DIVISION | | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| Danny Grubbs | 4776 | MC1 | | 04/06/1999 | 17:27 |

COPY
(112)

CONTINUED  Y

| CONTINUED FROM: | | |
|---|---|---|
| | OFFICER'S REPORT ONLY | |
| | ARR/JUV CON | |
| X | CRIME | |
| | OTHER | |

| | | INCIDENT NUMBER |
|---|---|---|
| | | 99040011318 |

| | PAGE | CASE NUMBER |
|---|---|---|
| | 11 OF 12 | 99022688 |

| CODE SECTION AND DESCRIPTION (ONE INCIDENT ONLY) | DATE | DAY OF WEEK | TIME |
|---|---|---|---|
| PC / 211 / Robbery [Purse Snatch] | 04/06/1999 | Tue | 12:30 |

| LOCATION OF INCIDENT (OR ADDRESS) | CITY | DISTRICT | BEAT |
|---|---|---|---|
| 3531 EL CAJON BL (Rear parking lot.) | SAN DIEGO | | 841 |

| PERSON(S) INVOLVED: VICTIM |
|---|
| Fortunato, Rosetta |

| SUSPECT (IF NAMED) |
|---|
| Unknown, |

| PROPERTY TAG NO.(S) |
|---|
| None.,None.,Photograph |

"I was canning in the dumpsters. I saw this wallet on the ground next to that power box. I told one of the several Police Officers that were driving around the area."

I spoke to Steve Doepker in the alley directly behind 3540 El Cajon Blvd. Doepker is a local transient.

Statement of Steve Doepker[Witness]:          *No mention of seeing a suspect! Only during trial*

"I know this other homeless guy. He's hispanic. His name is Oscar. He knows that black guy who's robbing all the old people out here. Oscar says the guy drives a burgundy Cadillac. He lives somewhere in the area of 4200 35th St. That's wrong what he's doing. You can reach me at the phone number and address I gave you."          *Whoever Oscar was, he was not called as a witness? ???*

I drove to Kaiser Hospital where Fortunato identified the purse, wallet, and check book as the one that were stolen in the attack.

BACKGROUND:

None.

EVIDENCE:

Fortunato's purse, wallet, and check book were returned to her. A photograph of wallet and where it was found is attached to the Investigator's copies of this report.

INJURIES:

Fortunato had a large lump on the back left side of her head.

PROPERTY DAMAGE:

None.

FOLLOW-UP:

| REPORTING OFFICER | I.D. # | DIVISION | | DATE OF REPORT | TIME |
|---|---|---|---|---|---|
| Danny Grubbs | 4776 | MC1 | | 04/06/1999 | 17:27 |

| CONTINUED | Y |
|---|---|

Incident History for: #P9   0011318

```
Entered      04/06/99  12:30:10  BY CT10   8680
Dispatched   04/06/99  12:30:43  BY RC08   8460
Enroute      04/06/99  12:30:43
Scene        04/06/99  12:31:43
```

Initial Type: 211CJ
Final   Type: 211        (ROBBERY) Pri: 1 Dispo: K
Police BLK:  0170000010800  FMap: 2126F3 TMap: 1269F4 Group: P8
Beat: 811 Src: T Inc Cmdr:
Loc: EL CAJON BL/WILSON AV

Loc Info: > > PURSE SNATCH < <
Name:                                Addr:                            Phone:

```
/1230  (8680 )  NBRHD        Normal Heights
/1230           ENTRY        2ND HAND INFO TO RP//
/1230  (8460 )  DISPER  ABLE1  #2654  BORINSKI, DONALD J
                               #4414  ALVARADO, JAIME
/1230           ASST    814J1  #5105  CHEAM, SOPHEAP
/1230           ASST    843J1  #5337  GILL, DONNA
/1231  (5105 ) *ENROUT  814J1
/1231  (8460 )  ASST    2931N1 #3458  SANTIAGO, EDWIN
/1231  (5337 ) *ENROUT  843J1
/1231  (8460 )  MISC         , ** 841S 10-4
/1231           ASST    841J1  #4776  GRUBBS, DANIEL L
/1231           ASST    825J1  #5265  BROUSSARD, RONALD
/1231           ASSTOS  841M   #3773  HIBSMAN, BYRON E
/1231  (4776 ) *ENROUT  841J1
/1231  (5265 ) *ENROUT  825J1
/1231  (8460 )  MISC         , * HYSTERICAL RP .. INJURED
/1232           ONSCNE  ABLE1
/1232           MISC         , * ATTEMPT ONLY .. WAS HIT IN THE HEAD
/1232  (3458 ) *ENROUT  2931N1
/1232  (8460 )  ASST    842G1  #5529  STINSON, ROBERT F
                               #4679  SOUTHERLAND, STEVEN B
/1233  (5529 ) *ENROUT  842G1
/1233  (8460 )  MISC    841M   , ** PURSE SNATCH .. BM SUSP ...
/1234           MISC    841M   , BM 40'S-50'S ..LS NB X ECB
/1236           MISC    841M   , ** WRNG CKRD SHIRT ...LS W OF EL CAJON AT THE LI
                               Q/MARKET.. ON THE WEST SIDE OF THE ST
/1237           ASST    2950S1 [EL CAJON BL/WILSON AV]
                               #2259  NULTON, WILLIAM D
/1237  (5105 ) *ONSCNE  814J1
/1237  (5529 ) *ONSCNE  842G1
/1237  (2259 ) *ENROUT  2950S1
/1238  (8460 )  MISC    841J1  , ** BLUNT TRAUMA TO HEAD, NEED 1141 .. MEDICS EN
                               RTE
/1238           ASST    841S1  [EL CAJON BL/WILSON AV]
                               #2781  PARGA, MICHAEL L
/1238           MISC    841M   , ** LS 4330 35TH
/1240  (3458 ) *ONSCNE  2931N1
/1240  (8460 )  ONSCNE  841J1
/1241           MISC    841J1  , ** NEEDS ITALIAN SPEAKER
/1241  (5337 ) *ONSCNE  843J1
/1  1  (5265 ) *ONSCNE  825J1
/1242  (8460 )  MISC    841M   , ** SUSP IS BM, 30'S 6'4", THIN, WRNG DRY/BLK CK
                               D JACKET, LARG CKS
```

(114)

```
44   (5105 )  *MISC     814J1   ,LIQUOR STORE 36TH ST/MEADE CHECKED NEGATIVE INSI
                                DE.
14   (*****)  REMINQ    841S1   PLATE/3NKZ320
45   (2259 )  *ONSCNE   2950S1
46   (8460 )  ASST      812K1   [EL CAJON BL/WILSON AV]
                                    #5081   VARGAS, MICHAEL E
                                    #5087   ZIZZO, LOUIS M
47            PREMPT    812K1
47            ASST      812K1   [EL CAJON BL/WILSON AV]
                                    #5081   VARGAS, MICHAEL E
                                    #5087   ZIZZO, LOUIS M
48   (5081 )  *ENROUT   812K1
49   (8460 )  $PREMPT   814J1
50            ASST      849D     #2147   GRIFFIN, PETER
50            CHANGE            LOCI:
                                --> > > PURSE SNATCH < <
                                TYP: 211CJ
                                --> 211
53   (5265 )  *CLEAR    825J1
54   (8460 )  $PREMPT   2931N1
55   (5081 )  *ONSCNE   812K1
55   (2259 )  *CLEAR    2950S1
55   (8460 )  MISC      841J1   , * LOSS LARGE BLK PURSE, $100, SOME BANK CARDS
56            MISC      841M    , * ROSETTA FORTUNADA ..
57            MISC      841M    , * FOUND THE PURSE BEHIND THE LIQUOR STORE
59            $PREMPT   841S1
02            MISC      841J1   ., 8 - $100 BILLS
02   (5081 )  *CHGLOC   812K1   [SHARP HOSP]
07   (5529 )  *CLEAR    842G1   D/K
10   (8460 )  CHGLOC    812K1   [KAISER]
17   (5081 )  *CHGLOC   812K1   [KAISER]
19   (8460 )  CLEAR     849D
22   (5337 )  *CLEAR    843J1
24   (8460 )  CHGLOC    841J1   [KAISER ]
28            TMPOUT    841J1   TSTOP[NB 15 /AERO] @4CJN795
28   (*****)  REMINQ    841J1   PLATE/4CJN785
31   (8460 )  TMPOUT    841J1   BACK TO INCIDENT
31            CHGLOC    841J1   [KAISER]
36   (5081 )  *ONSCNE   812K1
41   (4776 )  *ONSCNE   841J1
52   (3773 )  *CLEAR    841M
05   (8349 )  $PREMPT   ABLE1
05   (4776 )  *CHGLOC   841J1   [SUB]
                                ,INV
10   (8195 )  ASST      844J1   [3531 ECB ]
                                    #5163   FENDRICH, MARK A
10   (5163 )  *ENROUT   844J1
19            *ONSCNE   844J1
21            *ONSCNE   844J1
22            *CLEAR    844J1
24   (4776 )  *ONSCNE   841J1
32   (5081 )  *CHGLOC   812K1   [SUB]
43            *ONSCNE   812K1
49            *CLEAR    812K1
```

(115)



Direction and Allel that witness John Haolloran
saw, followed, and lost the suspect in the
Fortunato robbery.

# EXHIBIT
# H

**Description:** NewsPaper article of the Same
type of robbery while Petitioner
Was in Custody

**Page:** 2 Pages

## Man found unconscious in apparent assault, robbery
*The San Diego Union - Tribune*; San Diego, Calif.; Aug 24, 2000; Joe Hughes;

**Sub Title:** [7 Edition]
**Column Name:** CRIME WATCH
**Start Page:** B-6
**Dateline:** NORTH PARK
**Abstract:**
*A man was found severely beaten, bleeding from head wounds and unconscious in an alley near 28th and Landis streets yesterday, the victim of an apparent assault...*

**Full Text:**
*Copyright SAN DIEGO UNION TRIBUNE PUBLISHING COMPANY Aug 24, 2000*

NORTH PARK -- A man was found severely beaten, bleeding from head wounds and unconscious in an alley near 28th and Landis streets yesterday, the victim of an apparent assault and robbery, police said.

The man, believed to be in his 60s, carried no identification and his pant pockets were turned inside out when he was found about 8:20 a.m., said San Diego police homicide Lt. Jim Duncan.

"We believe he may have been robbed during the assault," Duncan said. The man was hospitalized with a skull fracture.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

SAme M.O, SAme area

Petitioner Was locked up !

# Man, 71, dies from injuries in beating

*The San Diego Union - Tribune*; San Diego, Calif.; Aug 29, 2000; Joe Hughes;

**Sub Title:**      [7 Edition]
**Column Name:** CRIME WATCH
**Start Page:**    B-2
**Dateline:**       NORTH PARK

**Abstract:**
*LeRay Parkins was found in the alley about 8:45 a.m. He had been struck on the head several times and the pockets of his pants were turned inside out, San Diego police homicide Lt. Jim Duncan said.*

**Full Text:**
*Copyright SAN DIEGO UNION TRIBUNE PUBLISHING COMPANY Aug 29, 2000*

NORTH PARK -- A man, 71, died of the injuries he received last Wednesday when he was beaten and apparently robbed in the alley behind 28th Street during his morning walk, police said.

LeRay Parkins was found in the alley about 8:45 a.m. He had been struck on the head several times and the pockets of his pants were turned inside out, San Diego police homicide Lt. Jim Duncan said.

He remained on life support at a hospital. He was pronounced dead Saturday. Parkins lived nearby, on Landis Street, and is survived by a son. Anyone with information on the attack is asked to call police at (619) 531-2293.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

# EXHIBIT I

**Description:** Individual responsible For
Similar types of robberies
Look at his Completion

**Page:** 2 Pages

(120)

# Ex-con gets life for two attacks

## Man beat woman, took nurse hostage

**By J. Harry Jones**
STAFF WRITER

A remorseless ex-convict fell asleep in a San Diego court-room yesterday as he was ordered back to prison for beating and robbing a woman on a downtown street and taking a nurse hostage in the downtown jail.

Just before nodding off, Marvin Goldston told a judge he was glad to be moved from the local jail where he has been held because he will be able to smoke cigarettes again.

Smoking is prohibited in the local jails.

Goldston, who has been kept away from other inmates while in San Diego, said he also is looking forward to prison because he will be able to have sex with other inmates.

Deputies had to nudge the heavily guarded and shackled Goldston several times to wake him up as he sat at the defense table.

"Mr. Goldston is one of the most dangerous people I've come across in 30 years," Superior Court Judge Michael Wellington said in imposing a life term plus 25 years. "He is an enormous danger."

Goldston, 33, was convicted in January of assaulting and robbing Marja Dadian on March 15 near Front and F streets in downtown San Diego. Dadian, the city manager of Artesia and wife of local political lobbyist John Dadian, suffered severe injuries of the head and face when the 365-pound Goldston struck her on the head and grabbed her purse.

Goldston testified that he had committed "thousands" of similar robberies in his lifetime. He said he attacked Dadian to get money to buy drugs.

Goldston was convicted in



Marvin Goldston looked back at the gallery before leaving court yesterday after being sentenced to life in prison.
*John Gastaldo / Union-Tribune*

**► ATTACKS**
CONTINUED FROM PAGE B1

## Man said he robbed woman for drug money

1985 of robbery in New York and spent three years in a prison there. He had been living as a transient in San Diego for several years before his arrest.

Last week, after a separate trial, Goldston was convicted of numerous charges, including kidnapping for ransom, in connection with taking jail nurse Cloribel de Silva hostage in his cell Nov. 11. Goldston outweighed her by about 280 pounds.

That jury was shown a videotape of the incident in which the nurse could be heard begging and crying throughout the 75-minute ordeal with one of Goldston's beefy arms wrapped around her neck. He also threatened her by holding a sharpened pencil tip to one of her eyes.

Goldston told jailers he was doing so because he wanted cigarettes, magazines and Los Angeles defense attorney Johnnie Cochran.

"Goldston will be eligible for a parole hearing when he is 68 years old," said prosecutor Blaine Bowman.

*San Diego Union Tribune Feb 21st 2001*

(121)

*ArTicle TakeN From The San Diego Union Tribune 1-13-01* **SAme M.O**

# Jury finds man guilty of assault, robbery

**By J. Harry Jones**
STAFF WRITER

*1-13-01*

An ex-convict who testified he has committed thousands of robberies was convicted yesterday of an attack here against the city manager of a Los Angeles County city.

Marvin Goldston was found guilty by a jury of assaulting and robbing Maria Dadian near Front and F streets in downtown San Diego on March 15.

Dadian, the city manager of Artesia and the wife of local political lobbyist John Dadian, suffered severe injuries to her head and face when the 365-pound Goldston struck her on the head and grabbed her purse.

Goldston, 33, testified that he robbed Dadian because he needed money to buy crack cocaine and that he has robbed thousands of people over the years.

Dadian testified that she still suffers headaches and blurry vision from the attack in which several of her teeth were knocked out.

When Dadian's husband testified about his wife's injuries,

Goldston laughed out loud.

It took the jury less than two hours to reach its verdicts.

Goldston was convicted of assault, battery and robbery. He was acquitted of a torture charge.

Prosecutor Blaine Bowman had argued that Goldston's attack was in part motivated by a "sadistic desire to inflict pain. However Goldston said he hit Dadian just once with great force in order to "keep her from screaming."

Bowman said Goldston faces 18 years in prison when sentenced at a hearing scheduled Feb. 13. Had he been found guilty of the torture charge, the sentence could have been life in prison.

"This is an animal who made the city unsafe for everybody," said John Dadian outside court yesterday after the verdicts.

Goldston has a prison history. He served three years in New York for a 1985 robbery conviction.

Goldston still faces kidnaping, attempted murder and other charges stemming from an alleged attack upon a nurse

in the downtown San Diego County Jail in November.

He is accused holding the woman, Cloribel de Silva, hostage by holding a sharpened pencil to the 88-pound nurse's eye for more than an hour.

Goldston testified at an earlier hearing he took the nurse hostage to get the attention of deputies who refused to let him smoke in jail. He also testified he wants to return to prison, where cigarettes and drugs are easily obtained on the black market.

Goldston faces two life prison terms if convicted on those charges.



# EXHIBIT
J

**Description:** Letter from Jury foreman

**Page:** 2 Pages

Robert I. Morse
10358 Rue Chamberry
San Diego, CA 92131-2202

September 18, 1999

Mr. Paul Pfingst
District Attorney
330 W. Broadway
San Diego, CA. 92101-3826

Dear Mr. Pfingst

I am writing this letter to raise some issues in regard to the District Attorney's Office as I perceived it during the trial of <u>People v. Gunn</u>, which concluded September 17, 1999. I was a juror.

I understand that the District Attorney's office may well be overworked. My comments and criticisms are not based solely on lack of time in preparation or investigation (although I suggest bit more time should have been taken). Lack of time or overwork can not be allowed to be an excuse for sloppy prosecution especially in a case where lack of conviction puts a dangerous criminal back on the streets as was nearly the case here.

To begin with, after the prosecutions opening statements, I barely had an idea of what she intended to prove. There was no framework on which to hang the scattered bits of evidence. I was not alone in this perception.  To be fair, the defense did an equally confusing job (as one jury member commented on entering the court room it was not clear as to which one was the lawyer and which the defendant).

Much of the identification depended on perceptions of height. It was suggested that an expert would testify- that never happened.

Witnesses described the 6'8" (or so the defense said) defendant as 6' or 6' plus or 6'2" etc. Obviously the jury was aware that people have difficulties in estimating heights- however, it was left to the jurors to raise the issue of estimating height of some one seated.  The witnesses were also never asked if their description could extend to someone the size of the defendant.

The street map- a people's exhibit- left out many of the alleys that were referred to by witnesses.

A witness identifying a tear in a shirt must have caught the prosecutor by surprise-, as there was no testimony as to when or if he had seen the shirt up close before that time.

No introduction of evidence as to how commonly even traffic officers misread license plates or the likelihood of randomly getting two out of seven numbers/letters correct.

The defense used an exhibit that was prepared with excessive contrast- (composite drawing) so much so that the witness who directed the drawing denied it was the one he did.

The defense kept saying 2:14 to 2:15 was equal or less than one minute when this can cover a two-minute span. Time and/or elapsed time were an issue! No mention of the lack of synchronization between the clocks used for 911 calls and the clocks used on the market video presented as evidence. Again, time was an issue.

The time or even the day of a money order purchase or even the location of the purchase was never mentioned. Time and location again were issues.

The defendant's girlfriend testifies that she had the car described in the case on the day she and Mr. Gunn broke up yet he was identified in that car that day-prosecution seemed not to notice. She further testified that she had no contact with Mr. Gunn until she moved back in with him- no comment from the prosecution. She claimed that she used the car to get to work and on occasion allowed Mr. Gunn to use it- did he drive her and pick her up etc-.

Certain descriptions and views of the crime scene would have made more sense with models or photograph taken from the position the witnesses were in.

Perhaps most egregious was to have the prosecutor ask her own witness if she was a *psychic* or *clairvoyant* (The jurors did not recall which or if both were used.)

It is not my purpose to be inclusive. Based on the prosecutor's performance, *had the jury been less proactive or less intelligent there would not have been a conviction and a dangerous criminal would be back on the streets.*

Neither overwork nor public service is an excuse for substandard performance.


Sincerely,

Robert L. Morse

# EXHIBIT

_K_

**Description:** Newspaper accounts of
Possible Juror misconduct during
Petitioner's trial

**Page:** 2 pages

# Jury misconduct possible in Gunn's conviction

**EULA BISS**
*Staff Writer*

Kevin Gunn has been serving sentence of 17 years in prison since he was convicted on two [of] three counts of robbery in 1999. He appealed this decision in January of 2002 and won what his attorney called a "partial victory." The appellate court's decision upheld the original conviction but acknowledged the possibility of jury bias or misconduct and granted Mr. Gunn permission to investigate this possibility.

Evidence of jury misconduct could convince the court to grant *Mr.* Gunn a new trial, but his public defender has not found enough evidence to file a motion for a new trial. At this point, Mr. Gunn's problematic case might have reached a dead end in the system.

Mr. Gunn was one of several people arrested as suspects in a highly publicized series of robberies against elderly people. There were nearly a dozen witnesses to the robberies for which Mr. Gunn was on trial and the case against him depended on the ability of these witnesses to positively identify Mr. Gunn as the man involved in the crimes.

Not a single witness made a positive identification of Mr. Gunn in a photographic lineup. Also, not a single witness gave a accurate physical description of Mr. Gunn. Most witnesses described a 6' to 6'4" black man with a very dark complexion. Several also described the man as having a thin or medium build. Mr. Gunn is unusually tall, light skinned and at 6'9" and 350 pounds he is the size of a professional football player. Despite these differences, the jury convicted Mr. Gunn of the robberies. His appeal of the conviction argued that there was "insufficient evidence to support the judgment" and that the trial court erred by refusing to disclose information about the jury.

On September 18, 1999, one day after the jury returned its verdict in Mr. Gunn's trial, the jury's foreperson wrote a letter to the District Attorney to complain about the prosecutor's presentation of the People's case against Gunn. The letter criticized the confusing presentation by the prosecutor and the lack of expert testimony. "Obviously the jury was aware that people have difficulties in estimating heights," the foreperson wrote, referring to the fact that many witnesses estimated the height of the man they saw as shorter than Mr. Gunn's actual height, "it was left to the jurors to raise the issue of estimating [the] height of [someone] seated." The juror's letter concluded, "Based on the prosecutor's performance, *had the jury been less proactive or less intelligent there would not*



Kevin Gunn is serving 17 years in jail for robberies he says he did [not] commit.

*have been a conviction....*"

The decision by the appellate court stated, "It can reasonably be inferred from the letter's statement that the jurors may have engaged

*See JURY on page A*

Printed
2002

Voice and Viewpoint

(127)

# *Jury*

Continued from page A1

that the jurors may have engaged in improper actions in 'proactively' deciding Gunn's guilt or innocence, Gunn should be given a reasonable opportunity to contact the jurors and determine whether there was, in fact, any juror bias or misconduct."

Mr. Gunn's appeal attorney, Nancy King, says that she was not optimistic about this process because "jurors are notoriously reluctant to say, 'we made a mistake.'" In order for Mr. Gunn to

be granted a new trial, says Ms. King, the jurors would have t admit that they "ignored the evidence and convicted him because he's big and he's mean looking. Ms. King no longer represents M Gunn but she would like to see hi case move forward. "He's a good guy," says Ms. King, "He's ver articulate and very intelligent and think he's right, I think there's problem with the conviction."

Mr. Gunn's case is now in th hands of his public defender, Stev Wadler. Mr. Wadler was reluctant to discuss the case with th *Voice and Viewpoint* and said onl that he had not found enough evidence of jury misconduct to file motion for a new trial. When h was asked what the next step wou be in Mr. Gunn's case, he sai "You'll have to speak to Nanc King about that." Ms. King, however, was Mr. Gunn's appeal a torney and she has not been r sponsible for his case since th appellate court upheld his convi tion in January. Ms. King says th if Mr. Wadler is unable to file motion for a new trial, Mr. Gunn case is finished at the state leve His only chance for a new tri would be in federal court.

Mr. Gunn's case was invest gated by the Innocence Project California Western School of La There was a possibility that would be able to file a petition f a new trial through the Innocen Project, but the *Voice and View point* was not able to determin whether the Innocence Project still woking on Mr. Gunn's cas Without the active support of h public defender or the Innocen Project, it is very likely that M Gunn will remain in jail. "I need the community's support," Mr Gunn wrote the *Voice and Vie point* from jail, "My family and I can't do it alone."

# EXHIBIT

L

**Description:** Motion For a new trial

**Page:** 9 Pages

1  TIMOTHY C. CHANDLER
   Alternate Public Defender
2  STEVEN I. WADLER
   Deputy Alternate Public Defender
3  Law Offices of the Alternate Public Defender
   110 West "C" Street, Suite 1100
4  San Diego, California 92101
   Telephone: (619) 236-2523
5
   Attorneys for Defendant
6  KEVIN GUNN

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF SAN DIEGO

10

11 THE PEOPLE OF THE STATE OF       )  Case No. SCD 144476
   CALIFORNIA,                      )
12                     Plaintiff,   )
   v.                               )
13                                  )  NOTICE AND
                                    )  MOTION FOR NEW TRIAL
14 KEVIN GUNN                       )  AND MEMORANDUM OF
                                    )  POINTS AND AUTHORITIES
15                                  )  IN SUPPORT THEREOF
                       Defendant.   )  (PENAL CODE §1181)
16                                  )  DATE: May 17, 2000
                                    )  DEPT: J. Enright, 9:00 a.m.
17 _____)

18     Please take notice that on the date, time and department noted

19 above, defendant Kevin Gunn will move the court for a new trial.

20     Defendant KEVIN GUNN submits the following Points and Authorities

21 in support of his motion for a new trial.  The motion is made on the

22 ground that the verdict was contrary to law and the evidence, the jury

23 was not impartial and relied on evidence that was not presented at the

24 trial and the numerous instances of law enforcement misconduct and

25 perjury rendered the trial fundamentally unfair in violation of Mr.

26 Gunn's constitutional right to a fair trial.

27

28

(130)

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

MAY 15 2000

By: D. HARDER, Deputy

## STATEMENT OF THE FACTS

The Court heard the trial in this matter and is thus familiar with the procedural and factual underpinnings of the instant action. It, therefore, will not be repeated in great detail herein.

The evidence in count 1 consisted, in part, of the testimony of Mr. *Dennis* ~~Duane~~ Loper and his in court identifications. Mr. Lopers' identifications of the defendant were made only in court at the preliminary hearing and at the trial. He affirmatively excluded him in a photo lineup (more on that later).

His description and composite drawing were nowhere close to the actual characteristics of Mr. Gunn. Mr. Gunn was affirmatively cleared at the scene by witness Burkholder and cleared once again by that same witness in a subsequent photo line up wherein he remembered Mr. Gunn and pointed him out to Det. Meaux.

The license plate number of the black "get away" car given was not even close to the one on the black car driven by Mr. Gunn when he was detained on 2/24/99.

The damage to the drivers' side was incapable of being seen by Mr. Loper as was established under cross-examination.

The jury utilized the damage to the car and the door from this count as crossover evidence with Count 2. The testimony of the defendant exiting the passenger and not the damaged drivers' side came from Officer Troussel.

The evidence pertinent here concerns the intentional withholding of exculpatory evidence by lead detective, Pete Griffin as well as the perjurious testimony of patrol officer Troussel with regard to the traffic stop made of Mr. Gunn on 2/24/qq. Though the jury hung on this count they clearly considered the evidence given on this count in its'

(131)

1  deliberations on the remaining counts as evidenced by their question in

2  that regard.

3       It was apparent from the formative stages of this case, including

4  the preliminary hearing, that Duane Loper was a pivotal witness for the

5  prosecution with regard to the identity of the robber of Mr. Kamien.

6  Despite providing descriptive information dramatically different than

7  the actual appearance of Mr. Gunn, Mr. Loper identified Mr. Gunn at

8  prelim and at trial as the robber.

9       Mr. Loper testified at the preliminary hearing, held on May 27,

10 1999, that he was shown at photo lineup containing Mr. Gunns' photograph

11 prior to the preliminary hearing. RT at 47:24-49:20. Counsel for Mr.

12 Gunn spent considerable time cross-examining Mr. Loper at the

13 preliminary hearing regarding the timing and presentation of the photo

14 lineup presented to Mr. Loper because the parties did not have any

15 report concerning such a line up. The confusion caused by this testimony

16 prompted defense counsel to specifically inquire of Detective Griffin as

17 to whether or not he was aware of such a line up and he answered in the

18 negative.158:7-10.

19      At the trial in this action, the prosecutor and defense counsel

20 were taken by surprise when Detective Meaux testified that he had shown

21 Mr. Loper a photo line up on April 9, ~~2000~~ 1999, the same day he showed

22 witness Burkholder the same spread. He further testified that he gave

23 both line up forms to Detective Griffin by leaving them in the same

24 envelope on his desk. Detective Griffin only turned the Burholder line

25 up over to the prosecution, thus the prosecution was unable to turn it

26 over to the defense.

27      The results of the photo line up exculpated Mr. Gunn in that Mr.

28 Loper had specifically excluded Mr. Gunn as the robber. This reality was

1  not known to the defense until after Mr. Loper had testified at the

2  preliminary hearing and the trial thus depriving the defense of an

3  extremely valuable tool for purposes of cross-examination at both

4  hearings. This deprivation came about as a direct result of the

5  intentional withholding of the line up results by Detective Griffin.

6  Officer Troussel also perjured himself when he testified that he

7  followed Mr. Gunn up and down streets and alleys before effectuating the

8  traffic stop detention that lead to Mr. Burkholder clearing Mr. Gunn of

9  any wrongdoing. This was proved conclusively by the dispatch tape played

10 for the jury and by the cross-examination of this witness.

11 Despite the weakness of this count, the jury hung 10-2 for guilt.

12 As to count 2, victim and clairvoyant, Carole Pomplin identified Mr.

13 Gunn in court. She failed to pick him out of a photo line up and failed

14 to identify him at the preliminary hearing. Her robber approached her

15 from behind and struck her to the ground. Her post incident description

16 did not fit Mr. Gunn. Her in court identification lacks the requisite

17 credibility to support this verdict.

18 Timmy Anderson, the witness from the car lot, could not identify

19 the robber in a photo line up, could not identify him at the preliminary

20 hearing and could not identify him in court.

21 Rose Anaya, the witness from the AMPM, could not identify the

22 robber in a photo line up, could not identify him at the preliminary

23 hearing and could not identify him in court.

24 The only evidence the jury could use to tie Mr. Gunn to this count

25 was the existence of a black car and Mr. Gunn having been detained in a

26 black car in Count 1. The black car was not described in any detail by

27 any of the witnesses. The black car driven by Mr. Gunn in the first

28 count did not fit the license plate description of the black car used by

1   the actual robber. In short, the jury could only have convicted Mr. Gunn

2   of the Pomplin robbery based on the fact of the black car. Clearly, such

3   evidence is insufficient, especially in light of Det. Eastus testimony

4   of having canvassed the neighborhood and coming across "hundreds" of

5   cars that could have fit the description of the one used in the

6   robberies.

7       As to Count 3, victim Fortunato identified Mr. Gunn in court at the

8   preliminary hearing and at the trial. This despite having been unable to

9   pick him out of a photo line up. Ms. Fortunato was no doubt confident

10   that the police had their man and identified Mr. Gunn out of that belief

11   as opposed recalling him from memory. She also testified that the robber

12   approached her from behind and knocked her down. She simply did not have

13   the opportunity to view the robber sufficient to make a credible

14   identification.

15       The evidence was uncontroverted that Mr. Gunn was in the store at

16   the time of the robbery based on the 911 call and the store video. The

17   descriptions given by witnesses Halloren and Stowall were inconsistent

18   with the defendant and they could not identify him in court or in a

19   photo lineup.

20       The jury chose to ignore these realities and convict an innocent

21   man as a favor to Paul Pfingst who should be grateful for their "pro-

22   active (pro-prosecution/law enforcement?)" stance.

23       They chose to assume, in the absence of evidence, that traffic cops

24   routinely completely misread license plates. They chose to assume, in

25   the absence of evidence, that the 911 call and the store video were not

26   synchronized. They chose to assume, in the absence of evidence, that the

27   defense was trying to trick them by darkening the composite. They chose

28   to ignore that not one witness described the robber as being taller than

1  6"4" tall and that the majority of the witnesses described the robber as

2  dark skinned with a thin to medium build, instead they casually noted

3  that witnesses can be wrong about such things. Finally, they chose to

4  ignore the withholding of exculpatory evidence by the lead detective

5  and the perjury of a key law enforcement officer in the case.

6

7                      STATEMENT OF LAW

8      Penal Code §1181 provides that the court may grant a new trial:

9      1. When the verdict is contrary to law or evidence.

10     The court may also grant a new trial whenever failure to do so would

11 result in denial of a fair trial.  People v. Davis (1973) 31 Cal.App.3d

12 106, 109.   The trial court's authority to grant a new trial on non-

13 statutory grounds derives from its constitutional duty to insure an

14 accused a fair trial.  Id. at 109.

15     A defendant in a criminal case has a constitutional right to have

16 the charges against him or her determined by a fair and impartial juror.
                        Blackwell

17 People v. Maxwell, (1987) 191 Cal.App.ed 925, 929.

18     This reality is why every juror must take an oath to "render true

19 verdict according only to evidence presented to you and the instructions

20 of the court". CCP section 232(b).

21     It is axiomatic that "the jury's receipt of evidence which has not

22 been admitted is error which creates a presumption of prejudice to the

23 defendant". People v. Sassounian, 182 Cal.App.3.399.

24     An important corollary to this rule is that a juror cannot "inject

25 his or her own expertise into the jury deliberations". People v.

26 Cabrera, (1991) 230 Cal.App.3d 303.

27     Jury misconduct under §1181(3) has long been considered grounds for

28 a new trial. See People v. Hedgecock (1990) 51 Cal.3d 395.

(135)

1   When presented with a motion for new trial predicated upon a claim
2   that the verdict returned is contrary to the law or evidence it is the
3   duty of the trial to independently review the evidence.  This standard
4   of independent review has existed as early as 1953 and was set out in
5   People v. Robarge, 41 Cal.2d 628:

6       "While it is the exclusive province of the jury to find the
7       facts, it is the duty of the trial court to see that this
8       function is intelligently and justly performed, and in the
9       exercise of its supervisory power over the verdict, the court,
10      on motion for a new trial, should consider the probative force
11      of the evidence and satisfy itself that the evidence as a
12      whole is sufficient to sustain the verdict."

13      [Id at 633, citations omitted.]

14   While the trial court is not free to ignore the verdict returned,
15   [People v. Lopez (1969) 1 Cal.App.3d 78, 85] it is not bound by the
16   jury's resolution of evidentiary conflicts.  People v. Veitch (1979) 89
17   Cal.App.3d 722, 730-731.

18      Thus the trial court not only has the power to rule on the
19   sufficiency of the evidence but the duty to do so.  People v. Borchers
20   (1958) 50 Cal.2d 321, 325.  This requires the court to give the moving
21   party the benefit of its independent judgement as to the sufficiency and
22   credibility of the evidence.  People v. Redmond (1969) 71 Cal.2d 745,
23   759-760.  Existing case law suggests a two prong test is to be applied
24   in reviewing an application for such relief; first a review of the
25   sufficiency of the evidence; and second, a determination on whether the
26   court deems the evidence to be believable.

27      It is also important to note that such relief may be granted
28   despite the fact that  the only evidence submitted is that of the

(136)
7

1  prosecution and is legally sufficient.  People v. Sarazzawski (1945) 27

2  Cal.2d 7, 16, cited in Vietch, supra.

3

4                    People v. Davis, (1973) 31 Cal.App.3d 106

5      The Davis court made crystal clear that trial courts have broad

6  discretion to consider whatever it deems appropriate in deciding new

7  trial motions in order to insure the fundamental fairness of the process

8  and to protect the defendants' unwavering right to due process:

9      "The power to grant a new trial on...nonstatutory grounds obviously

10  is derived from the trial courts constitutional duty to insure an accused

11  a fair trial...It is axiomatic that when an accused is denied that fair

12  and impartial trial guaranteed by law, such procedure amounts to a denial

13  of due process of law..." Id at 110.

14                              ARGUMENT

15

16      This motion is addressed to the trial courts' discretion to grant

17  a new trial when the evidence is insufficient to support the verdict and

18  when the trial itself was fundamentally unfair. As illustrated above,

19  there a few limits the law places on the court in exercising its

20  discretion in deciding this motion.

21      It is important for the court to note that Mr.Gunns` request is

22  based on the totality of the circumstances presented by the trial and

23  its' aftermath. He concedes that, standing only, the perjury of the

24  officers may be insufficient to warrant a new trial. Similarly, he

25  concedes that the letter from the foreman is not evidence of jury

26  misconduct per se. Frankly, the defense concedes that the post verdict

27  interviews did not reveal the existence of the standard instances of

28  misconduct that mormally form a good faith basis for a new trial request

1 based on those grounds. The defense contends, however, that the court may

2 consider such juror sentiment as one of the circumstances it may evaluate

3 in deciding this motion. It is submitted that when you had the instances

4 of perjury to the clearly expressed pro-prosecution bias of the jury with

5 the weakness of the evidence presented to support the verdict you have

6 a case where due process requires a new trial because the first one was

7 fundamentally unfair.

8    As demonstrated by the above authority the court must determine

9 whether the jury in this case did act "intelligently and justly" and be

10 satisfied that the probative force of the evidence viewed as a whole was

11 sufficient to sustain the verdict rendered.

12    It is respectfully submitted, based on the foregoing, that the jury

13 did not act intelligently and justly and that the evidence was

14 insufficient to support the verdicts.

15                              <u>CONCLUSION</u>

16    For all the reasons stated, Mr. Gunn respectfully requests that you

17 grant him a new trial.

18

19

20 DATED:   5-12-00

21

22                              Respectfully submitted,

23                              Steven Wadler

24                              Attorney for Defendant

25

26

27

28

(138)

9

# EXHIBIT

M

**Description:** Slip OP. Do35782  Pg 21

**Page:** 1 Page

C

We conclude Gunn made the required prima facie showing of good cause for disclosure of the jurors' identifying information. Gunn's motion for disclosure relied on the content of the juror's letter to establish a prima facie showing of good cause. The letter's statement that "had the jury been less proactive or less intelligent there would not have been a conviction," together with other statements in the letter, support a reasonable inference that there *may* have been jury bias or misconduct. Although the juror's letter by itself does not show conclusively either that the jury was biased or that the jury committed misconduct by convicting Gunn without sufficient evidence, it can reasonably be inferred from the letter's statements that the jurors may have engaged in improper actions in "proactively" deciding Gunn's guilt or innocence. Gunn should be given a reasonable opportunity to contact the jurors and determine whether there was, in fact, any juror bias or misconduct.

Because the statements in the juror's letter support a reasonable inference or belief that there may have been jury bias or misconduct, the trial court erred by finding that Gunn did not make the required prima facie showing of good cause for disclosure of the jurors' identifying information. (§ 237, subd. (b); *People v. Rhodes, supra*, 212 Cal.App.3d at pp. 551-552.) Therefore, the court abused its discretion by denying Gunn's motion for disclosure of juror identifying information. (*People v. Townsel, supra*, 20 Cal.4th at p. 1096; *People v. Jones, supra*, 17 Cal.4th at p. 317.) On remand, the trial court shall issue a new order granting Gunn's request and shall release to Gunn's counsel personal juror identifying information regarding the jurors in this case. Gunn shall then

21

(140)

# EXHIBIT
## N

**Description:** CALJIC 2.92 as given during Petitioner's trial and The Factors not specified during trial.

**Page:** 2 pages

(141)

## Factors Not Specified in CALJIC 2.92

1. **You must view eyewitness identification testimony with caution and evaluate it carefully.**

2. The length of time the witness saw the perpetrator.

3. The positions and distances between the witness and the perpetrator at various times.

4. The lighting conditions.

5. The presence or absence of any circumstances that might focus or distract the witness' attention.

6. Fairness of the photographic lineup.

7. Whether a perpetrator was familiar to the witness.

8. Whether a perpetrator was unfamiliar to the witness.

9. Testimony of an expert regarding acquisition, retention, or retrieval of information presented to the senses of a witness.

10. Whether the witness' memory was or was not affected by intervening time and events."

*After the first sentence of CALJIC 2.92, the Johnson instruction added the following language:

## Points and Authorities

People v. Johnson (92) 3 C4th 1183, 1234-35 [14 CR2d 702] provides authority for instruction upon several factors not specifically enumerated in CJ 2.92. The court concluded that the instruction given in Johnson "met the requirements set forth in [Wright] [and] it focused the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence, without improperly invading the domain of either jury or expert witness." (Johnson 3 C4th at 1234.) Hence the above factors, which the Johnson instruction added to CJ 2.92 (Johnson 3 C4th at 1230, fn 12), should be added upon request.

Improper or inadequate instruction upon witness credibility implicates the defendant's state (Art. 1 § 15 and § 16) and federal (6th and 14th Amendments) constitutional rights to trial by jury and due process. [See generally, 1 FORECITE Practice Guide § VII.]

Failure to adequately instruct the jury upon matters relating to proof of any element of the charge and/or the prosecution's burden of proof thereon violates the defendant's state (Art. 1 § 15 and § 16) and federal (6th and 14th Amendments) constitutional rights to trial by jury and due process. [See generally, 1 FORECITE Practice Guide § VII.]

## NOTES

Deletion of the Term "Alleged". Johnson's conclusion that deletion of the word "alleged" before the term "perpetrator" was in part founded upon defense counsel's statement that there was no need for the word "alleged." Hence, even though deletion of "alleged" from the instruction may not "lighten the prosecution's burden of proof" (Johnson 4 C3d at 1233), Johnson does not hold that the term should be deleted in a case where defense counsel specifically objects to such deletion.

(142)

# Cautionary Instruction:
## Eyewitness Failing To Attend Pretrial Lineup

*To be added at end of CALJIC 2.92:

- You should also consider the failure of the eyewitness to attend the pretrial lineup despite being requested to attend. You should view the witnesses' testimony as to eyewitness identification with caution, as it may be less reliable than if [he] [she] had attended the aforesaid lineup.

## Points and Authorities

In People v. Fernandez (90) 219 CA3d 1379, 1384 [269 CR 116], the court addressed the question of the appropriate sanction to be applied when certain witnesses fail to attend a court-ordered lineup which has been requested by the defendant. The court utilized People v. Zamora (80) 28 C3d 88, 99 [167 CR 573], to conclude that suppression of the in-court identification "is too harsh." (Fernandez at 1385.)

However, it is appropriate to give an instruction similar to the one set forth above. (Fernandez at 1385.)

Improper or inadequate instruction upon witness credibility implicates the defendant's state (Art. I § 15 and § 16) and federal (6th and 14th Amendments) constitutional rights to trial by jury and due process. [See generally, 1 FORECITE Practice Guide § VII.]

___ Given as Requested        ___ Given as Modified        ___ Refused/Reasons:

(143)

# EXHIBIT

**Description:** Sentencing Minutes

**Page:** 1 Page

S D S

SCD144476 DA PC946801    **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

DATE 05-26-00 AT 09:30 M.    99129854    PROB HEAR-SENTENCING 0200

PRESENT: HON KEVIN A. ENRIGHT _____    JUDGE PRESIDING DEPARTMENT 051

CLERK W. Hardin _____    REPORTER W. Foster _____    CSR# 7698

REPORTER'S ADDRESS: P.O. BOX 120128, SAN DIEGO, CA 92112-0128

THE PEOPLE OF THE STATE OF CALIFORNIA    Kate Bush

VS.    DEPUTY DISTRICT ATTORNEY

GUNN        KEVIN        0    A - D. ALTERNATE Steve Wadler

DEFENDANT    ATTORNEY FOR DEFENDANT (PD/APD/PCC/retained)

VIOLATION OF ~~PC211 Ct.1~~ dismissed on 12-2-99 PC211 Ct.2    PC211 Ct.3 Priors: No Prob per PC1203(e)(4)

1st serious felony per PC667(a)(1)    OATH ON FILE/SWORN

Strike Prior per PC667(a)-(i)    INTERPRETER

LANGUAGE P.O. Jessica Latumeten

DEFENDANT ☒ PRESENT ☐ NOT PRESENT. Δ's mother, Mrs Williams, & extensive family members present.

**PREV**
☐ DEFENDANT ADVISED OF RIGHTS AND ADMITS/DENIES A VIOLATION OF PROBATION _____    ☐ WAIVES HEARING.
PROBATION IS: ☐ FORMALLY/SUMMARILY ☐ REVOKED ☐ REINSTATED ☐ MODIFIED ☐ CONTINUED ☐ ST&C ☐ EXTENDED TO: _____

**JUDGMENT**
☒ WAIVES ARRAIGNMENT. ☐ ARRAIGNED FOR JUDGMENT. ☐ IMPOSITION/EXECUTION OF SENTENCE IS SUSPENDED.
☒ PROBATION IS: ☒ DENIED ☐ GRANTED _____ YEARS (FORMAL/SUMMARY) TO EXPIRE _____
☐ COMMITMENT TO SHERIFF FOR _____ DAYS. STAYED TO _____. ☐ ADULT INST. RECOMMENDED. ☐ PAROLE NOT TO BE GRANTED.
☐ PERFORM _____ HRS/DAYS PSP/VOL. WORK AT NONPROFIT ORG. SUBMIT PROOF TO PROBATION/COURT BY _____.
☐ FOURTH AMENDMENT WAIVER OF PERSON/AUTO/RESIDENCE/PERSONAL EFFECTS. ☐ SHORT TERM WORK FURLOUGH, REPORT: _____
☐ FURTHER CONDITIONS ARE SET FORTH IN PROBATION ORDER. ☐ VEHICLE INTERLOCK DEVICE (VC 23235/23246).
☐ DEFENDANT IS COMMITTED TO THE CALIFORNIA YOUTH AUTHORITY ☐ PER WI 1737
☒ DEFENDANT IS COMMITTED TO THE DEPARTMENT OF CORRECTIONS ☐ PER PC 1170(d).    Total
☒ FOR _____ ~~LOWER/MIDDLE/~~UPPER TERM OF 10 YEARS/~~MONTHS/TO LIFE~~    Term:
ON COUNT 2 CODE & NO. PC 211 ☒ PRINCIPAL COUNT.    17 years
☒ CIRCUMSTANCES IN ~~MITIGATION/~~AGGRAVATION OUTWEIGH THOSE IN MITIGATION/~~AGGRAVATION~~.
☐ NO VIOLATION, PER PC 1202.05. VICTIM IS UNDER 18 YRS. OF AGE. DA TO COMPLY WITH NOTICES.
☒ DEFENDANT IS ADVISED REGARDING ~~PAROLE/~~APPEAL RIGHTS. ☐ REGISTRATION PER PC 290/HS 11590/PC 457.1. ☐ TESTING PER PC 1202.1/PC 296.
☐ FINE OF $ _____ PLUS PENALTY ASSESSMENT.
☒ RESTITUTION FINE OF $ 5,000 _____ PER PC 1202.4(b). ☒ FORTHWITH PER PC 2085.5.
☒ RESTITUTION FINE OF $ 5,000 _____ PER PC 1202.45 SUSPENDED UNLESS PAROLE IS REVOKED.
☒ RESTITUTION TO VICTIM(S) PER P.O.'S REPORT/REST. FUND PER PC 1202.4(f) OF see below /IN AN AMOUNT TO BE DETERMINED.
☐ AT $ _____ PER MONTH. ☐ COMBINED RATE. TO START 60 DAYS AFTER RELEASE/ON _____ THROUGH REVENUE AND RECOVERY.
☐ DEFENDANT TO PAY PRE-PLEA INVESTIGATION AND REPORT PREPARATION COSTS. ☐ DEFENDANT TO PAY BOOKING FEES.
☐ REFERRED TO REVENUE AND RECOVERY. ☐ COURT APPOINTED ATTORNEY FEES ORDERED IN THE AMOUNT OF $ _____.

CREDIT FOR TIME SERVED
396 DAYS LOCAL
_____ DAYS STATE INST.
198 DAYS PC 4019/~~2933.1~~
594 TOTAL DAYS CREDIT

**CUST STAT**
☒ DEFENDANT REMANDED TO CUSTODY OF SHERIFF. ☒ WITHOUT BAIL. ☐ WITH BAIL SET AT $ _____
☐ DEFENDANT ORDERED RELEASED FROM CUSTODY. ☐ ON PROBATION. ☐ ON OWN/SUPERVISED RECOGNIZANCE. ☐ THIS CASE ONLY.
☐ DEFENDANT TO REMAIN AT LIBERTY. ☐ ON BOND POSTED $ _____. ☐ ON PROBATION. ☐ ON OWN/SUPERVISED RECOGNIZANCE.

**FUT HRGS**
☐ DEFENDANT WAIVES STATUTORY TIME FOR PRONOUNCEMENT OF JUDGMENT.
☐ DEFENDANT REFERRED FOR DIAGNOSTIC EVALUATION. ☐ PER PC 1203.03. ☐ PER WI 707.2.
_____ CONTINUED TO/SET FOR _____ AT _____ M. IN DEPT. _____ ON MOTION
OF COURT/DDA/DEFENDANT/PROBATION OFFICER. REASON: _____

**WRNTS BONDS**
☐ BENCH WARRANT TO ISSUE, BAIL SET AT $ _____. ☐ SERVICE FORTHWITH. ☐ ORDERED WITHHELD TO _____
☐ BENCH WARRANT ISSUED/ORDERED _____ IS RECALLED/RESCINDED.
☐ BAIL IS ☐ EXONERATED. ☐ FORFEITED. AMOUNT $ _____. BOND NO. _____
BOND COMPANY _____ AGENT _____

**MH**
☐ PROCEEDINGS SUSPENDED ☐ PER PC 1368, MENTAL COMPETENCY. (SEE BELOW FOR DATES OF EXAMINATION AND HEARING.)
☐ PER WI 3051, ADDICTION OR DANGER OF ADDICTION. (SEE BELOW FOR SERVICE DATE OF PETITION AND ORDER.)

**OTHER**
☐ SUPPLEMENTAL REPORT ORDERED. ☒ REPORT TO REGISTRAR OF VOTERS. ☐ DMV ABSTRACT. B.A.C. _____ Media Request granted.
Defense motion for new trial is denied. Sentenced per PC667(b)-(i) & PC1170.12.
Count 3 - PC211 - ~~Upper~~ 1/3 Mid-term - 2 years - Consecutive
1st serious felony Prior - PC667(a)(1) - 5 years - Consecutive
Restitution to Victim Fortunato in the amount of $2,000. Restitution to Victim Pomplin in the
amount of $328. Further Restitution to be determined/modified by the court if a loss
is reported.

SDSC CR-28(Rev. 6-99)    **CRIMINAL MINUTES - PRONOUNCEMENT OF JUDGMENT**    JUDGE OF THE SUPERIOR COURT
KEVIN A. ENRIGHT

(145)

# EXHIBIT
# P

**Description:** Declaration of Attorney
Nancy J. King

**Page:** 1 page

## DECLARATION OF NANCY J. KING

I, Nancy J King, do hereby declare:

1.     I am an attorney licensed to practice law in the State of California, Bar Number 163477;

2.     I represented Kevin Gunn in appellate procedures in Case Numbers D035782 and D041821;

3.     During the appeal, I did not raise any issue challenging the procedure by which witnesses identified a vehicle. The reason I did not challenge the identification process was because it was not, in my opinion, an issue that would have a reasonable chance of success in the Court of Appeal.  I was not aware of any authority by which a judge would have sustained an objection to the evidence, or if such an objection were erroneously overruled, that would have resulted in a finding of prejudice by the Court of Appeal.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     Dated: September 15, 2005

                                        _____
                                        NANCY J. KING

(147)

# EXHIBIT

Q

**Description:** Prelim transcripts re: Doepker
receiving money

**Page:** 5 pages

1    A    CORRECT.

2    Q    AND AT THE TIME, WHEN YOU SAW HIM ON THE DATE

3 THAT YOU HEARD THE WOMAN SCREAM, IS IT FAIR TO SAY THAT YOU

4 WERE LIVING ON THE STREET?

5    A    YEAH.  I AM LIVING ON THE STREET, YES.

6    Q    AND IS IT FAIR TO SAY THAT OSCAR WAS LIVING ON

7 THE STREET?

8    A    YES.

9    Q    IS IT FAIR TO SAY THAT YOU WERE DRINKING EVERY

10 DAY DURING THIS TIME PERIOD?

11    A    I DRINK EVERY DAY.  I DO DRINK EVERY DAY.

12    Q    AND HAVE YOU HAD ANYTHING OF AN ALCOHOLIC NATURE

13 TO DRINK TODAY?

14    A    ABSOLUTELY, YES.

15    Q    OKAY.  AND WHAT -- WHAT HAVE YOU DRANK PRIOR TO

16 COMING TO COURT TODAY?

17    A    JUST A 32-OUNCE COBRA.

18    Q    32-OUNCE --

19    A    COBRA.

20    Q    OKAY.  A MALT LIQUOR.

21    A    RIGHT.

22    Q    AND ON THE DATE THAT YOU MADE THESE OBSERVATIONS,

23 HOW MUCH HAD YOU -- WHAT DID YOU DRINK?

24    A    SAME THING.  ABOUT THE SAME AMOUNT.

25    Q    AND THE SA -- WERE YOU DRINKING WITH OSCAR THAT

26 DAY?

27    A    NO.  I HADN'T SEEN OSCAR FOR ABOUT AN HOUR BEFORE

28 THAT.

SEE PG 133
(149)

1          Q      OKAY.  THE CLO -- WHERE DID YOU GET THE CLOTHES

2     THAT YOU'RE WEARING TODAY?

3          A      I WENT TO A THRIFT STORE AND ASKED THEM IF I

4     COULD GET SOME CLOTHES.

5          Q      ALL RIGHT.

6          A      BECAUSE I DIDN'T WANT TO COME IN MY REG -- YOU

7     KNOW, MY CLOTHES ARE GETTING KIND OF BAD.

8          Q      HAVE YOU RECEIVED ANY MONEY FROM EITHER A POLICE

9     OFFICER OR A DISTRICT ATTORNEY'S INVESTIGATOR?

10         A      YEAH.  MR. GRIFFIN HAS ALLOWED ME SOME MONEY.

11         Q      OFFICER -- DETECTIVE GRIFFIN HAS GIVEN YOU SOME

12    MONEY?

13         A      RIGHT.

14         Q      HOW MUCH MONEY HAS HE GIVEN YOU?

15         A      TO RELOCATE BECAUSE OF THREATS.

16         Q      OKAY.

17         A      I'M NOT REALLY SURE EXACTLY HOW MUCH.

18         Q      AND HAS ANYONE ELSE GIVEN YOU MONEY?

19         A      NO.

20         Q      THE D.A. INVESTIGATOR GAVE YOU TEN BUCKS THE

21    OTHER DAY.

22         A      OH, YEAH.  YEAH.  THAT WAS -- YEAH, HE DID.

23         MR. WADLER:  IF I COULD HAVE ONE MOMENT, YOUR HONOR.

24         THE COURT:  ALL RIGHT.

25                    (PAUSE IN PROCEEDINGS.)

26    BY MR. WADLER:

27         Q      DID YOU HAVE ANY CONTACT WITH THE POLICE ON THE

28    DAY THAT YOU HEARD THE WOMAN SCREAM?

(150)

1        A    YES.

2        Q    WHEN YOU HAD CONTACT WITH THE POLICE ON THE DAY

3   THAT YOU HEARD THE WOMAN SCREAM, WAS OSCAR WITH YOU?

4        A    YES, HE WAS.   *See Police report by officer Grubbs
             #14776

5        Q    DID HE TALK TO THE POLICE THAT DAY, DO YOU KNOW?

6        A    YES, HE DID.  YES.  *There is no mention of Oscar Vega
             talking to the police on 4-6-99

7        Q    IN ADDITION TO THE ALCOHOL, HAVE YOU CONSUMED ANY

8   DRUGS?

9        A    NO.

10       MR. WADLER:  THAT'S ALL I HAVE, YOUR HONOR.

11       THE COURT:  ANY QUESTIONS ON REDIRECT?

12       MS. BUSH:  YES, YOUR HONOR.

13

14                    REDIRECT EXAMINATION

15   BY MS. BUSH:

16       Q    YOU SAID THAT YOU WERE GIVEN MONEY TO RELOCATE

17   BECAUSE OF THREATS.

18       A    RIGHT.

19       Q    DO YOU RECOGNIZE ANYONE IN THE COURTROOM TODAY

20   WHO THREATENED YOU?

21       MR. WADLER:  I'M GOING TO OBJECT --

22       THE WITNESS:  NOT ANYBODY THAT THREATENED ME.

23       MR. WADLER:  -- TO THE FORM OF THE QUESTION --

24       THE COURT:  WELL --

25       MR. WADLER:  -- AS --

26       THE COURT:  HIS ANSWER WILL STAND.  HE SAID HE DIDN'T

27   RECOGNIZE ANYBODY IN THE COURTROOM.

28       MS. BUSH.  OKAY.

(151)

*Dowler*

1   BY MS. BUSH:

2        Q    YOU SAID --

3        A    NOBODY THREATENED ME, NO.

4        Q    OKAY.  BUT DO YOU RECOGNIZE ANYONE IN THE

5   COURTROOM WHO'S CONTACTED YOU AFTER YOU TALKED TO THE

6   POLICE?

7        A    YES, I DO.

8        Q    ALL RIGHT.  AND WHO MIGHT THAT BE?

9        A    THE GENTLEMAN SITTING OVER THERE.

10       Q    WHAT DOES HE LOOK LIKE?

11       A    BIG BLACK GUY.

12       Q    OKAY.  WHAT IS HE WEARING?

13       A    HE'S GOT A BLACK SHIRT ON.

14       Q    A BLACK SHIRT ON?

15       A    (NODS HEAD AFFIRMATIVELY.)

16       Q    AND IS HE SITTING IN THE AUDIENCE?

17       A    YES.

18       Q    ALL RIGHT.  AND HOW IS IT THAT THIS GENTLEMAN

19   CONTACTED YOU AFTER YOU TALKED TO THE POLICE?

20       A    HE ASKED ME ABOUT WHERE A STREET WAS, AND I

21   DIDN'T KNOW WHERE THE STREET WAS, AND THEN A LITTLE BIT

22   LATER HE TOOK A PICTURE.

23       Q    OF YOU?

24       A    YES.

25       Q    AND DID HE TAKE A PICTURE OF OSCAR VEGA, TOO?

26       A    OSCAR SAID HE DID.  I DON'T KNOW IF HE DID OR

27   NOT.

28       Q    OKAY.  DID HE EVER COME AROUND TO THE

*Docket*

1    MS. BUSH:  YOUR HONOR, THE PEOPLE HAVE NO FURTHER

2    QUESTIONS AS TO THIS WITNESS.

3         THE COURT:  ANY QUESTIONS ON RECROSS?

4

5                    RECROSS-EXAMINATION

6    BY MR. WADLER:

7         Q    NOW, THE GENTLEMAN THAT YOU'RE TALKING ABOUT, HE

8    DIDN'T THREATEN YOU IN ANY WAY, DID HE?

9         A    NO.

10        Q    IN FACT, WHEN YOU TERMINATED THE CONVERSATION

11   WITH HIM, HE GAVE YOU A BUCK.

12        A    YES, HE DID.

13        Q    AND HOW LONG WERE YOU PUT UP BY THE DISTRICT

14   ATTORNEY'S OFFICE?

15        A    WELL, THE OFFICE DIDN'T -- MR. GRIFFIN DID

16   HIMSELF, HELPED ME OUT, ABOUT TWO WEEKS, WEEK-AND-A-HALF,

17   TWO WEEKS.

18        Q    HE PUT YOU IN A HOTEL FOR A COUPLE OF WEEKS?

19        A    WELL, I USED IT FOR THAT, YES, AND FRIENDS OF

20   MINE, GAVE THEM MONEY SO I COULD STAY.    *special consideration for a witness*

21        Q    SO WHO GAVE YOU MONEY?

22        A    SO I COULD STAY AT A FRIEND'S HOUSE.  I GAVE THEM

23   MONEY.    *How much did Griffin give him*

                                        *$ 300.00*

24        MR. WADLER:  ALL RIGHT.  THAT'S ALL I HAVE, YOU HONOR.

25        THE COURT:  ANYTHING FURTHER?

26        MS. BUSH:  NOTHING FURTHER, YOUR HONOR.

27        THE COURT:  ANY OBJECTION TO THIS WITNESS BEING

28   EXCUSED?

# EXHIBIT

**Description:** Order denying Habeas Corpus Petition

**Page:** 4 Pages



FEB 0 1 2008

By: _____, Deputy

1

2

3

4

5

6

7

8                    **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **IN AND FOR THE COUNTY OF SAN DIEGO**

10    IN THE MATTER OF THE APPLICATION OF:    )
                                              )
11    KEVIN GUNN,                             )    HC 18350
                                              )    SCD 144476
12              Petitioner.                   )
                                              )    ORDER DENYING PETITION FOR WRIT
13                                            )    OF HABEAS CORPUS
                                              )
14                                            )
                                              )
15    _____)

16          AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE

17    COURT FILE IN THE ABOVE REFERENCED MATTER, THE COURT FINDS AS

18    FOLLOWS:

19          On September 17, 1999, a jury convicted petitioner of two counts of Robbery (Pen. Code

20    § 211). One of the counts carried an enhancement pursuant to Penal Code section 667. The

21    court sentenced petitioner to 17 years. Defendant filed a timely notice of appeal. In the appeal,

22    petitioner raised issues of (1) insufficient evidence to support the judgment, (2) trial court error

23    by (a) excluding evidence of third party culpability, (b) denying a motion for disclosure of juror

24    identifying information, and (c) denying his motion for a new trial. The court of appeal affirmed

25    the judgment, but then remanded reversing the orders denying the motion for disclosure of juror

26    information and new trial. After further motion hearings and another appeal, the court of appeal

27    affirmed the guilty judgment on August 17, 2004.

28          Petitioner filed his first petition for writ of habeas corpus with this court on November 4,

                                          ORDER - 1

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| ☒ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814<br>☐ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827<br>☐ FAMILY COURT, 1501 6TH AVE., SAN DIEGO, CA 92101-3296<br>☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105<br>☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649<br>☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792<br>☐ JUVENILE COURT, 1701 MISSION AVE., OCEANSIDE, CA 92054-7102 | F I L E D<br>Clerk of the Superior Court<br><br>FEB 0 1 2008<br><br>By: _____, Deputy |
| PLAINTIFF(S)/PETITIONER(S)<br><br>The People of The State of California | |
| DEFENDANT(S)/RESPONDENT(S)<br><br>KEVIN GUNN | JUDGE: ____<br><br>DEPT: ____ |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL**<br>**(CCP 1013a(4))** | CASE NUMBER<br><br>HC 18350 |

I certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER DENYING PETITON FOR WRIT OF HABEAS CORPUS

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:   ☒ San Diego   ☐ Vista   ☐ El Cajon   ☐ Chula Vista   ☐ Oceanside   ☐ Ramona, California.

| <u>NAME</u> | <u>ADDRESS</u> |
|---|---|
| KEVIN GUNN | CDC# P78894<br>P.O. BOX 608<br>TEHACHAPI, CA 93581 |
| SAN DIEGO COUNTY DISTRICT ATTORNEY'S OIFFICE<br>APPELLATE DIVISION | P.O. BOX 121011<br>SAN DIEGO, CA 92112-1011 |

CLERK OF THE SUPERIOR COURT

Date:02/01/08____          By J. HOBBS_____, Deputy

## PROOF OF SERVICE BY MAIL

### BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _Kevin O. Gunn_____, declare:

I am over 18 years of age and a party to this action. I am a resident of _____

_____Prison,

in the county of _____,

State of California. My prison address is: _____,

_____

_____

On_____,

(DATE)

I served the attached: _Writ of Habeas Corpus_____

_6 Copies Sent + Motion For appointment of Counsel_

(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

United States District Court
Southern District Of California
880 Front St. Rm 4290
San Diego Ca 92101-8900

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on _5/22/08_____          _____

(DATE)                                    (DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)                        ::ODMA\PCDOCS\WORDPERFECT\22832\1

(154)

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Kevin Gunn

**FILING FEE PAID**
Yes    No
**IFP MOTION FILED**
Yes    No
**COPIES SENT TO:**
Court

J.F. Salazar, et al

**FILED**
MAY 2 7 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Imperial
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Kevin Gunn
PO Box 2349
Blythe, CA 92226
P-78894

**ATTORNEYS (IF KNOWN)**

'08 CV 0972 LAB WMc

| **II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY) | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT (For Diversity Cases Only) | | | |
|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | | PT  DEF | | PT  DEF |
| | | Citizen of This State | ☐1 ☐1 | Incorporated or Principal Place of Business in This State | ☐4 ☐4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III | Citizen of Another State | ☐2 ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 ☐5 |
| | | Citizen or Subject of a Foreign Country | ☐3 ☐3 | Foreign Nation | ☐6 ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

## 28 U.S.C. 2254

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

| **VII. REQUESTED IN COMPLAINT:** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See Instructions):   JUDGE _____   Docket Number _____

DATE   5/27/2008        SIGNATURE OF ATTORNEY OF RECORD

[signature]